# Exhibit A

## Savannah Stevenson

| | |
|---|---|
| **From:** | Mermelstein, Rebecca (USANYS) <Rebecca.Mermelstein@usdoj.gov> |
| **Sent:** | Wednesday, March 30, 2016 10:33 AM |
| **To:** | Savannah Stevenson |
| **Subject:** | RE: Richard Lee sentencing |

Yes of course.

**From:** Savannah Stevenson [mailto:sstevenson@morvillolaw.com]
**Sent:** Monday, March 28, 2016 3:11 PM
**To:** Mermelstein, Rebecca (USANYS)
**Subject:** Richard Lee sentencing

Hi Rebecca,

I got your voicemail about pushing Richard's sentencing out past the *Salman* decision.  While we are not opposed to that idea, the client is still making a determination.
I am starting to get concerned voicemails and emails from the probation officer so, for at least the time being, would you consent to a 90-day adjournment based on our ongoing discussions?  We can certainly adjourn for the longer term at a later date, but I would like to put in a 90-day adjournment request simply to alert the court and give the probation officer some comfort.

Thanks,
Savannah

*Savannah Stevenson*
**MORVILLO LLP**
500 Fifth Avenue
New York, New York 10036
Tel: 212.796.6342
Email: sstevenson@morvillolaw.com
www.morvillolaw.com

# Exhibit B

**From:**
**To:**        svcsacimauditor.com
**Sent:**      1/22/2011 7:21:07 AM
**Subject:**   12372080 F: Cohen, Steve F: SteveC@saccap.int T: rleesac

Conversation Transcript
Name: Cohen, Steve
Employee ID: SteveC@saccap.int
Buddy Name: cas359
Conversation ID: 12372080

Sent Time From Message
2009-07-10 09:13:01.000 AIM:rleesac Hi Steve, just tried reaching you on your cell Re YHOO. I
mentioned the Collins Stewart call on YHOO this morning, they seem to think something might
happen within 2 wks. We have no view regarding this but 1) Collins Stewart has been the only
broker in line with our views regarding the initial 'coldness' of discussions and now they are
the only broker to turn positive regarding the discussions. We're trying to be price sensitive
as we think upside might be $17.50-$19 on a deal, depending on the spit of economics between
YHOO and MSFT (many possible permutations..)
2009-07-10 09:13:01.000 AIM:rleesac Instant Messages sent to or from this address may be
monitored and/or recorded.
2009-07-10 09:13:31.000 AIM:cas359 k

FOIA Confidential Treatment Requested

SAC3281948

# Exhibit C

| | |
|---|---|
| **Sent:** | Friday, July 10, 2009 9:10 AM |
| **To:** | svcsacinstantmessage |
| **Subject:** | 12382034 T: richardle@imtrader.com T: Lee, Richard (richardle@imtrader.com) T: RichardLe@saccap.int |

Conversation Transcript
Employee Name: N/A
Employee's ID: N/A
Employee Email:
Employee's Buddy Name: default *rldb chatroom listener IP Address:
Internal conversation: Yes

Participant's Buddy Name: richardle@imtrader.com Participant's Name: Lee, Richard Participant's ID:
RichardLe@saccap.int Participant's Email address: Richard.Lee@sac.com

Conversation ID: 12382034

| Sent Time | From | Message |
|---|---|---|
| 2009-07-10 09:09:54.000 | IMTrader:richardle@imtrader.com | Where is TAA NO trading? |
| 2009-07-10 09:10:37.000 | IMTrader:davidbl@imtrader.com | 106.70 -5.50 |
| 2009-07-10 09:15:48.000 | IMTrader:davidbl@imtrader.com | GLW: Davenport upgrades to Buy from Neutral - - on valuation and positive data points last few weeks. $18 target. |
| 2009-07-10 09:25:11.000 | IMTrader:richardle@imtrader.com | Let's pickup 30,000 more TAA under 107 NOK pls? |
| 2009-07-10 09:25:23.000 | IMTrader:davidbl@imtrader.com | ok TAA |
| 2009-07-10 09:38:00.000 | IMTrader:davidbl@imtrader.com | Collins Mike Herrero [09:36:07 AM]: Sandeep, my msft / yhoo analyst is making a major call that the recently cooled off MSFT / YHOO talks have heated back up in a big way. He believes it's possible something could happen in the next week or two based on his channel checks as YHOO has come back to the table since Bing has debuted to strong mkt share gains. |
| 2009-07-10 09:46:35.000 | IMTrader:davidbl@imtrader.com | Wedbush [09:46:06 AM]: We expect Polycom (PLCM, BUY, $24 PT) to post results that will likely exceed guidance as demand for video conferencing rebounded slightly in Q2 |
| 2009-07-10 09:46:49.000 | IMTrader:davidbl@imtrader.com | chandler hearing bhp for mos |
| 2009-07-10 09:47:13.000 | IMTrader:davidbl@imtrader.com | YHOO cohe bot 300k to get to 1.1M position |
| 2009-07-10 09:49:13.000 | IMTrader:davidbl@imtrader.com | YHOO 14.95 |
| 2009-07-10 09:49:33.000 | IMTrader:richardle@imtrader.com | How's TAA NO doing? |
| 2009-07-10 09:49:40.000 | IMTrader:davidbl@imtrader.com | FNF bot 19k @ 12.80, working 81k 12.80 |
| 2009-07-10 09:50:38.000 | IMTrader:davidbl@imtrader.com | TAA 107.79 -4.41 -- not much trading since we went in -- bot 1k so far only |
| 2009-07-10 09:50:54.000 | IMTrader:richardle@imtrader.com | Buy 100,000 YHOO < 95 cents pls. Short 3,500 GOOG > 414.75 to hedge. |
| 2009-07-10 09:50:59.000 | IMTrader:davidbl@imtrader.com | k yhoo / goog |
| 2009-07-10 09:52:23.000 | IMTrader:davidbl@imtrader.com | Michigan soon |
| 2009-07-10 09:53:54.000 | IMTrader:davidbl@imtrader.com | SPUs + |
| 2009-07-10 09:54:21.000 | IMTrader:davidbl@imtrader.com | YHOO bot 100k @ 14.96 vs GOOG ss 3,500 @ 415.04 |
| 2009-07-10 09:55:23.000 | IMTrader:davidbl@imtrader.com | Gerard says Michigan weak -- 64.6 |
| 2009-07-10 09:55:35.000 | IMTrader:davidbl@imtrader.com | vs 70 est |

FOIA Confidential Treatment Requested
Confidential Grand Jury Materials Subject to Fed. R. Crim. P. 6(e)

SAC_YHOO00000032

| | | |
|---|---|---|
| 2009-07-10 09:58:02.000 | IMTrader:richardle@imtrader.com | Pls buy another 100,000 YHOO > 95 cents. |
| 2009-07-10 09:58:08.000 | IMTrader:davidbl@imtrader.com | k yhoo |
| 2009-07-10 09:58:11.000 | IMTrader:davidbl@imtrader.com | taa back in range |
| 2009-07-10 10:01:14.000 | IMTrader:davidbl@imtrader.com | YHOO bot 30k, leave 70k |
| 2009-07-10 10:05:10.000 | IMTrader:davidbl@imtrader.com | YHOO bot 60k, leave 40k |
| 2009-07-10 10:08:17.000 | IMTrader:davidbl@imtrader.com | YHOO cohe buying 200k more |
| 2009-07-10 10:08:22.000 | IMTrader:richardle@imtrader.com | OK |
| 2009-07-10 10:18:28.000 | IMTrader:richardle@imtrader.com | Pls sell 50,000 POT > 30 cents now. |
| 2009-07-10 10:18:32.000 | IMTrader:davidbl@imtrader.com | ok POT |
| 2009-07-10 10:18:36.000 | IMTrader:richardle@imtrader.com | Just sell it now. |
| 2009-07-10 10:18:39.000 | IMTrader:richardle@imtrader.com | No price limit. |
| 2009-07-10 10:18:40.000 | IMTrader:richardle@imtrader.com | Thanks, |
| 2009-07-10 10:18:45.000 | IMTrader:same@imtrader.com  ok POT | |
| 2009-07-10 10:19:59.000 | IMTrader:richardle@imtrader.com | Sell it all pls. |
| 2009-07-10 10:20:14.000 | IMTrader:same@imtrader.com  ok POT | |
| 2009-07-10 10:20:33.000 | IMTrader:same@imtrader.com  POT sold 50k @ 94.16, leave 7k5 to get flat | |
| 2009-07-10 10:21:27.000 | IMTrader:richardle@imtrader.com | We out yet? |
| 2009-07-10 10:21:31.000 | IMTrader:richardle@imtrader.com | Let me know pls. |
| 2009-07-10 10:21:43.000 | IMTrader:davidbl@imtrader.com | leave 25k |
| 2009-07-10 10:22:44.000 | IMTrader:davidbl@imtrader.com | POT sold 125k @ 93.80 to flatten |
| 2009-07-10 10:24:46.000 | IMTrader:richardle@imtrader.com | ddbrawn [10:22:43 AM]: we dumping |
| POTddbrawn [10:22:48 AM]: if so we can hold off on qqqs | | |
| 2009-07-10 10:24:51.000 | IMTrader:richardle@imtrader.com | Can you hold off on the QQQQs... |
| 2009-07-10 10:25:00.000 | IMTrader:davidbl@imtrader.com | k QQQQ |
| 2009-07-10 10:26:13.000 | IMTrader:davidbl@imtrader.com | HBAN covered 120k, leave 380k and USB |
| covered 65k, leave 260k vs QQQQ ss 65k @ 35.03 | | |
| 2009-07-10 10:28:06.000 | IMTrader:davidbl@imtrader.com | YHOO we leave 40k 14.95 below - should we |
| clean up in here? | | |
| 2009-07-10 10:30:03.000 | IMTrader:davidbl@imtrader.com | TAA NA bot 22k, leave 8k |
| 2009-07-10 10:30:10.000 | IMTrader:richardle@imtrader.com | No let's wait on YHOO. |
| 2009-07-10 10:30:17.000 | IMTrader:davidbl@imtrader.com | ok, np |
| 2009-07-10 10:30:23.000 | IMTrader:richardle@imtrader.com | We don't 'leave 40k' really... we leave 3mm |
| shares... | | |
| 2009-07-10 10:30:26.000 | IMTrader:richardle@imtrader.com | :( |
| 2009-07-10 10:31:37.000 | IMTrader:richardle@imtrader.com | Look at POT go... |
| 2009-07-10 10:31:38.000 | IMTrader:davidbl@imtrader.com | :-! |
| 2009-07-10 10:31:46.000 | IMTrader:richardle@imtrader.com | So volatile... |
| 2009-07-10 10:31:47.000 | IMTrader:davidbl@imtrader.com | i know - great out |
| 2009-07-10 10:32:30.000 | IMTrader:davidbl@imtrader.com | MasterCard: Q2 est trimmed but earnings are |
| still expected to be above consensus - Barclays | | |
| 2009-07-10 10:44:33.000 | IMTrader:richardle@imtrader.com | How's TAA NO? |
| 2009-07-10 10:44:39.000 | IMTrader:davidbl@imtrader.com | bot 22k, leave 8k w/ 107 top |
| 2009-07-10 10:44:47.000 | IMTrader:richardle@imtrader.com | Where is stock? |
| 2009-07-10 10:44:54.000 | IMTrader:davidbl@imtrader.com | 108 -4.20 |
| 2009-07-10 10:44:57.000 | IMTrader:richardle@imtrader.com | OK |
| 2009-07-10 10:45:05.000 | IMTrader:davidbl@imtrader.com | so probably ok |
| 2009-07-10 10:45:11.000 | IMTrader:davidbl@imtrader.com | YHOO back <15 |
| 2009-07-10 10:45:25.000 | IMTrader:richardle@imtrader.com | we're 14.95 top on 40k (with 3M in our pocket!) |
| 2009-07-10 10:48:38.000 | IMTrader:richardle@imtrader.com | YHOO Buy 500,000 < 15 pls |
| 2009-07-10 10:48:44.000 | IMTrader:davidbl@imtrader.com | ko YHOO |
| 2009-07-10 10:51:16.000 | IMTrader:davidbl@imtrader.com | MAR: ISI vanilla buyer 75k+ |

2

SAC_YHOO00000033

| | | |
|---|---|---|
| 2009-07-10 09:58:02.000 | IMTrader:richardle@imtrader.com | Pls buy another 100,000 YHOO > 95 cents. |
| 2009-07-10 09:58:08.000 | IMTrader:davidbl@imtrader.com | k yhoo |
| 2009-07-10 09:58:11.000 | IMTrader:davidbl@imtrader.com | taa back in range |
| 2009-07-10 10:01:14.000 | IMTrader:davidbl@imtrader.com | YHOO bot 30k, leave 70k |
| 2009-07-10 10:05:10.000 | IMTrader:davidbl@imtrader.com | YHOO bot 60k, leave 40k |
| 2009-07-10 10:08:17.000 | IMTrader:davidbl@imtrader.com | YHOO cohe buying 200k more |
| 2009-07-10 10:08:22.000 | IMTrader:richardle@imtrader.com | OK |
| 2009-07-10 10:18:28.000 | IMTrader:richardle@imtrader.com | Pls sell 50,000 POT > 30 cents now. |
| 2009-07-10 10:18:32.000 | IMTrader:davidbl@imtrader.com | ok POT |
| 2009-07-10 10:18:36.000 | IMTrader:richardle@imtrader.com | Just sell it now. |
| 2009-07-10 10:18:39.000 | IMTrader:richardle@imtrader.com | No price limit. |
| 2009-07-10 10:18:40.000 | IMTrader:richardle@imtrader.com | Thanks, |
| 2009-07-10 10:18:45.000 | IMTrader:same@imtrader.com  ok POT | |
| 2009-07-10 10:19:59.000 | IMTrader:richardle@imtrader.com | Sell it all pls. |
| 2009-07-10 10:20:14.000 | IMTrader:same@imtrader.com  ok POT | |
| 2009-07-10 10:20:33.000 | IMTrader:same@imtrader.com  POT sold 50k @ 94.16, leave 7k5 to get flat | |
| 2009-07-10 10:21:27.000 | IMTrader:richardle@imtrader.com | We out yet? |
| 2009-07-10 10:21:31.000 | IMTrader:richardle@imtrader.com | Let me know pls. |
| 2009-07-10 10:21:43.000 | IMTrader:davidbl@imtrader.com | leave 25k |
| 2009-07-10 10:22:44.000 | IMTrader:davidbl@imtrader.com | POT sold 125k @ 93.80 to flatten |
| 2009-07-10 10:24:46.000 | IMTrader:richardle@imtrader.com | ddbrawn [10:22:43 AM]: we dumping |
| POTddbrawn [10:22:48 AM]: if so we can hold off on qqqs | | |
| 2009-07-10 10:24:51.000 | IMTrader:richardle@imtrader.com | Can you hold off on the QQQQs... |
| 2009-07-10 10:25:00.000 | IMTrader:davidbl@imtrader.com | k QQQQ |
| 2009-07-10 10:26:13.000 | IMTrader:davidbl@imtrader.com | HBAN covered 120k, leave 380k and USB |
| covered 65k, leave 260k vs QQQQ ss 65k @ 35.03 | | |
| 2009-07-10 10:28:06.000 | IMTrader:davidbl@imtrader.com | YHOO we leave 40k 14.95 below - should we |
| clean up in here? | | |
| 2009-07-10 10:30:03.000 | IMTrader:davidbl@imtrader.com | TAA NA bot 22k, leave 8k |
| 2009-07-10 10:30:10.000 | IMTrader:richardle@imtrader.com | No let's wait on YHOO. |
| 2009-07-10 10:30:17.000 | IMTrader:davidbl@imtrader.com | ok, np |
| 2009-07-10 10:30:23.000 | IMTrader:richardle@imtrader.com | We don't 'leave 40k' really... we leave 3mm |
| shares... | | |
| 2009-07-10 10:30:26.000 | IMTrader:richardle@imtrader.com | :( |
| 2009-07-10 10:31:37.000 | IMTrader:richardle@imtrader.com | Look at POT go... |
| 2009-07-10 10:31:38.000 | IMTrader:davidbl@imtrader.com | :-! |
| 2009-07-10 10:31:46.000 | IMTrader:richardle@imtrader.com | So volatile... |
| 2009-07-10 10:31:47.000 | IMTrader:davidbl@imtrader.com | i know - great out |
| 2009-07-10 10:32:30.000 | IMTrader:davidbl@imtrader.com | MasterCard: Q2 est trimmed but earnings are |
| still expected to be above consensus - Barclays | | |
| 2009-07-10 10:44:33.000 | IMTrader:richardle@imtrader.com | How's TAA NO? |
| 2009-07-10 10:44:39.000 | IMTrader:davidbl@imtrader.com | bot 22k, leave 8k w/ 107 top |
| 2009-07-10 10:44:47.000 | IMTrader:richardle@imtrader.com | Where is stock? |
| 2009-07-10 10:44:54.000 | IMTrader:davidbl@imtrader.com | 108 -4.20 |
| 2009-07-10 10:44:57.000 | IMTrader:richardle@imtrader.com | OK |
| 2009-07-10 10:45:05.000 | IMTrader:davidbl@imtrader.com | so probably ok |
| 2009-07-10 10:45:11.000 | IMTrader:davidbl@imtrader.com | YHOO back <15 |
| 2009-07-10 10:45:25.000 | IMTrader:davidbl@imtrader.com | we're 14.95 top on 40k (with 3M in our pocket!) |
| 2009-07-10 10:48:38.000 | IMTrader:richardle@imtrader.com | YHOO Buy 500,000 < 15 pls |
| 2009-07-10 10:48:44.000 | IMTrader:davidbl@imtrader.com | ko YHOO |
| 2009-07-10 10:51:16.000 | IMTrader:davidbl@imtrader.com | MAR: ISI vanilla buyer 75k+ |

2

FOIA Confidential Treatment Requested
Confidential Grand Jury Materials Subject to Fed. R. Crim. P. 6(e)

| 2009-07-10 11:41:34.000 | IMTrader:richardle@imtrader.com | What 5 cents? |
| 2009-07-10 11:41:38.000 | IMTrader:richardle@imtrader.com | >:o |
| 2009-07-10 11:41:47.000 | IMTrader:richardle@imtrader.com | =-O |
| 2009-07-10 11:41:51.000 | IMTrader:richardle@imtrader.com | :-D |
| 2009-07-10 11:43:45.000 | IMTrader:davidbl@imtrader.com | .04 |
| 2009-07-10 11:44:03.000 | IMTrader:richardle@imtrader.com | :'( |
| 2009-07-10 11:44:33.000 | IMTrader:davidbl@imtrader.com | :( |
| 2009-07-10 11:51:36.000 | IMTrader:davidbl@imtrader.com | TAA NO continue Monday? |
| 2009-07-10 12:02:26.000 | IMTrader:richardle@imtrader.com | I don't know what to make of these Steve emails... |
| 2009-07-10 12:02:52.000 | IMTrader:davidbl@imtrader.com | Can you fwd? |
| 2009-07-10 12:02:58.000 | IMTrader:davidbl@imtrader.com | I got taken off . . . |
| 2009-07-10 12:05:31.000 | IMTrader:davidbl@imtrader.com | SPY covered 100k @ 87.64 |
| 2009-07-10 12:09:15.000 | IMTrader:davidbl@imtrader.com | jphickeyjpmc [12:08:46 PM]: POT: our analyst defending potash at current levels...$86 price implies $460 potash prices....too low....she says we should be buying the stock at current levels.... |
| 2009-07-10 12:34:58.000 | IMTrader:davidbl@imtrader.com | TCB bot 23k, working 27k overdayHBAN covered 265k, working 235kUSB covered 165k, working 160k |
| 2009-07-10 12:35:18.000 | IMTrader:davidbl@imtrader.com | FNF bot 19k, working 81k 12.80 top belowCGB buying 100k 7.85 top below |
| 2009-07-10 12:49:03.000 | IMTrader:davidbl@imtrader.com | *Uralkali trader says surprised at IPC indian $460/T contract |
| 2009-07-10 13:04:50.000 | IMTrader:sumits@imtrader.com | from uralkali "``We are surprized with the news that IPC signed a contract with Indian Potash Ltd. at $460 per ton,'' Oleg Petrov, head of sales at Belarusian Potash Co., said in an e-mail. ``We didn't expect such a sizable/considerable price reduction. Without any doubt, these new conditions will require us to amend our plans. I believe, we'll be able to provide information shortly as to how the conditions of the contract between IPC and IPL influence our talks with Indian partners.'' this is the translation of the email verbatim. |
| 2009-07-10 13:07:25.000 | IMTrader:davidbl@imtrader.com | Cardinal Health's board approves CareFusion spinoff effective 31-Aug |
| 2009-07-10 13:10:53.000 | IMTrader:richardle@imtrader.com | Great! |
| 2009-07-10 13:10:56.000 | IMTrader:richardle@imtrader.com | Thanks. |
| 2009-07-10 13:13:11.000 | IMTrader:davidbl@imtrader.com | Grabbing lunch |
| 2009-07-10 13:25:52.000 | IMTrader:richardle@imtrader.com | So apparently everyone is buying YHOO today... Gerster, Shutze, Cohe.. |
| 2009-07-10 13:25:53.000 | IMTrader:richardle@imtrader.com | Great... |
| 2009-07-10 13:26:02.000 | IMTrader:richardle@imtrader.com | Won't be fun when everyone is rushing for the exits! |
| 2009-07-10 13:26:03.000 | IMTrader:richardle@imtrader.com | :) |
| 2009-07-10 13:27:26.000 | IMTrader:davidbl@imtrader.com | oh yes . . . can't wait! |
| 2009-07-10 13:56:49.000 | IMTrader:davidbl@imtrader.com | WCG bot 25k @ 16.75 earlier |
| 2009-07-10 14:10:20.000 | IMTrader:davidbl@imtrader.com | YHOO bot 500k @ 14.98, working 75k more to get to 3.75MUSB covered 240k, leave 85k to flattenHBAN covered 375k, leave 125k to flatten |
| 2009-07-10 14:24:23.000 | IMTrader:davidbl@imtrader.com | YHOO bot 575k @ 14.98 to get to 3.75M position |
| 2009-07-10 14:59:30.000 | IMTrader:davidbl@imtrader.com | Do another 100,000 YHOO < 90 cents pls |
| 2009-07-10 14:59:38.000 | IMTrader:davidbl@imtrader.com | ok YHOO |
| 2009-07-10 15:01:47.000 | IMTrader:davidbl@imtrader.com | YHOO bot 47k, working 53k |
| 2009-07-10 15:26:52.000 | IMTrader:richardle@imtrader.com | Let's go to 3.9mm YHOO on the day under 90 cents; pls short 150,000 MSFT against? Thanks! |
| 2009-07-10 15:27:14.000 | IMTrader:same@imtrader.com  ok YHOO and MSFT | |
| 2009-07-10 15:27:39.000 | IMTrader:davidbl@imtrader.com | ok |

FOIA Confidential Treatment Requested
Confidential Grand Jury Materials Subject to Fed. R. Crim. P. 6(e)

SAC_YHOO00000035

| | | |
|---|---|---|
| 2009-07-10 15:40:31.000 | IMTrader:same@imtrader.com  WFC 500k to buy MOC | |
| 2009-07-10 15:45:15.000 | IMTrader:davidbl@imtrader.com | SPX MOCs = $120M to buy. Mixed but financials |
| $170M to buy. | | |
| 2009-07-10 15:45:50.000 | IMTrader:same@imtrader.com  AXP 125k to buy | |
| 2009-07-10 15:46:32.000 | IMTrader:davidbl@imtrader.com | YHOO bot 75k @ 14.88, makes 725k @ 14.96 to |
| get to 3.9M position | | |
| 2009-07-10 15:47:08.000 | IMTrader:davidbl@imtrader.com | MSFT ss 150k @ 22.38 |
| 2009-07-10 15:50:40.000 | IMTrader:same@imtrader.com  WFC 325k to buy | |
| 2009-07-10 16:00:36.000 | IMTrader:davidbl@imtrader.com | TAA NO continue Monday? (left 8,500 to buy |
| 107 top) | | |
| 2009-07-10 16:00:43.000 | IMTrader:richardle@imtrader.com | Nah. |
| 2009-07-10 16:00:47.000 | IMTrader:davidbl@imtrader.com | ok |
| 2009-07-10 16:00:54.000 | IMTrader:richardle@imtrader.com | Let's reexamine Mon morning our time. |
| 2009-07-10 16:01:02.000 | IMTrader:davidbl@imtrader.com | cool |
| 2009-07-10 16:02:33.000 | IMTrader:davidbl@imtrader.com | *RANGEL SAYS HEALTH SURTAX WOULD TAKE |
| EFFECT 2011; WOULD APPLY TO INCOMES >$350K | | |
| 2009-07-10 16:04:25.000 | IMTrader:davidbl@imtrader.com | HBAN covered 500k @ 3.83USB covered 325k |
| @ 16.61 | | |
| 2009-07-10 16:04:46.000 | IMTrader:richardle@imtrader.com | Thanks' |
| 2009-07-10 16:05:27.000 | IMTrader:davidbl@imtrader.com | FDR FP we're back Monday from the open to ss |
| 18,600 >56 (Darius wanted to leave it out there) | | |
| 2009-07-10 16:05:33.000 | IMTrader:davidbl@imtrader.com | Enjoy the weekend! |

FOIA Confidential Treatment Requested
Confidential Grand Jury Materials Subject to Fed. R. Crim. P. 6(e)

SAC_YHOO00000036

# Exhibit D



Collins Stewart plc  Annual Report and Accounts 2010

**Collins Stewart plc**
Annual Report and Accounts

Case 1:13-cr-00539-PGG    Docume

Collins Stewart is a leading independent international financial advisory group with around 800 employees providing services to clients across four main operating divisions:

- Wealth Management – private clients, intermediaries and charities in the UK and Europe
- Securities – institutional investment clients in UK, Europe and the US
- Corporate Broking – corporate and private equity clients in UK, US and Asia
- Corporate Advisory (Hawkpoint) – corporate, government and private equity clients globally

We aim to develop and maintain long-term relationships with our clients and to give high-quality, unconflicted advice. The Board plans to maximise returns to shareholders over the medium to long term with an acceptable level of risk. This includes both operating returns generated by the business and returns delivered through share-price appreciation and dividends.

The Group's strategy is to focus on its core businesses, namely Securities sales, trading and research, Corporate Broking and Corporate Advisory (Hawkpoint) and Wealth Management. In doing so, we seek to maximise the individual strengths of our businesses and, where desirable, combine them to best effect and for the benefit of our clients. We also seek to use our strong European position, supported by our presence in the US and Singapore, to extend our international reach into key markets.

As well as investing in and developing its existing businesses, the Group is intent on making further selective acquisitions, especially in wealth management where returns are most stable.

## Contents

**Business Profile**
1   Highlights 2010
2   Our Group at a glance

**Overview of 2010**
4   Chairman's Statement
6   Business Review
20   Key risks facing the business
22   Board of Directors

**Reports and Financial Statements**
24   Report of the Directors
27   Corporate governance report
30   Remuneration report
37   Statement of directors' responsibilities
38   Responsibility statement of the directors
39   Independent auditor's report to the members of Collins Stewart plc
40   Consolidated income statement
41   Consolidated statement of comprehensive income
42   Consolidated statement of changes in equity
43   Consolidated balance sheet
44   Consolidated cash flow statement
45   Notes to the consolidated financial statements
71   Independent auditor's report to the members of Collins Stewart plc
72   Company balance sheet
73   Notes to the company financial statements

# Highlights 2010

- Revenue up 16% to £215.7m (2009: £186.4m)
- Operating profit before share-based payment charges up 17% to £25.6m (2009: £21.9m)
- Underlying operating profit up 70% to £23.6m (2009: £13.9m)
- Profit before tax increased 3% to £19.0m (2009: £18.4m)
- Earnings per share up 11% to 6.1p (2009: 5.5p)
- Underlying earnings per share up 69% to 7.1p (2009: 4.2p)
- Proposed 31% increase in final dividend to 1.7p (2009: 1.3p); first increase since 2007
- Strong progress across all areas of the Group
- Proposed change of name to "Collins Stewart Hawkpoint plc"

|  | 2010 | 2009 |  |
|---|---|---|---|
| Revenue: | £215.7m | £186.4m | +16% |
| Operating profit before share-based payment charges: | £25.6m | £21.9m | +17% |
| Operating profit: | £20.2m | £18.5m | +9% |
| Underlying operating profit: | £23.6m | £13.9m | +70% |
| Profit before tax: | £19.0m | £18.4m | +3% |
| Basic EPS: | 6.1p | 5.5p | +11% |
| Underlying EPS: | 7.1p | 4.2p | +69% |
| Final dividend: | 1.7p | 1.3p | +31% |
| Net cash and cash equivalents: | £104.5m | £113.2m | -8% |
| Assets under management: | £7.9bn | £5.9bn | +34% |

# Our Group at a glance

## Wealth Management

Collins Stewart Wealth Management is an award-winning investment manager and stockbroker committed to providing its clients with a broad spectrum of independent wealth management services

Revenue 2010
### £48.3m
2009: £43.7m

### Overview

We manage and administer £7.9bn of assets through Collins Stewart's international network of offices.

Our range of award-winning investment services, including portfolio management, stockbroking, holistic wealth planning and a range of multi-manager investment funds, are tailored to suit the individual needs and requirements of private clients, intermediaries, institutions and charities.

## Securities

The Securities division offers a full research, sales and execution service to over 400 institutional clients across Europe and North America

Revenue 2010
### £106.5m
2009: £97.2m

Collins Stewart Securities is a premier independent research house. Our research model utilises a combination of fundamental company and sector analysis and our proprietary online, interactive valuation model, Quest™, which is innovative, impartial and independent, providing access to 350 data items on 2,800 companies across 28 countries. Our equity analysts cover over 200 stocks across Europe and over 100 in the US and seek to focus on ideas that challenge conventional thinking.

Through superior fundamental analysis, supported by the principles of Quest™, we have developed a reputation for high-quality, differentiated research. The European product is distributed by sales teams in London,

## Corporate Broking

Collins Stewart is a leading distributor of small and mid-cap equity, both primary and secondary, and specialises in raising capital from institutional investors on a global basis

Revenue 2010
### £21.8m
2009: £17.2m

Working in close conjunction with our Securities division and Corporate Advisory business, Hawkpoint, we give guidance to our corporate clients on the structure, size, timing and pricing of both primary and secondary equity issues. Collins Stewart is a registered Nomad and also provides advice on the Takeover Code (both for offeror and offeree), M&A transactions, introductions, move-ups (and vice versa), take-privates and de-listings.

As a corporate broker we act as the interface between the client company, the relevant stock exchange and the investment community to ensure that each understands the key drivers of the other. In this role we draft

## Corporate Advisory – Hawkpoint

Hawkpoint is a leading, independent corporate finance advisory firm based in Europe with international reach into all key markets which advises corporates, financial institutions, private equity houses and governments

Revenue 2010
### £39.1m
2009: £28.3m

Hawkpoint's advisory services focus on providing mergers & acquisitions, capital markets, debt and restructuring and strategic advice throughout Europe. Hawkpoint provides objective advice free from the conflicts that can arise amongst its competitors, whose business models are built around the sale of multiple products. A combination of a strong diversified senior team and an in-depth execution capability give Hawkpoint a cutting edge in meeting the needs of its clients.

As well as its London office, Hawkpoint has a successful operation in Paris; and in 2010 established a full service corporate advisory presence in Frankfurt.

| | Objective | Strategy |
|---|---|---|
| Our services are based around a dedication to traditional, personal client service, enhanced through the use of technology and the latest portfolio management techniques.<br><br>Drawing upon our offshore heritage and independence, our forward thinking approach has helped us deliver a sophisticated, open architecture investment proposition for our growing, international client base.<br><br>Overall headcount in the division is 279 (2009: 221) with 139 front office staff supported by 140 infrastructure staff. | • "10 x 12" – £10bn of assets under management by the end of 2012<br>• Invest in infrastructure to produce a robust, high-quality and scalable platform<br>• Maximise long-term returns in the business | • Growth in AUM through targeted acquisitions and organic growth<br>• Focus on clients and service rather than on product<br>• Deliver good risk-adjusted returns through high-quality investment management |
| Dublin, Paris, Milan and New York backed up by first-rate execution capabilities. Our London-based operation also encompasses a full-service Investment Companies team and specialist trading desks encompassing preference shares, PIBS, Australian equities, credit and convertibles, while in New York we also have market-leading specialist International Equity and Fixed-income desks.<br><br>Overall headcount in UK Securities is 161 (2009: 158) with 107 front office staff and 54 support staff. Overall headcount in US Securities is 159 (2009: 141), comprising 117 front office staff and 42 support staff. | • Enhance our reputation for independent, differentiated ideas and research<br>• Provide a high-quality distribution platform to support corporate broking and advisory<br>• Maximise long-term returns in the business | • Provide differentiated research and money-making ideas for clients<br>• Tailor those ideas to the individual needs of institutional investment clients<br>• Provide best-execution to enable clients to implement and benefit from our ideas |
| and review public announcements, create investor relations programmes and give market-related advice. Collins Stewart acts for 77 companies listed on the UK Main Market or AIM, including 36 clients in the £100m to £1bn market cap range. We also have a leading position advising companies in the Singapore market and a specialist equity capital markets capability in the US.<br><br>Overall headcount in Corporate Broking is 49 (2009: 48), comprising 34 front office staff and 15 support staff. | • Become the pre-eminent mid-cap corporate broker in the UK<br>• Continue to develop established presence in Asian market<br>• Maximise long-term returns in the business | • Recruitment of high-quality, talented corporate brokers<br>• Investment in high-quality research and distribution support from securities.<br>• Exemplary transaction execution |
| As a result of Hawkpoint's broad range of advisory skills, it exploits its flexibility in the range of services which it offers clients. This is typified in the current market environment by a greater emphasis on debt refinancing and restructuring advisory work.<br><br>Hawkpoint's relationship with the rest of Collins Stewart ensures that its independence is maintained, but facilitates access, where it is in the clients' interest, to Collins Stewart's research and distribution and Wealth Management capabilities.<br><br>Overall headcount in Hawkpoint is 153 (2009: 144), comprising 105 front office staff and 48 support staff. | • Provide our clients with original, well considered ideas and innovation solutions for their business strategies<br>• Consolidate our position as a leading independent corporate finance advisory firm<br>• Maximise long-term returns in the business | • Infill our advisory capability in niche areas of opportunity<br>• Expand our recently established German office<br>• Maintain the highest standards of execution |

# Chairman's Statement

This is my first report since taking over as Chairman of Collins Stewart in April and it is pleasing to report on a year in which the Group made excellent progress. This is as a result of the positive initiatives that have been put in place by Mark Brown and his team over the last two years or so in the face of continuing challenging conditions. Statutory profits after tax increased from £13.4m in 2009 to £14.6m but most notably underlying profits after tax increased year-on-year by 70% from £10.1m to £17.2m (as explained in the financial performance section of the business review).



## Key Objectives

During the year we have pursued four key objectives:

### 1.  US Securities

We have succeeded in turning around the losses that were being made in our US Securities business. The results show that the operating loss in the US has reduced from £8.0m in 2009 to £2.2m for the last year. Most significantly, in aggregate the last nine months of the year were marginally profitable, and unaudited management accounts show that the business has traded profitably in both January and February this year.

### 2.  Wealth Management

A major strategic objective has been and remains to put more resources into growing our Wealth Management business where returns are  more stable. During the year, as well as seeing organic growth, we made two acquisitions: Corazon Capital and Andersen Charnley. As a result, assets under management and administration increased from £5.9bn to £7.9bn.

### 3.  Corporate Broking

We have continued to strengthen our management in the Corporate Broking team as well as in our UK Securities trading and research areas. As a result, operating profit in Corporate Broking increased by 56% from £4.1m in 2009 to £6.4m. Most notably, in the UK, we are now ranked fifth in terms of mid-market (£100m–£1bn market cap) brokerships from 18th just two years ago and during the year we were appointed as corporate broker to our first FTSE 100 client.

### 4.  Hawkpoint

Considerable progress has been made in developing closer co-operation between Hawkpoint and our Corporate Broking division. This has already resulted in increased business opportunities for both businesses.

## Change of Company Name

One of the pleasing features of the year has been the increasing number of occasions where teams from Hawkpoint and Collins Stewart have worked together for the benefit of clients. Whilst both brands are recognised for their particular strengths in their respective markets, the Board believes that opportunities for such co-operation would be enhanced by a wider awareness of their common ownership and the synergies that exist. Accordingly, at the Annual General Meeting ("AGM") in May, a resolution to change the name of Collins Stewart plc to "Collins Stewart Hawkpoint plc" will be proposed. The individual businesses will continue to trade under their existing names but a rebranding exercise will take place to ensure presentational harmony.

## Dividend

The directors recommend that, subject to approval at the AGM, a final dividend of 1.7p (2009: 1.3p) per ordinary share be paid on 26 May 2011 to members on the register on 6 May 2011. An interim dividend of 1.3p (2009: 1.3p) per ordinary share was paid on 25 November 2010. The total dividend for the year would therefore be 3.0p (2009: 2.6p) per ordinary share; giving an increase of 15.4% on the previous year.

Clearly, the last few years have seen unusual market conditions to which the Board has responded by reducing the absolute level of dividend and retaining capital in the business. Going forward, as conditions improve, the Board intends to move over time to a policy whereby the total dividend is covered approximately 2 to 2½ times by earnings, with approximately one-third of the total dividend for the year paid as an interim dividend and two-thirds as a final dividend.

## Board

In December, Terry Smith, who was latterly Deputy Chairman but had been Chairman prior to my appointment, retired from the Board. Although not the actual founder of the Company, Terry was synonymous with Collins Stewart for many years and, having joined the company in 1992, became Chief Executive in 2000. During his time the business grew enormously and was successfully demerged from Tullett Prebon in 2006. In May, Keith

Hamill, who was Deputy Chairman, retired from the Board having been a director since 2000. Terry and Keith made exceptional contributions to the growth of the Company and we wish them both well.

Paul Hewitt and I were appointed as non-executive directors in January 2010. Nicholas Page and Giles Vardey also joined as non-executive directors in July and September respectively. As a result of these changes we now have seven directors – three executive, three non-executive and myself as Chairman – all of whom have extensive experience of the financial services industry. It is a new Board and is fully committed to developing the business in the long-term interests of its shareholders.

## Staff

The progress that we have made – and continue to make – would not be possible without the diligent and steadfast effort made by our people. We now employ approximately 800 people in six countries. I am very grateful to Mark Brown, his team and everyone throughout the Group for their hard work and achievements.

## Outlook

The previous government left this country in a parlous economic situation, with public expenditure and debt having spiralled out of control. For many years the country as a whole has been living beyond its means; not a sustainable situation. The present coalition government is attempting to regain control of public expenditure and put government finances on a more even footing but it will take many years to achieve this properly and the economy remains very fragile. Living within our means will inevitably constrain economic activity in the UK, while the possibility of stagflation is very real. However, the initiatives that we have put in place to strengthen our business have been done on the assumption of a subdued economy, and we are expecting the full benefits of these initiatives to come through in the future. Certainly, for the Group as a whole, the first two months of this year are showing good growth compared with the same period last year. Consequently, we believe that this represents a solid foundation for further progress.

**Tim Ingram**
Chairman
15 March 2011

# Business Review

## Objectives and Strategy

Collins Stewart's objective is to be a leading independent international financial advisory group and to create wealth for our clients, both corporate and individual, and shareholders. In particular, we aim to develop and maintain long-term relationships with our clients and we aim to give high-quality, unconflicted advice. The Board plans to maximise returns to shareholders over the medium to long term with an acceptable level of risk. This includes both operating returns generated by the business and returns delivered through share-price appreciation and dividends.

The Group's strategy is to focus on its core businesses, namely Securities sales, trading and research, Corporate Broking and Corporate Advisory (Hawkpoint) and Wealth Management. In doing so, we seek to maximise the individual strengths of our businesses and, where desirable, combine them to best effect for the benefit of our clients. We also seek to use our strong European position, supported by our presence in the US and Singapore, to extend our international reach into key markets.

As well as investing in and developing its existing business, the Group is intent on making further selective acquisitions, especially in wealth management where returns are more stable.



(L) **Paul Baines**
Executive Director and Chairman of Hawkpoint

(C) **John Cotter**
Group Finance Director

(R) **Mark Brown**
Chief Executive

# Overview of 2010

**SUMMARY OF RESULTS**

| Revenue | 2010 £m | 2009 £m |
|---|---|---|
| Wealth Management | **48.3** | 43.7 |
| Securities | **106.5** | 97.2 |
| Corporate Broking | **21.8** | 17.2 |
| Hawkpoint | **39.1** | 28.3 |
| | **215.7** | 186.4 |
| | | |
| **Operating profit before share–based payment charges** | | |
| Wealth Management | **9.3** | 10.1 |
| Securities | **4.5** | 3.0 |
| Corporate Broking | **6.4** | 4.1 |
| Hawkpoint | **5.4** | 4.7 |
| | **25.6** | 21.9 |
| Share-based payment charges | **(5.4)** | (3.4) |
| **Operating profit** | **20.2** | 18.5 |
| Net interest | **(1.2)** | (0.1) |
| **Profit before tax** | **19.0** | 18.4 |
| Taxation | **(4.4)** | (5.0) |
| **Profit after tax** | **14.6** | 13.4 |
| Earnings per share | | |
| Basic | **6.1p** | 5.5p |
| Diluted | **5.8p** | 5.4p |

# Business Review continued

## Financial performance

The uncertain market conditions experienced during 2009 continued into 2010, and equity markets deteriorated in the second quarter of the year. Nevertheless, the Group made a solid start, benefiting from the diversity of its activities and the actions taken previously to focus on each division's core strengths. This left the Group well-placed to exploit improvements in markets that occurred later in the year and each division performed strongly in the second half.

### Underlying performance

|  | 2010 £m | 2009 £m | % Change |
|---|---|---|---|
| Operating profit | 20.2 | 18.5 | 9.2% |
| Provision release | – | (2.4) | |
| Acquisition & integration costs | 1.8 | – | |
| Frankfurt start-up costs | 1.6 | – | |
| One-off SBP release | – | (2.2) | |
| Total adjustments | 3.4 | (4.6) | |
| Underlying operating profit | 23.6 | 13.9 | 69.8% |
| Net interest | (1.2) | (0.1) | |
| Underlying profit before tax | 22.4 | 13.8 | 62.3% |
| Underlying taxation | (5.2) | (3.7) | |
| Underlying profit after tax | 17.2 | 10.1 | 70.3% |
| Underlying earnings per share | 7.1p | 4.2p | 69.0% |
| Underlying diluted earnings per share | 6.8p | 4.0p | 70.0% |

### Effect of share-based payment charges

|  | 2010 | | | 2009 | | |
|---|---|---|---|---|---|---|
|  | As reported £m | SBP £m | After SBP £m | As reported £m | SBP £m | After SBP £m |
| Operating profit | | | | | | |
| Wealth Management[1] | 9.3 | 2.3 | 7.0 | 10.1 | 2.4 | 7.7 |
| Securities | 4.5 | 1.4 | 3.1 | 3.0 | (1.2) | 4.2 |
| Corporate Broking | 6.4 | 0.3 | 6.1 | 4.1 | – | 4.1 |
| Hawkpoint[1] | 5.4 | 1.4 | 4.0 | 4.7 | 2.2 | 2.5 |
| | 25.6 | 5.4 | 20.2 | 21.9 | 3.4 | 18.5 |

1   Underlying 2010 operating profit pre SBP: Wealth Management £11.1m (2009: £10.1m); Hawkpoint £7.0m (2009: £2.3m).

**Operating profit before share-based payment charges ("SBP") for the year increased by 17% to £25.6m (2009: £21.9m), although these figures mask an even stronger underlying performance.**

### Revenue
£m



| 2009 | 2010 |
|------|------|
| 186.4 | 215.7 |

### Underlying operating profit
£m



| 2009 | 2010 |
|------|------|
| 13.9 | 23.6 |

### Dividend per share
pence



| 2009 | 2010 |
|------|------|
| 2.6 | 3.0 |

### Underlying earnings per share
pence



| 2009 | 2010 |
|------|------|
| 4.2 | 7.1 |

Operating profit before share-based payment charges ("SBP") for the year increased by 17% to £25.6m (2009: £21.9m), although these figures mask an even stronger underlying performance. Operating profit in 2010 is reported after charging £1.8m of acquisition and integration costs in Wealth Management and £1.6m in costs relating to establishing Hawkpoint's new office in Frankfurt. Each of these represents significant investments in the business, the rewards of which will only begin to accrue from 2011. In contrast, reported profit in 2009 benefited from one-off releases of a provision of £2.4m made at the time of the acquisition of Hawkpoint in 2006 and £2.2m relating to accumulated SBP in respect of share awards that did not vest. Adjusting for these items, the underlying increase in operating profit was 70%, as shown in the table on page 8.

The investment in the business has led to a planned increase in the cost base, with total costs before SBP rising from £164.5m to £190.1m. Total staff costs increased from £112.6m to £131.9m; an increase of 17.1%. Total staff costs before SBP have remained constant at 58.6% of revenues. Variable remuneration has reduced slightly as a percentage of revenue from 26.3% to 25.9%.

### Effect of share-based payment charges
As in previous years, total operating profit includes significant SBP; non-cash costs in respect of awards granted to employees under the Group's share-based bonus deferral and incentive plans. The effect of SBP on the results of each business segment is analysed in the table on page 8.

The divisional review that follows analyses operating profits before share-based payment charges.

### Key Performance Indicators ("KPIs")
Revenue, operating profit before SBP and operating margin represent KPIs that the Board uses to monitor the underlying performance of the businesses within the Group. In the case of the Wealth Management division, the level of assets under management is also an important KPI, while the number of retained corporate clients is a KPI for Corporate Broking. An analysis of the performance of each division during 2010 based on these KPIs, together with a review of the trends and factors likely to affect its future development, is set out in the following pages.

10 | Collins Stewart plc
Annual Report and Accounts
2010

# Business Review continued

## Wealth Management

Collins Stewart Wealth Management is an award-winning investment manager and stockbroker committed to providing its clients with a broad spectrum of independent wealth management services

Revenue 2010

# £48.3m

2009: £43.7m

|  | 2010 £m | 2009 £m |
|---|---|---|
| Revenue | 48.3 | 43.7 |
| Operating profit | 9.3 | 10.1 |
| Underlying operating profit[1] | 11.1 | 10.1 |
| Operating margin | 19.3% | 23.1% |
| Underlying operating margin | 23.0% | 23.1% |

1   Excluding £1.8m of acquisition and integration costs



**Neil Darke**
Head of Wealth Management

# Underlying operating profit increased by 10%, helped by a positive profit contribution from both acquired businesses.

**Revenue**
£m



**Underlying operating profit before SBP**
£m



**Underlying operating margin**
%



Wealth Management revenues increased 11% year-on-year, reflecting part-year contributions from the two acquisitions, Corazon Capital and Andersen Charnley, offset by a decrease in the client turn and a modest decline in transaction income. Recurring revenues, including management fees, now account for 53% of total revenues (up from 48%) as a result of the impact of the acquisitions (both of which are fee-based businesses) and from the rise in underlying management fees.

Underlying operating profit increased by 10%, helped by a positive profit contribution from both acquired businesses. However, one-off acquisition and integration costs of £1.8m resulted in reported operating profit falling by 8% to £9.3m. Although the business continues to keep a tight rein on controllable costs, profits were also impacted by the increasing costs of regulation.

Total assets under management and administration ("AUM") rose 34% during the year to £7.9bn as at 31 December 2010. Discretionary AUM rose 59% to £2.7bn. The increase in AUM included net organic inflows of £354m, an organic growth rate of 6.0% (2009: 6.8%). Discretionary inflows came from direct private clients and intermediaries, both in the UK and internationally. On the advisory side, there were inflows into the cash management service and in, non-advisory, there were inflows into the corporate share plan desk which won nine corporate (including four FTSE 100) clients during the year. The diversity of inflows demonstrates the breadth of the business.

Although discretionary return on assets ("ROA") rose as a result of the acquisitions, this was counteracted by lower client turn with the result that overall discretionary ROA of 112bps was slightly lower than in 2009. The client turn reflects lower prevailing interest rates and a more conservative cash management policy, while both the advisory ROA (47bps versus 59bps) and non-advisory ROA (38bps versus 46bps) were further impacted by lower transaction income on a higher asset base.

Corazon has now been largely integrated and the integration of Andersen Charnley is progressing well. Client retention has been high, client assets have been transferred onto our in-house platform and all staff are now based in existing Collins Stewart offices. Both acquisitions are expected to enhance earnings and shareholder value from 2011 onwards as planned. Meanwhile, the division continued to receive external recognition of its services in 2010, winning industry awards based on client votes for discretionary portfolio management and advisory stockbroking services. This reflects well on our independent, client-focused approach.

The Wealth Management division has a strategic target entitled "10x12" – the achievement of £10bn of assets under management by the end of 2012 – based on a three-pronged strategy of organic growth, recruitment and value-enhancing acquisitions. Considerable progress was made in 2010 and we look forward to further progress in 2011.

**Assets under Management and Administration**

| (£bn) | 2010 | 2009 | Net Inflows | Market Appreciation | Assets Acquired | ROA(%) 2010[1,2] | ROA(%) 2009[1] |
|---|---|---|---|---|---|---|---|
| Discretionary | 2.7 | 1.7 | 0.1 | 0.2 | 0.7 | 1.12 | 1.15 |
| Advisory | 2.9 | 2.3 | 0.2 | 0.4 | – | 0.47 | 0.59 |
| Non-Advisory | 2.3 | 1.9 | 0.1 | 0.3 | – | 0.38 | 0.46 |
| Total | 7.9 | 5.9 | 0.4 | 0.9 | 0.7 | | |

1   The annual Return on Assets ("ROA") is derived from the four-quarter average of quarterly revenues and quarter-end AUM. The ROA calculation for Non-Advisory assets excludes revenues of £3.0m (2009: £4.9m) arising from trading in assets that are not under administration and has been restated in respect of 2009.
2   The ROA calculation for Discretionary assets includes an annualised contribution from the acquired businesses, Corazon Capital and Andersen Charnley.

# Business Review continued

## Securities

The Securities division offers a full research, sales and execution service to over 400 institutional clients across Europe and North America

UK Revenue 2010

# £47.6m

2009: £56.1m

US Revenue 2010

# £58.9m

2009: £41.1m

|  | 2010 £m | 2009 £m |
|---|---|---|
| Revenue |  |  |
| UK | 47.6 | 56.1 |
| US | 58.9 | 41.1 |
|  | 106.5 | 97.2 |
| Operating profit/(loss) |  |  |
| UK | 6.7 | 11.0 |
| US | (2.2) | (8.0) |
|  | 4.5 | 3.0 |
| Operating margin |  |  |
| UK | 14.1% | 19.6% |
| US | (3.7%) | (19.5%) |
|  | 4.2% | 3.1% |



(L) **Rob Mann**
Head of Large-Cap European Equities

(C) **Robbie Robertson**
Head of Investment Companies

(R) **Martin Turner**
Head of Small and Mid-Cap UK Equities

The benefits of the extensive reorganisation of the US Securities business that took place at the beginning of 2009 became clear during 2010, and further investment during the year has continued the momentum, with revenues increasing 43% year-on-year.

**Revenue**
£m



97.2 (2009) | 106.5 (2010)

**Operating profit before SBP**
£m



3.0 (2009) | 4.5 (2010)

**Operating margin**
%



3.1 (2009) | 4.2 (2010)

The UK Securities business continued to experience difficult conditions throughout 2010, with market volumes remaining at post-financial crisis depressed levels.

Against this background, the division has shown commendable resilience, with a new management team in the large-cap business driving it to achieve the required returns on the investment that has been made in research during the year. Collins Stewart now has 29 fundamental analysts to augment its differentiated research product, Quest™.

The specialist desks, particularly those dealing in Investment Companies, Preference Shares and Australian Shares, continued to perform strongly during the year. Small teams have been added in convertibles, derivatives and corporate bonds which should all contribute in 2011 and add to the resilience of the business.

The benefits of the extensive reorganisation of the US Securities business that took place at the beginning of 2009 became clear during 2010, and further investment during the year has continued the momentum, with revenues increasing 43% year-on-year. As a result, a loss of £2.2m in 2010 was a material improvement on the loss of £8.0m in 2009. The business was marginally profitable during the last nine months of the year and finished the year strongly.

The transition to a research product-led model has driven a 10% increase in revenues in the core cash equities business, with improved margins and a rapid rise in the institutional rankings, all achieved in difficult markets. In a reflection of the strategy used successfully in the UK, the business was further transformed by the addition of two specialist market-making teams that deal predominantly with the US retail broking community, one focusing on International Equities that started in March and a Fixed-Income team that joined towards the end of the year. Each of these teams has a leading position in its respective market and immediately had a significant impact on the business's revenue and performance.

## Business Review continued

## Corporate Broking

Collins Stewart is a leading distributor of small and mid-cap equity, both primary and secondary, and specialises in raising capital from institutional investors on a global basis

Revenue 2010

# £21.8m

2009: £17.2m

|  | 2010 £m | 2009 £m |
|---|---|---|
| Revenue | 21.8 | 17.2 |
| Operating profit | 6.4 | 4.1 |
| Operating margin | 29.4% | 23.8% |



(L) Roger Lambert
Chairman of Corporate Broking
(R) Mark Dickenson
Head of Corporate Broking

**Overall, Corporate Broking raised capital for 21 clients and acted for 53 clients on various transactions in 2010. The division participated in transactions raising a total of £1.6bn of primary and secondary fundraisings in 2010, making it one of the most active and successful mid-market houses.**

**Revenue**
£m



**Operating profit before SBP**
£m



**Operating margin**
%



2010 saw further progress by Corporate Broking in building a leading mid-market franchise. The business won 13 new clients in 2010 and, in terms of mid-market (£100m to £1bn market cap.) brokerships, the UK business is now ranked fifth across the whole market, up from 18th two years ago. In addition, it achieved its first appointment as corporate broker to a FTSE 100 company during the year. These advances are testimony to the level of service and commitment that the Corporate Broking division delivers for its clients and also reflects the strength and depth Collins Stewart has established in equity research and sales.

Difficult market conditions led to a relatively low level of transactions in the first half of 2010 but in the second half there was a much broader spread of activity. A £285m rights issue for Yule Catto enabled it to complete a transformational acquisition, continuing its growth from a FTSE Fledgling company at the time Collins Stewart was appointed as its broker to a FTSE250 company. The division also participated in the best-performing private equity backed IPO of 2010, AZ Electronic Materials, while a placing and rights issue conducted for Development Securities in July 2010 was another highlight, with £100m raised for the Company at a discount of just 9% to the prevailing share price.

Collins Stewart and Hawkpoint are increasingly working together, where this is appropriate and requested by a client, to deliver benefits.

In 2009, Chesnara, a longstanding relationship of Hawkpoint, appointed Collins Stewart as corporate broker and in 2010 Collins Stewart completed a £27m equity placing to help finance a key acquisition, with Hawkpoint acting  as financial adviser. The number of joint mandates and opportunities to work together continue to grow and Collins Stewart's ability to offer this breadth of expertise and capability is a real differentiator in the market.

Overall, Corporate Broking raised capital for 21 clients and acted for 53 clients on various transactions in 2010. The division participated in transactions raising a total of £1.6bn of primary and secondary fundraisings in 2010, making it one of the most active and successful mid-market houses. Europe remains the core market, but the business has a strong international presence, including Singapore and the new US equity capital markets ("ECM") capability. Together, they completed 23 ECM transactions during the year, three of which were in the US and four in Singapore.

We continue to develop the business through key appointments and are pleased that Erik Anderson, who has been Co-Head of Investec's corporate broking business for the last eight years, joined Collins Stewart in March 2011 as Co-Head of Corporate Broking. The progress of Corporate Broking bodes well, particularly as market conditions encourage higher corporate activity levels, and the division is well-positioned for the future.

16   Collins Stewart plc
Annual Report and Accounts
2010

# Business Review continued

## Hawkpoint

Hawkpoint is a leading, independent corporate finance advisory firm based in Europe with international reach into all key markets which advises corporates, financial institutions, private equity houses and governments

Revenue 2010

# £39.1m

2009: £28.3m

|  | 2010 £m | 2009 £m |
|---|---|---|
| Revenue | 39.1 | 28.3 |
| Operating profit | 5.4 | 4.7 |
| Underlying operating profit[1] | 7.0 | 2.3 |
| Operating margin | 13.8% | 16.6% |
| Underlying operating margin[1] | 17.9% | 8.1% |

1   Before cost of German investment in 2010 and provision release in 2009.



(L) **Simon Gluckstein**
Managing Director, Head of UK

(C) **Henrik Schliemann**
Managing Director, Head of International

(R) **Jacques Callaghan**
Deputy Head (UK and International)

## Hawkpoint expanded its client base during the year, both in Europe and the UK quoted sector.

**Revenue**
£m



**Underlying operating profit before SBP**
£m



**Underlying operating margin**
%



In spite of continued underlying weakness in the economy, markets were relatively stable in 2010 compared to the previous year, and Hawkpoint has benefited from the post-financial crisis growth in demand for unconflicted, independent advice. It was also able to benefit from an increase in advisory roles, particularly in M&A, with the improvement in the availability of debt for higher-quality transactions. Consequently, momentum and activity picked up steadily throughout the year and revenues in the second half were 34% higher than in the first.

Hawkpoint expanded its client base during the year, with new quoted clients such as Augean, Lavendon, Morgan Sindall and Spice. It was also engaged in significant public company takeover activity and was the Rule 3 adviser on a number of recommended public offers including acting for Spice on the £350m offer by Cinven.

Hawkpoint also advised on a number of private company acquisitions, including that of Save & Prosper Insurance by Chesnara from JP Morgan, and saw a marked increase in disposal advisory roles. These included the disposal by Bank of Ireland of its asset management business, BIAM, to State Street; by 3i of NSL to AAC Capital Partners; and by Reliance of its Security Services business to Securitas.

The more demanding debt environment saw Hawkpoint's specialist skills in this area come to the fore. Hawkpoint advised OMV on: refinancing its €1.5bn revolving credit facility; Advent on financing its acquisition of DFS; and Iridium Communications on obtaining a $1.8bn Coface backed credit facility. Restructuring work continued and included further advice to the Icelandic Government on restructuring the country's banking system and assisting its  negotiations with the UK and Dutch Governments in relation to the Icesave deposits.

Hawkpoint continues to develop and expand its European presence and saw a marked uplift in the level of activity in the Paris office. French sale mandates in the second half included the disposal by Valeo of Telma; by Silverfleet of Histoire d'Or to Bridgepoint and Apax; and advising on the sale of Picard Surgelés to Lion Capital, the largest buy-out in the French market in 2010. The French office also advised Safran on acquiring Harvard Custom Manufacturing in the USA and LBO France on acquiring EXXELIA Group from Caisse des Dépôts. In order to broaden its international reach and penetration of the German market, in November Hawkpoint opened an office in Frankfurt comprising a team of 11 professionals. This team completed its first major transaction in February 2011.

# Business Review continued

### Net finance costs
The Group had interest income of £1.3m in 2010 (2009: £1.3m) and interest payable of £2.5m (2009: £1.4m). Interest income reflects continued low prevailing interest rates and reduced cash balances at times during the year primarily due to investment in inventory. Interest payable was incurred in respect of borrowing fees on covering short positions, currency overdrafts and bank borrowings that are used to fund short-term settlement activity and trading positions.

### Taxation
The 2010 tax charge of £4.4m arises on a profit before tax of £19.0m compared with a tax charge of £5.0m in 2009 on a profit before tax of £18.4m. The 2010 effective tax rate of 23.2% (2009: 27.2%) reflects the impact of lower tax rates applicable to the businesses in the Channel Islands and Singapore, partially offset by disallowable expenditure and the non-recognition of losses in the US business. The 2009 effective tax rate was impacted by similar factors with a greater level of unrecognised losses relating to the US business partially offset by a favourable prior year adjustment.

### Earnings per share
Basic earnings per share were 6.1p (2009: 5.5p). The share capital used to calculate earnings per share is adjusted to exclude shares held by the Group's employee share ownership trusts and those held in Treasury.

### Balance sheet and cash flow
The consolidated balance sheet is shown on page 43. As at 31 December 2010, net assets amounted to £262.7m (2009: £253.4m), of which goodwill represents £156.5m or 60%. Further detail of the goodwill, which increased during the year due to the acquisitions, is set out in Note 11 to the consolidated financial statements. The remainder of the Group's net worth substantially comprises liquid net assets, including net cash and cash equivalents, trading positions and trade receivables, net of trade payables.

Net trading positions amounted to £30.6m (2009: £9.9m), comprising long and short positions of £103.5m (2009: £32.8m) and £72.9m (2009: £22.9m) respectively. Gross and net positions were significantly higher than in 2009 due to increased activity on trading desks and the addition of two new desks in the US business. Further detail on trading positions is shown in Note 18 to the consolidated financial statements. Trade receivables and payables include unsettled delivery versus payment market trades, of which more information is also provided in Note 18.

The Group's operating activities generated £8.0m cash in 2010 (2009: £14.0m) from a statutory operating profit of £20.2m (2009: £18.5m). Despite increased investment in trading inventory and acquisitions, the Group finished the year with net cash and cash equivalent balances of £104.5m (2009: £113.2m), as described further in the Financing and Treasury section below, and also in Note 26 to the consolidated financial statements.

### Regulatory capital
The Group is subject to the consolidated capital adequacy supervision regime of the Financial Services Authority ("FSA") and has maintained adequate levels of capital within the overall Group and in its regulated subsidiaries throughout 2010.

The Group has an Internal Capital Adequacy Assessment Process ("ICAAP") as required by the FSA for establishing the amount of regulatory capital to be held by the Group. The ICAAP gives consideration to both current and projected financial and capital positions, and includes stress testing for adverse economic conditions. The ICAAP is updated as required to reflect changes to the Group's structure and business environment. Capital adequacy is monitored on an ongoing basis by management. The Group uses the standardised approach to market risk, the simplified approach to credit risk and the basic indicator approach to operational risk. The Group complied with the FSA's regulatory requirements throughout the year.

The Group's capital requirements at 31 December 2010 are set out below in accordance with Pillar 3 disclosure requirements.

| | 2010 £m | 2009 £m |
|---|---|---|
| Total capital per Balance Sheet | 262.7 | 253.4 |
| Goodwill | (156.5) | (143.8) |
| Other intangible assets | (2.6) | (0.7) |
| Material holdings & free deliveries | (0.4) | (0.4) |
| Deductions | (159.5) | (144.9) |
| Total capital after deductions | 103.2 | 108.5 |
| Capital requirements | | |
| Equity | 17.2 | 4.6 |
| Interest rate | 2.1 | 1.9 |
| Foreign currency | 3.1 | 2.0 |
| Market risk (standardised approach) | 22.4 | 8.5 |
| Credit risk (simplified approach) | 12.8 | 10.4 |
| Operational risk (basic indicator approach) | 30.2 | 29.2 |
| Total capital requirements | 65.4 | 48.1 |
| Surplus capital | 37.8 | 60.4 |
| Solvency ratio | 157.8% | 225.6% |

## Financing and treasury

As stated above, at 31 December 2010 the Group had net cash and cash equivalents of £104.5m (2009: £113.2m). This included client settlement balances of £1.7m (2009: £2.2m). Of the overall cash and cash equivalent balances, some £22.4m (2009: £4.5m) comprise margin deposits with various banks and a further £0.9m (2009: £2.5m) is held by the Group's ESOTs, which can only be used for the benefit of staff.

The Group has a number of overdraft facilities with major banks that are used for short-term financing of inventory and settlement obligations. In addition, it has a £25m revolving unsecured credit facility that is due to expire in June 2012.

## Treasury policy and liquidity

The Group's policy is to hold both its own and its clients' cash reserves with a diversified range of financial institutions, each of which is a major UK or international bank or an institution supported by a government guarantee. Client money is ring-fenced under FSA client money rules.

At 31 December 2010, client money was held with a diversified range of banks. The Group's own cash was placed with the same institutions and others where the needs of the business so required. The Group's own money is held primarily on demand, as it needs to be readily available to meet short-term funding requirements. Client cash is held primarily on demand but deposits of longer duration are also placed where this can maximise returns within an agreed maturity risk profile.

The Company has prepared an Individual Liquidity Adequacy Assessment ("ILAA") in accordance with FSA regulations. Further details of the Group's approach to capital and liquidity risk are given in Note 18 to the consolidated financial statements.

## Going concern

The Group's business activities, its financial position (including cash flows, liquidity position and borrowing facilities) together with any factors that are likely to affect its future performance are set out in this Business Review. As shown in the Regulatory Capital section above, the Group has £37.8m (2009: £60.4m) of

regulatory capital in excess of its requirements and a resulting solvency ratio of 157.8% (2009: 225.6%). Stress test scenarios are undertaken both as part of the ICAAP and ILAA reviews and as a routine management discipline, the outcomes of which show that the Group has adequate capital resources for the foreseeable future, and a high degree of liquidity, even in very stressed economic conditions.

The Group also has substantial liquid net assets, with net cash and cash equivalents amounting to £104.5m, as set out in the Financing and Treasury section and in Note 26 to the consolidated financial statements. In addition, the Group has an undrawn bank facility of £25m which provides further flexibility to the Group's funding arrangements.

The directors believe that the Group is well placed to manage successfully its business risks, as described in more detail below, despite the current uncertain economic outlook and has adequate resources to continue in operational existence for the foreseeable future. Accordingly, they continue to adopt the going concern basis in preparing the annual report and accounts.

Collins Stewart plc
Annual Report and Accounts
2010

# Key risks facing the business

The key risks facing the business are described below, together with the principal means by which these risks are mitigated. These risks are assessed before any new business is established and monitored on a day to day basis as part of the normal management process. The processes through which the Group manages the key risks it faces are described in the Corporate Governance Report.

## Credit risk

The risk of financial loss to the Group in the event that a client or counterparty fails to settle its contractual obligations to the Group.

**Impact**
- A counterparty failure could have a significant adverse impact on the Group's profits, cash and capital resources.

**Mitigation**
- Virtually all of the Group's business is contracted on a delivery versus payment basis, so the main credit risk is actually more akin to market risk.
- All counterparties are subject to regular review and assessment and overall counterparty limits are approved by the Risk Committee.

## Market risk

The risk of financial loss to the Group due to movements in the value of financial instruments.

**Impact**
- If a counterparty in a matched principal transaction fails to fulfil its obligations (ie an initially unsettled transaction) or trade mismatches or other errors occur, short-term price movements in stocks held or to be delivered to the Group and movements in foreign exchange rates may impact the Group's profits and cash.
- In certain circumstances, the Group may take equity positions as part of Corporate Broking transactions. Also, certain divisions take long and short equity positions as part of their day-to-day activities, but these are generally related to the wider activities of market-making or agency broking within the relevant unit's area of specialisation. Some low-risk arbitrage trading strategies are employed by the Investment Companies team. The Group is exposed to a fall in the value of such positions.

**Mitigation**
- The Group follows policies and procedures to reduce the likelihood of such trade mismatches.
- In the event that trade mismatches arise, the Group's policy is to close out such balances immediately.
- The Group will only take positions related to Corporate Broking transactions if there is a reasonable prospect of unwinding the position without loss in the short term. Any bonuses due on these transactions are only paid once the relevant positions have been liquidated and profits realised.
- Limits apply to the overall permitted long or short positions, as well as a limit on positions in a single stock. These limits apply to all books as well as to the Group as a whole and are approved by the Board. The Group's actual exposure against these limits is identified, monitored and reported on a daily basis.

## Strategic risk

The risk that the Board pursues a strategy that is inappropriate in terms of the markets in which the Group operates, economic conditions or the resources available to it.

**Impact**
- Inappropriate or poorly-executed strategy could result in losses or missed opportunities.

**Mitigation**
- The Board keeps its strategy under review. Annual budgets are prepared and challenged. Periodic reviews are undertaken during the year.
- Divisional management present business plans to the Board for discussion each year.

## Liquidity risk

The risk that the Group is unable to fund its commitments as they arise.

**Impact**
- The Group enters into many transactions each year in the course of its business. Failure to settle trades (including situations where a counterparty fails) may have a significant detrimental effect.
- The Group can be subject to short-term fluctuations in its cash requirements due to failed trades or to the processing of certificated trades and the funding of trading positions.
- In addition to its own cash, the Company is responsible for significant client cash, primarily in its Wealth Management division. Although client cash is generally held on deposits of short duration, the profile is longer-dated than the firm's own cash. This is because the short-term fluctuations are less extreme and it enables the division greater flexibility to maximise returns. This does create a maturity risk if the duration of deposits is not matched exactly to that provided to clients.

**Mitigation**
- The Group maintains substantial cash balances and liquid trading assets and undertakes ongoing cash forecasting, including under stress-tested scenarios.
- Funding and capital is centrally managed, and deployed where necessary according to the needs of the individual entities and businesses.
- The Group has a number of bank facilities at its disposal for settlement transactions, and an undrawn bank facility of £25m. The Group maintains most of its cash resources on demand.
- Executive management receives daily reports on the Group's cash position. The Company complies with the FSA's new liquidity regime and has prepared an ILAA.
- The maturity profile of client money is determined by a divisional treasury committee to ensure that the maturity risk is maintained within appropriate limits. This committee also approves the institutions with which cash is placed, and the limits on the amount that can be placed with any one institution.
- Counterparties selected for client cash are the same as those for the firm's cash to the extent possible. The different maturity profiles of clients and the firm, however, together with the particular business requirements of group companies, mean that it is not feasible to align the counterparty portfolios exactly.

## Operational risk

The risk of loss resulting from inadequate or failed internal processes, people, systems or external events.

**Impact**
- Failure of systems or processes, or employee error, could result in the Group suffering loss through being unable to conduct business or creating liabilities to third-parties.

**Mitigation**
- The overall objective of the Group's operational risk management approach is to identify and assess risks and risk situations in order to manage them in an efficient manner.
- The Group keeps its operations and systems under continual review and development to meet the needs of the business.
- Internal Audit is deployed to subject operations and systems to detailed scrutiny, on a risk-weighted basis, based on the Group's Risk Assessment Framework.

## Reputational risk

The risk that the Group's ability to do business will be damaged as a result of its reputation being tarnished.

**Impact**
- Clients rely on the Group's integrity and probity and may refuse to do business with Group companies.

**Mitigation**
- The Group has policies and procedures in place to manage this risk to the extent possible which include, inter alia, procedures for employee hiring, the taking on of new business, and conduct of business rules.
- The Group has policies and procedures to counter fraud and corruption.
- Group Compliance functions operate to ensure adherence to regulatory requirements.
- Issues such as legal actions and regulatory reviews are monitored by Company Secretarial and Compliance functions and addressed at appropriate levels throughout the organisation.

# Board of Directors



### 1. Tim Ingram (aged 63) – Chairman

Tim Ingram was appointed a non-executive director of the Company and a member of the Audit, Remuneration and Nomination Committees on 11 January 2010. He was Chief Executive of Caledonia Investments plc from 2002 until his retirement in July 2010. After an early career in international banking, he was finance director, chief executive and later chairman of First National Finance Corporation from 1992, a managing director of Abbey National from 1996 to 2002, and was a non-executive director of ANZ Bank (Europe) Limited from 2004 to 2010. He is also the senior independent non-executive director of Savills plc and a non-executive director of Alliance Trust plc and Alok Industries Limited. He was appointed Chairman of the Company on 1 April 2010.

### 2. Mark Brown (aged 47) – Chief Executive

Mark Brown was appointed Chief Executive of Collins Stewart in October 2008. With over 20 years' experience in investment banking, Mark joined the Company from Arbuthnot Securities, where he held the position of Chief Executive from 2004 to 2008. Prior to Arbuthnot, Mark held positions as Chief Executive of ABN AMRO Equities (UK) and Global Head of Research at both ABN AMRO and HSBC Investment Bank. In 1987 he joined UBS/Phillips and Drew as Economist and Market Strategist, during which time he was rated No.1 UK Strategist in the Extel Survey. Mark started his early career as Economist at the Confederation of British Industry followed by Her Majesty's Treasury.

### 3. Paul Baines (aged 55) – Executive Director

Paul Baines, who is Executive Chairman of Hawkpoint, was appointed an executive director of the Company on 22 December 2006. After qualifying as a solicitor with Freshfields he joined Antony Gibbs & Sons Limited, a UK merchant bank. In 1984 he joined Charterhouse Bank, where he became a director in 1988. In 1993 he became a member of the management committee of its corporate finance business, latterly becoming its Chief Executive. He joined Hawkpoint in 2000 and was appointed Chief Executive and Managing Partner in October 2003. He was appointed Executive Chairman of Hawkpoint in October 2009.

### 4. John Cotter (aged 44) – Executive Director

John Cotter was appointed Group Finance Director of Collins Stewart in June 2009. John was previously at Royal Bank of Scotland, in the Global Banking & Markets Division, where he held a number of senior Finance posts including Chief Operating Officer to the Global Head of Business Unit Control. Before that he worked for Morgan Stanley & Co International Limited between 1992 and 2007, latterly as Executive Director and European Head of Financial and Regulatory Control. John was also COO, CFO and Vice Chairman of the Management Committee of Morgan Stanley's UK Bank, (Morgan Stanley Bank International Limited). He is a Fellow of the Institute of Chartered Accountants in Ireland.

### 5. Paul Hewitt (aged 54) – Independent non-executive director

Paul Hewitt, a Chartered Accountant, was appointed a non-executive director of Collins Stewart plc and Chairman of the Audit Committee on 11 January 2010. He is currently non-executive Chairman of R.J.Kiln & Co Limited, a trustee member of NEST Corporation, a non-executive director of Co-operative Financial Services and of Kiln Group Limited, and an industrial partner with Lyceum Capital. Paul was previously Deputy Group Chief Executive of the Co-operative Group and before that was finance director of RAC plc and a number of other public companies.

### 6. Nicholas Page (aged 58) – Independent non-executive director

Nicholas Page, a Fellow of the Institute of Chartered Accountants, was appointed a non-executive director of the Company on 5 July 2010. Nicholas has been a non-executive director of International Personal Finance plc and Chairman of its Audit and Risk Committee since 2007. He is a senior adviser to Star Capital Partners and Chairman of C.A.R.E. Europe SA. His previous appointments include Chief Operating Officer of Travelex plc, Managing Director of Hambro Insurance Services plc, executive director of Hambros Bank and Joint Deputy Chairman of Hambro Group Investments, and a non-executive director of MoneyGram International Limited.

### 7. Giles Vardey (aged 54) – Independent non-executive director

Giles Vardey was appointed a non-executive director on 1 September 2010 and became Chairman of the Remuneration Committee on 30 September 2010. He has over 28 years' senior management and board experience in financial markets, investment banking and high-growth companies. He is Chairman of Plus Markets Group plc, a small and mid-cap stock exchange in London, and a non-executive director of Pipeline Financial Europe Ltd, a specialist equity trading systems provider. Previous roles include Chairman of CQS Management and Chief Executive of Greig Middleton & Co. He served on the main board of the London Stock Exchange between 1992 and 1997, leading the implementation of SETS and the creation of AIM and FTSE International. Prior to that he spent ten years in securities sales and trading at Salomon Brothers, Swiss Bank Corporation and County Natwest.

# Report of the Directors

The Companies Act 2006 requires us to set out in this report a fair review of the business of the Group during the financial year ended 31 December 2010, including an analysis of the position of the Group at the end of the financial year and a description of the principal risks and uncertainties facing the Group (known as a "Business Review"). All the information detailed in the sections stated below is incorporated by reference into this report and deemed to form part of this report:

- Chairman's Statement on pages 4 to 5
- Business Review on pages 6 to 19
- Principal risks and uncertainties on pages 20 to 21; and
- The Corporate Governance Report on pages 27 to 29

Pages 24 to 26 inclusive (together with the sections of the Annual Report incorporated by reference) consist of a Company Directors' Report that has been drawn up and presented in accordance with, and in reliance upon, applicable English company law. The liabilities of the Directors, in connection with that report, shall be subject to the limitations and restrictions provided by such law.

## Business review
### Principal activities
Collins Stewart plc is a holding company. Details of its principal subsidiary undertakings are shown in Note 33 to the consolidated financial statements. The Group, which comprises the Company and all its subsidiary undertakings, is an independent financial advisory business. It was founded in 1991 and its activities include institutional and private-client stockbroking, market making, corporate advisory services, fund management and the supply of online financial information through the quantitative research system Quest™. The Group operates in a number of countries, including the UK, US, Channel Islands and Singapore. Certain Group companies conduct activities through branches located in France, Ireland, Germany and Italy.

### Results and dividends
The profit attributable to ordinary shareholders of the Company for the year ended 31 December 2010 amounted to £14.6m, compared with a profit of £13.4m for the year ended 31 December 2009, as set out in the consolidated income statement on page 40.

An interim dividend of 1.3p (2009: 1.3p) per ordinary share was paid on 25 November 2010. The directors recommend that, subject to approval at the Annual General Meeting, a final dividend of 1.7p (2009: 1.3p) per ordinary share be paid on 26 May 2011 to members on the register on 6 May 2011. This will make a total dividend for the year of 3.0p (2009: 2.6p) per ordinary share.

### Financial performance
A review of the Group's performance during the year ended 31 December 2010 and the Group's financial position as at that date is contained in the Business Review on pages 6 to 19.

### Risk factors
The Group's future performance and results could be materially different from expected results depending on the outcome of certain potential risks and uncertainties. Details of the principal risks and uncertainties facing the Group, and how they are controlled, are described on pages 20 to 21.

The reported results of the Group are also sensitive to the accounting policies, assumptions and estimates that underlie the preparation of its financial statements. Details of the Group's principal accounting policies and key sources of accounting judgements are included in Note 2 to the consolidated financial statements.

### Staff
The Group employed an average of 757 employees during the year, and employed 801 at 31 December 2010. A geographical analysis of headcount is included in Note 5 to the Consolidated Financial Statements. Details of employee-related costs are set out in Note 5.

It is the Group's policy to give appropriate consideration to applications for employment from all persons, having regard to their particular aptitudes. The Group is committed to fairness and its policy is not to discriminate against any persons with regard to gender, age, disability, sexual orientation, religious or political beliefs but to develop and promote based on individual ability and the needs of the business.

The Group has a policy of keeping employees informed about major developments in the business. In particular, announcements are made available to employees when released to the public and other communication channels such as the corporate intranet and online newsletters are used to encourage employee engagement.

The ownership of shares in the Company is encouraged by the Board, who consider share ownership as an important means of providing an incentive to employees and aligning their interests with other shareholders.

### Health and safety policy
The health, safety, wellbeing and security of employees are a priority for the Group. Regular reviews are undertaken of both policies and processes to ensure compliance with current legislation and best practice. The Group focus is on ensuring that these policies are closely linked to the operational needs of the business.

### Social, environmental and ethical matters
The Board has adopted policies with regard to the social, environmental and ethical matters which affect the business. These govern, inter alia, the type of business which is transacted, the way in which business is conducted and the approach to training and incentivising staff. In particular:

- The Board takes account of social and ethical matters affecting the business; environmental issues are not considered on a frequent basis as these are not regarded as a high risk;
- The Board periodically carries out formal assessments of the significant risks to its business which take account of social and ethical matters affecting both short and long-term value. The opportunities to create value arising from certain social and ethical stances are taken into account when formulating policies;
- There are systems of risk management in place to manage the significant risks which could affect the business.

The nature of the Group's activities is such that it has a minimal direct effect on the environment. However, the Board has agreed that it will seek to adopt policies to safeguard the environment to meet statutory requirements or where such policies are commercially sensible. Currently, where possible, waste paper is recycled and energy saving practices are employed.

### Share capital

At 1 January 2010 and 31 December 2010, the Company's authorised share capital was £79,993,418. This comprised 319,773,672 ordinary shares with a nominal value of 25 pence each, representing 99.94% of the total share capital, and 50,000 redeemable shares with a nominal value of £1 each, which represented 0.06% of the total share capital.

On 1 January 2010, there were 248,112,117 ordinary shares in issue. During the year, holders of options granted under the Company's share options plans exercised options over 2,659,396 ordinary shares, resulting in the issue of 17,433 new shares by the Company before the Board resolved to satisfy any future exercises from the shares held in the Company's Employee Share Ownership Trust (the "ESOT"). Consequently there were 248,129,550 ordinary shares in issue as at 31 December 2010 (2009: 248,112,117), of which 283,173 shares were held in treasury. The ordinary shares are listed on the London Stock Exchange.

The holders of ordinary shares are entitled to receive the Company's reports and accounts; to attend and speak at general meetings of the Company; to appoint proxies and exercise voting rights. There are no restrictions on transfer or limitations on the holding of any class of shares and no requirements for prior approval of any transfers.

### Control

None of the Company's ordinary shares carries any special rights with regard to control of the Company. There are no known arrangements under which financial rights are held by a person other than the holder of the shares and no known agreements on restrictions on share transfers or on voting rights. Shares acquired through Company share plans rank pari passu with the shares in issue and have no special rights. At 31 December 2010, the Collins Stewart ESOT held 5,665,229 ordinary shares. The trustee has waived its right to receive dividends on these shares.

In addition, employee benefit trusts have been established for employees of other group companies. Shares held by these trusts, totalling 761,283 at 31 December 2010, generally related to deferred consideration in respect of the acquisition of the companies concerned and substantially all of the shares have been allocated to individual employees. Although such employees had the right to benefit from dividends payable on such shares, they could forfeit some or all of their entitlement to the shares in the event that they cease to be employed by a group company. The voting rights of shares held by employee benefit trusts are exercised at the discretion of the trustee who may, but is not obliged to, follow the recommendation of the Company.

As far as the Company is aware, there are no persons with significant direct or indirect holdings in the Company other than has been disclosed by the Company pursuant to the FSA's Disclosure & Transparency Rules. Such disclosures are published on a Regulatory Information Service and on the Company's website, www.collinsstewart.com

The rules about the appointment and replacement of directors are contained in the Company's Articles of Association. Changes to the Articles of Association must be approved by the shareholders in accordance with the legislation in force at the time.

The powers of the directors are determined by UK legislation and the Memorandum and Articles of Association of the Company in force from time to time. The directors have been authorised to issue and allot ordinary shares pursuant to Articles 6 and 7. The directors have also been authorised to make market purchases of ordinary shares pursuant to Article 11. Any ordinary shares so purchased may be cancelled or held in treasury. The powers under Articles 6, 7 and 11 are referred to the shareholders at the Annual General Meeting for renewal.

The Company is not party to any significant agreements that would take effect, alter or terminate upon a change of control following a takeover bid. The Company also does not have agreements with any director or employee that would provide compensation for loss of office or employment resulting from a takeover except that provisions in the Company's share-based incentive plans may cause options and awards granted to employees under such plans to vest on a takeover.

### Directors

The following directors held office during the year ended 31 December 2010:

| | |
|---|---|
| Tim Ingram | Chairman – *appointed as non-executive director on 11 January 2010 and Chairman on 1 April 2010* |
| Mark Brown | Chief Executive |
| Paul Baines | Executive Director |
| John Cotter | Group Finance Director |
| Paul Hewitt | Independent non-executive director – *appointed 11 January 2010* |
| Nicholas Page | Independent non-executive director – *appointed 5 July 2010* |
| Giles Vardey | Independent non-executive director – *appointed 1 September 2010* |
| Terry Smith | Non-executive director (formerly Chairman) – *resigned 6 December 2010* |
| Keith Hamill | Independent non-executive Deputy Chairman – *resigned 18 May 2010* |

Biographical details of the directors in office at the date of this report are set out on page 23. Nicholas Page and Giles Vardey were appointed as directors subsequent to the last Annual General Meeting of the Company and so will stand for election at the forthcoming AGM.

### Directors' Interests

The interests (all beneficial) in the ordinary share capital of the Company of those persons who were directors at the end of the year, together with comparatives at the beginning of the year or, if later, the date of appointment, are set out below. The interests of directors in options over the Company's shares are given in the Remuneration Report.

# Report of the Directors continued

| | 31 Dec 2010<br>No. of shares | 31 Dec 2009<br>No. of shares |
|---|---|---|
| Tim Ingram | 250,000 | – |
| Mark Brown | 75,000 | – |
| Paul Baines | 1,482,988 | 2,420,639 |
| John Cotter | 50,000 | – |
| Paul Hewitt | 22,935 | – |
| Nicholas Page | 62,000 | – |
| Giles Vardey | – | – |

The interests of the directors in the share capital of the Company disclosed above have remained unchanged during the period between 31 December 2010 and the date of signing of this report.

## Directors' indemnities

The Company executed an instrument by way of Deed Poll to the extent permitted by law so as to provide indemnification to the directors. The terms of the indemnification are uncapped in amount in relation to certain losses and liabilities which they may incur to third parties in the course of acting as directors. The Deed Poll and Company's articles are available for inspection during normal business hours on any weekday (other than public holidays) at the Company's registered office from the date the notice of Annual General Meeting is posted until the conclusion of the Annual General Meeting.

## Directors' disclosure to auditors

In accordance with the provisions of section 418 of the Companies Act 2006, each of the directors at the date of approval of this report confirms that:

(1) so far as the director is aware, there is no relevant audit information of which the Group's auditors are unaware; and
(2) the director has taken all the steps that he ought to have taken as a director in order to make himself aware of any relevant audit information and to establish that the Group's auditors are aware of the information.

Words and phrases used in this confirmation should be interpreted in accordance with section 418 of the Companies Act 2006.

## Substantial interests

At the date of this document, the following (not being directors, their families or persons connected within section 252 of the Companies Act 2006) had notified the Company that they were interested in 3% or more of the issued ordinary share capital of the Company:

| | Voting interest<br>(%) |
|---|---|
| Aberforth Partners LLP | 9.99 |
| Standard Life Investments Limited | 6.04 |
| Oppenheimer Funds Inc | 5.99 |
| Legal & General Group plc | 5.97 |
| Schroders plc | 5.47 |
| Royal Bank of Canada | 5.18 |
| Gartmore Investment Limited | 4.92 |
| Credit Suisse Securities (Europe) Limited | 3.81 |
| Barclays plc | 3.70 |

## Policy of payment to suppliers

It is the Group's policy that all transactions are settled in accordance with relevant terms and conditions of business agreed with the supplier, provided all such terms and conditions have been complied with. Creditor days outstanding for the Company at 31 December 2010 were 31 (2009: 30 days).

## Annual General Meeting

The AGM of the Company will be held at 9.30 a.m. on 19 May 2011 at the registered office of the Company; 88 Wood Street, London EC2V 7QR. The notice of the meeting and details of the resolutions to be proposed are contained in the circular which accompanies the Annual Report.

## Events since the balance sheet date

There have not been any material post-balance sheet events.

## Political and charitable donations

During 2010, no political or charitable donations were made by the Group. Charitable donations amounting to £3,000 were made in 2009.

## Auditors

The auditors, Deloitte LLP, have indicated their willingness to continue in office. A resolution to re-appoint Deloitte LLP as the Company's auditors will be proposed at the forthcoming AGM.

By order of the Board

## Simon Pearce ACA

Company Secretary
15 March 2011

# Corporate governance report

This report explains how the Company has applied the main and supporting principles of the Combined Code issued by the Financial Reporting Council ("the Code").

During a period of Board restructuring, the Company did not comply with Code Provisions A.3.2 (composition of the Board), B.2.1 (composition of the Remuneration Committee) and C.3.1 (composition of the Audit Committee) between 1 January 2010 and 11 January 2010, the date of appointment of Tim Ingram and Paul Hewitt, as each committee comprised only one member during that brief period. The Company was also not in compliance with these Code provisions following the resignation of Keith Hamill as a non-executive director on 18 May 2010, as the Board then comprised two non-executive directors, excluding the Chairman, and three executive directors and each committee comprised only two members. The Company became compliant with A.3.2 on 5 July 2010 on the appointment of Nicholas Page to the Board and with B.2.1 and C.3.1 on 26 July 2010 on his appointment to the Committees.

Except as set out above, the Company has complied with all the provisions of the Code during the year ended 31 December 2010.

## The Board
The Board, which currently comprises the Chairman, three executive directors and three non-executive directors, has overall responsibility for leading and controlling the Company and is accountable to shareholders for financial and operational performance. Biographies of each member of the Board are set out on page 23.

The Chairman, Tim Ingram, has a part-time non-executive role and is responsible for the conduct of the Board and its collective oversight of the Company's affairs and strategy. The Chief Executive, Mark Brown, is responsible for the day-to-day management of the business, the co-ordination of its activities and the development of strategy. Paul Hewitt has been designated the Senior Independent Director. As such, he has responsibility for dealing with any shareholders who have concerns which contact through the normal channels of Chairman, Chief Executive or Group Finance Director has failed to resolve, or for which such contact is inappropriate. The Board believes that these arrangements facilitate the effective management of the business and provide a strong control environment.

Each of the non-executive directors is considered to be independent under the Code. The directors' biographies demonstrate a range of experience and sufficient calibre to bring independent judgement on issues of strategy, performance, resources and standards of conduct which is vital to the success of the Group. A statement of the directors' responsibilities in respect of the accounts is set out on page 37, and a statement on going concern is set out on page 19. The directors receive ongoing training including an induction programme tailored to meet the needs of the individual. The directors also receive regular updates on changes and developments to the business, legislative and regulatory environments.

The Board has established Audit, Remuneration and Nomination Committees to which it has delegated some of its responsibilities. Each of the committees has detailed terms of reference and the Audit and Remuneration committees each have a schedule of business to be transacted during the year. The responsibilities of each of the Committees are described below.

The number of meetings of the Board and of each of the Committees is set out below, together with the attendance of each director:

| | Board[1] | Audit Committee[2] | Remuneration Committee[2] | Nomination Committee[2] |
|---|---|---|---|---|
| Total meetings held during the year | 9 | 5 | 5 | 3 |
| Tim Ingram – *appointed 11 January 2010* | 9/9 | 5/5 | 5/5 | 2/2 |
| Mark Brown | 9/9 | – | – | – |
| Paul Baines | 9/9 | – | – | – |
| John Cotter | 9/9 | – | – | – |
| Paul Hewitt – *appointed 11 January 2010* | 7/9 | 5/5 | 5/5 | 2/2 |
| Nicholas Page – *appointed 5 July 2010* | 4/4 | 1/1 | 1/1 | 1/1 |
| Giles Vardey – *appointed 1 September 2010* | 3/3 | 1/1 | 1/1 | – |
| Terry Smith – *resigned 6 December 2010* | 9/9 | – | – | – |
| Keith Hamill – *resigned 18 May 2010* | 4/4 | 2/2 | 3/3 | 1/1 |

1   Excludes ad hoc meetings of Committees of the Board appointed to complete business approved by the Board or routine business.
2   Committee attendance shown for committee members only.

## Board administration
The Board has a schedule of nine meetings during the year to discuss the Group's ordinary course of business. Every effort is made to arrange these meetings so that all directors can attend. Additional meetings are arranged throughout the year as required to address matters arising.

The Board is provided with appropriate information on a timely basis to enable it to discharge its duties. It has a formal schedule of matters reserved to it for decision, including developing the future direction of the Group's business, agreeing policies and procedures, approving material transactions, budgets and borrowings and monitoring the Group's progress. All directors receive detailed papers prior to each Board meeting to enable them to make an informed decision on corporate and business issues under review. All Board meetings are minuted and any unresolved concerns would be recorded in such minutes.

# Corporate governance report continued

It is the policy of the Board to conduct a review of its performance, its Committees and individual directors each year. In this process, the Board or Committee members assess whether the Board or Committee fulfilled its terms of reference satisfactorily, whether the terms of reference need to be revised, whether the administration operated effectively and whether individual directors performed their roles effectively. In 2011, the process will be conducted with external assistance. The non-executive directors are responsible for assessing the effectiveness of the Chairman, a process that includes a meeting conducted in his absence.

The terms of the directors' service agreements and letters of appointment are summarised in the Remuneration Report. All directors are subject to election by shareholders at the first Annual General Meeting after their appointment and, thereafter, at intervals of three years. At the forthcoming AGM in May, Nicholas Page and Giles Vardey will be subject to election as this will be the first AGM since their appointment.

The terms and conditions of appointment of the non-executive directors will be available for inspection during normal business hours on any weekday (other than public holidays) at the Company's registered office from the date the notice of AGM is posted until the conclusion of the AGM.

All directors have access to the services of the Company Secretary and there are procedures in place for taking independent professional advice at the Company's expense if required. The Company arranges insurance cover in respect of legal action against the directors and provides indemnities to the extent permitted by law. The Company Secretary is responsible for ensuring that the Board keeps up to date with key changes and developments to the legislative and regulatory environments which affect the Company. The Company Secretary is also responsible for ensuring that directors receive ongoing training including an induction programme tailored to meet the needs of the individual.

## Board Committees

Due to the changes in the composition of the Board during the year, there have been a number of changes to the membership of the Audit, Remuneration and Nomination Committees. Paul Hewitt and Tim Ingram joined the Committees on their appointment to the Board on 11 January 2010. Nicholas Page and Giles Vardey joined the Committees on 26 July and 1 September respectively. Keith Hamill was a member of the Committees until his retirement from the Board on 18 May 2010.

## Audit Committee

The current members of the Audit Committee are Paul Hewitt, Tim Ingram, Nicholas Page and Giles Vardey. Paul Hewitt chairs the Committee and all of the members are independent non-executive directors.

The Company's external and internal auditors, other directors and appropriate members of senior management may attend Committee meetings by invitation. The Committee meets at least four times a year and the Committee has a discussion with the external and internal auditors at least once a year without executive directors being present, to ensure that there are no unresolved issues of concern. The Audit Committee met five times during 2010.

The Committee's terms of reference include monitoring the integrity of the financial statements, reviewing the scope and findings of external audit, assessing the independence and objectivity of the external auditors and making recommendations for their re-appointment or removal, monitoring the effectiveness of the Company's risk management and internal control procedures, including the internal audit function, and reviewing arrangements by which staff may, in confidence, raise concerns about improprieties.

The Audit Committee is responsible for reviewing the interim and preliminary announcements of results and the statutory accounts prior to their approval by the Board. When conducting the review, the Committee considers any judgements made in the preparation of the accounts, whether the accounting policies are appropriate and the adequacy of disclosures.

The Audit Committee received an annual risk assessment following a review of the effectiveness of internal control and risk management systems and reported to the Board thereon.

In February 2011, in order to reflect the Committee's pivotal role in the monitoring and management of risk, the Board determined that it should be renamed the "Audit and Risk Committee".

## Remuneration Committee

The current members of the Remuneration Committee are Giles Vardey, Paul Hewitt, Tim Ingram and Nicholas Page. Giles Vardey chairs the Committee and all of the members are independent non-executive directors.

The Board has delegated the following responsibilities to the Remuneration Committee: agreeing the remuneration of the executive directors; recommending and monitoring the structure of remuneration of senior management; and granting share-based incentives under the Company's incentive plans. The Remuneration Committee met five times in 2010.

The Chief Executive attends certain parts of meetings of the Remuneration Committee by invitation. Further details of the Company's policies on remuneration, service contracts and share options are given in the Remuneration Report.

## Nomination Committee

The current members of the Nomination Committee are Tim Ingram, Paul Hewitt, Nicholas Page and Giles Vardey. Tim Ingram chairs the Committee and all of the members are independent non-executive directors.

The Nomination Committee is responsible for proposing candidates for appointment to the Board, having regard to the balance of skills, knowledge and experience of the Board. For non-executive appointments, the Committee will also consider the time commitment involved in the appointment in arriving at its decision and this is reflected in all new letters of appointment. The Committee prepares a detailed specification of the role and engages professional Search Consultants to assist in finding and assessing suitable candidates for Board appointments. The Nomination Committee met three times in 2010.

The schedule of matters reserved to the Board and terms of reference of the Audit, Remuneration and Nomination Committees are available on the Company's website, www.collinsstewart.com.

## Risk management and internal control

The Board is responsible for setting the Group's risk policies and ensuring that it has an appropriate and effective risk management framework. The Board monitors the ongoing process for identifying, evaluating, managing and reporting the significant risks faced by the Group. The Board is also responsible for the Group's system of internal control and for reviewing its effectiveness. In discharging its responsibilities in this respect, the Board has appointed the Audit Committee to carry out the annual review of the effectiveness of the internal control and risk management systems and to report to the Board thereon.

The Company has a Risk Committee, comprising the Group Finance Director (who chairs the committee), the Chief Executive, Chief Operating Officer and Company Secretary, which meets at least on a quarterly basis. The Company has also established a Risk Group which reports to the Risk Committee and monitors the Company's key risks. The Risk Group meets on a monthly basis to review any potential or outstanding risks and to initiate any appropriate courses of action. It also supervises the Risk Assessment Framework which is utilised to provide risk analysis for management and the Risk Committee and to develop the internal audit schedule.

Risk management and the operation of the internal control systems are primarily the responsibility of executive directors and senior management within parameters agreed by the Board. The aim is to ensure that risks are clearly owned and managed on a day-to-day basis and that systems of control operate effectively. The executive directors monitor activities on a daily basis and ensure that the appropriate controls are exercised over the Group's operations. The boards of the Company and principal subsidiaries review monthly management accounts, budgets and plans and discuss any issues arising from them.

The key risks facing the business are described on pages 20 and 21. These risks are assessed before any new business is established and monitored on a day-to-day basis as part of the normal management process. A single set of policies for the management of risk has been adopted and is applied across all activities.

The systems of internal control operated by the Group are designed to manage rather than eliminate risk of failure to achieve business objectives, and can only provide reasonable and not absolute assurance against material misstatement or loss.

## The Board's review of the system of internal control

The Board, with the assistance of the Audit Committee as described above, has reviewed the effectiveness of the system of internal control operated throughout the period from 1 January 2010 to the date of this report and is satisfied that the Group complies with the Turnbull Guidance.

## Compliance

The Group has a compliance function which ensures that all the Group's entities meet the requirements of regulators in each of the jurisdictions in which the Group operates. The compliance officers are in regular contact with the Group Head of Compliance and other senior management, and the Group Head of Compliance reports to the Audit Committee and the Board as appropriate.

The Group is regulated on a consolidated basis by the FSA. The Group ensures that its control environment is consistent with FSA requirements. The Group maintains sufficient regulatory capital in all its regulated entities and at the Group level.

## Internal audit

Internal Audit forms an integral part of the Group's risk management framework. The role of Internal Audit is to provide independent, objective review of the control environment and assessment of the effectiveness of the Group's operations. It is intended to bring a systematic, disciplined approach to the evaluation and improvement of the effectiveness of the risk management, control and governance processes.

The Board has chosen to outsource the Internal Audit function and Ernst & Young LLP has been appointed to provide Internal Audit services to the Group. Periodically, the Board reviews the decision to outsource.

The Audit Committee is responsible for monitoring the activities of the Internal Audit function and reviewing its effectiveness. Day-to-day responsibility for Internal Audit rests with the Group Finance Director, assisted by the Company Secretary.

Although it is intended that all significant areas should be subjected to Internal Audit review on a periodic basis, the programme is risk-weighted – areas for review are prioritised according to an assessment of the potential risk impact. The programme is therefore derived with reference to the analysis and prioritisation of risks within the Risk Assessment Framework. The Internal Audit programme has been approved by the Audit Committee. It is subject to ongoing review by the Risk Committee which will recommend changes to the programme if required.

## Relations with shareholders

The Board recognises the importance of communications with shareholders. The Company's website, www.collinsstewart.com, provides information for shareholders on the Group's activities, announcements, shareholder presentations and meetings. Various operating subsidiaries also have websites providing information on products and services.

There is regular dialogue with institutional investors, fund managers and analysts, including presentations at the time of the results announcements and also on request. Following formal presentations to shareholders, the Company's brokers additionally provide feedback to the Board from shareholders. The other non-executive directors are available to meet with shareholders should such meetings be requested.

The Board uses the AGM to communicate with investors and welcomes their participation. The Chairman aims to ensure that all of the directors are available at AGMs to answer questions and meet shareholders. The proxy votes cast on each resolution proposed at general meetings are disclosed at those meetings and published on the Company's website. To encourage shareholder participation, those shareholders whose shares are held via the CREST system are offered the facility to submit their proxy votes via CREST, while facilities are made available to other shareholders to allow their proxies to be submitted electronically.

# Remuneration report

This report has been prepared in accordance with Schedule 8 to the Accounting Regulations under the Companies Act 2006 and meets the relevant requirements of the Listing Rules of the FSA and the Combined Code. It also discloses information required pursuant to section 11.5 of the Prudential Sourcebook for Banks, Building Societies and Investment Firms issued by the FSA. The report is divided into the following sections:

1. The Remuneration Committee.
2. The Company's policies on remuneration.
3. Summary of directors' remuneration and share-based incentive awards.
4. Remuneration of key employees.

The information contained in section 3 of this report has been audited. This report will be submitted for approval at the forthcoming AGM.

## 1. Remuneration Committee

The Remuneration Committee makes recommendations to the Board on the policy and framework of executive remuneration. The Committee has oversight of the Company's remuneration policies, including assessment of the relationship between reward and risk, and approves the policies concerning the remuneration of executive directors and their application. The Committee also reviews the remuneration of senior managers and is consulted on changes in their remuneration. In addition, on behalf of the Board, the Committee approves long-term and share-based incentive plans and the granting of awards under those plans.

The Remuneration Committee comprises Giles Vardey, who is Chairman of the Committee, Nicholas Page, Tim Ingram and Paul Hewitt. Each of the members is considered to be an independent non-executive director. The Chief Executive attends meetings by invitation but does not attend those parts of meetings which deal with his own remuneration.

The Committee has access to the advice and views of the Chief Executive, Group Finance Director and the Company Secretary. During the year, the Committee consulted PricewaterhouseCoopers LLP, who provided advice in connection with the design and adoption of the Collins Stewart plc 2010 Long-Term Incentive Plan ("2010 LTIP").

The Committee is scheduled to hold at least three meetings a year. During 2010, it held five meetings.

## 2. Policies on remuneration

The Group's policy with respect to the remuneration of its employees, including directors, is described below. This reflects the extent to which performance of the Group is dependent upon the performance of individual employees and certain remuneration practices may be different from those adopted by UK-listed companies operating in other business sectors. In addition, a significant proportion of the businesses against which the Company competes are not headquartered in the UK.

The Group's remuneration policies are designed to attract, retain and motivate staff who have the alternative of working for its competitors. As a consequence, and in line with competitive practices, remuneration levels are generally higher than those paid by other UK companies of equivalent size operating in other sectors. The Company's policy is

based on a principle of variable remuneration depending on performance. It therefore pays relatively low base salaries and potentially high bonuses. These are not capped as it is believed that doing so would impact performance. Given the relationship between salaries and bonuses arising under this policy it is not appropriate to determine bonuses as a percentage or a multiple of fixed remuneration.

The Committee is mindful of the need to ensure that the remuneration policy, while providing a competitive level of reward and motivation to employees, does not encourage behaviour that could conflict with the Company's overall approach to risk. In this context, it should be noted that the nature of the business of the Company generally does not involve long-tail characteristics affecting the determination of profits. Consequently, transactions taken into account in determining bonuses are generally completed and the resultant profit realised well before the bonus becomes payable. To the extent this is not the case, appropriate retention is applied. The Company's policy of bonus deferral, described in more detail below, provides further control and the Remuneration Committee retains the right of appropriate clawback of deferred bonuses in the event that a serious error regarding the basis on which bonuses have been determined becomes apparent prior to their release.

The remuneration policy is continually subject to review in the light of changes in market practice, general guidance issued by the FSA, and as part of a continual programme to ensure that it continues to meet the long-term needs of the business. The Remuneration Committee believes that it is in the best interest of shareholders for the Company to follow remuneration policies that are normally adopted in its business sector and which encourage individual out-performance.

Following the approval by shareholders of the 2010 Long-Term Incentive Plan ("2010 LTIP") in February 2010, the Remuneration Committee has implemented a remuneration structure designed to encourage, reward and retain key individuals who are able to build and shape the business based on the following principles:

- To provide reasonable levels of fixed remuneration but with the opportunity for significant variable remuneration justified by performance;
- To provide a competitive total reward framework with a clear link to performance; and
- To engender a strong culture of equity ownership and long-term performance both through the 2010 LTIP and part-deferral of the annual bonus, thereby aligning the interests of key employees and shareholders.

In applying the policy the Remuneration Committee will take into account the following factors:

- market conditions affecting the Company and in particular the current macroeconomic situation;
- levels of remuneration of the Company's competitors; and
- the objective of achieving sustainable returns and value for shareholders at an acceptable level of risk.

The main components of remuneration are as follows:

### Salaries

Salaries are intended to provide regular remuneration that is appropriate to the position, skills and experience of the employee and

sufficient for their reasonable requirements before any bonuses are taken into account. They are determined by taking account of comparable salary levels within the UK financial services sector. The salaries of executive directors and senior employees are reviewed each year by the Remuneration Committee but are not automatically increased annually. Changes are only made if salaries are considered to be out of line with salary levels elsewhere in the sector.

### Annual performance bonuses

The main element of variable remuneration comprises annual performance-related payments. All awards to executive directors are determined by the Remuneration Committee and are discretionary. No director has a contractual entitlement to a bonus. The Remuneration Committee also reviews and approves bonus awards to senior employees.

In general, the Committee seeks to ensure that bonus pools are based on profit or contribution and not on revenues, and after directly or indirectly making allowance for related costs. This policy is applied to bonus arrangements across the Group with the exception of certain contracted legacy revenue-based arrangements for individual brokers, primarily in the US. Although bonuses are generally discretionary, certain employees do have a contractual entitlement to variable remuneration determined according to a formula.

The Company experiences a high level of variability in short-term financial outcomes due to varying market circumstances. Accordingly, the Remuneration Committee's judgement on performance is not determined predominantly by performance against annual budgets. In 2010, as in previous years, the Committee established a bonus pool for executive directors determined by the following formula:

1) 10% of the surplus return on average capital employed after deducting the Company's weighted average cost of capital; plus
2) 1% of the value of absolute total shareholder returns in the year after deducting an average risk-free capital return to shareholders; plus
3) 1% of the value of the relative total return to shareholders against the average of returns achieved by the UK FTSE 250 Index and the UK FTSE General Financial Index in the year.

The Committee keeps the method of determining the pool under review and may change the formula if it concludes that doing so would be appropriate; such a change would be recorded in the Remuneration Report. The Committee may decide to reduce the pool to be distributed if it concluded that it is excessive relative to performance achieved against plan, performance in market circumstances, performance against previous results and the achievement of the Company's objectives. The Committee may also increase the size of the pool if it concludes that it is in the interests of the Company to do so. In respect of 2010, the Committee decided to make payments in excess of the calculated pool.

The pool is allocated between executive directors taking into consideration their personal contribution, achievement of personal objectives, comparable remuneration in competitive or comparable businesses in the sectors in which the Company operates and considerations relating to retention and motivation. It is the policy of the Remuneration Committee not to pay bonuses if it is not satisfied with personal performance.

### Deferral of annual bonuses

Discretionary annual bonuses of £50,000 or more payable to any employee of the Company, including directors, are normally subject to partial deferral. In general, such bonuses are subject to 30% deferral, with 20% in the form of deferred cash payments and 10% in deferred equity awards. Annual bonuses of less than £50,000 are not subject to deferral.

Deferred cash payments are normally paid approximately 10 months after the end of the financial year to which they relate. The deferred amount is paid only if, in the opinion of the Board, the Group is expected to be profitable at the operating level for the subsequent financial year (ie the year of payment). If this condition is not satisfied, the Board may determine whether the deferred bonus should be paid or further performance conditions for payment (including adjustment to timing) should be set. In 2010, the Remuneration Committee decided that the cash element of certain bonuses relating to the 2009 financial year should be paid in full, rather than subject to partial deferment, on condition that an amount equal to that which would otherwise have been deferred may be clawed back in the event that the recipient were to leave the Company in certain circumstances within the deferral period.

The deferred equity element of annual bonuses is settled by grants of nil-cost options over shares with a current market value equivalent to the bonus being deferred under the terms of the Collins Stewart plc Annual Bonus Equity Deferral Plan. The shares are receivable in full on or after the third anniversary of the date of award provided the recipient has not resigned or been dismissed from the Group's employment for gross misconduct. No performance conditions apply to deferred bonus equity awards as they are already considered to have been earned by reference to performance. Following the introduction of the 2010 LTIP, the shares used for this purpose are acquired through market purchases and held by an employee share ownership trust. They do not form part of the 2010 LTIP.

A more extensive deferral policy applies to participants in the 2010 LTIP who receive a bonus in excess of £50,000. The annual bonus payable to such participants in respect of the year ended 31 December 2010 will be deferred by means of deferred cash payments and restricted equity awards as shown below:

| Portion of Annual Bonus | Element of bonus deferred | | |
| --- | --- | --- | --- |
| | Cash | Equity | Total |
| £nil–£100,000 | 20% | 10% | 30% |
| £100,000–£200,000 | 20% | 20% | 40% |
| Greater than £200,000 | 20% | 30% | 50% |

For bonuses between £50,000 and £100,000, 30% of the whole bonus will be deferred. Bonuses above £100,000 will be deferred as above on an incremental basis.

# **Remuneration report** continued

### Pensions and other benefits

It is the Company's normal policy not to contribute to pension schemes on behalf of executive directors or other employees. In the case of employees who previously worked for acquired businesses, a cash supplement in lieu of pension contributions may be made. The Company provides employees, including executive directors, with private medical insurance and death-in-service benefits but otherwise does not provide benefits in kind.

### Long-Term Incentive Plan

The Remuneration Committee recognises the need to attract and retain high-quality talent in a very competitive marketplace whilst fostering a strong sense of real long-term ownership of the Company. The Company has therefore operated a long-term incentive plan (the Collins Stewart Long-Term Incentive Plan) since its demerger from Collins Stewart Tullett plc in 2006 and grants of awards under this plan have been made to directors (as described in more detail below) and other employees. However, the Remuneration Committee determined that this plan is no longer aligned with the strategic aims of the Company's remuneration policy and, accordingly, proposals to approve the 2010 LTIP were put to shareholders and approved at a General Meeting of the Company held on 8 February 2010.

The 2010 LTIP is designed to reward participants for promoting a sustained improvement in corporate performance and shareholder value over the medium to long term. Participants are granted LTIP Units that entitle them to a share of the return to Shareholders above a pre-determined base value measured over the Performance Period. The Base Price for the initial grant of LTIP Units was 75 pence per share, and 10% of the value created by a rise in the share price from 75p to 100p the ("Intermediate Price"), and 20% of the value created by a rise in the share price above 100p, will be attributable to LTIP Unit holders. Vesting of LTIP Units will be subject to the satisfaction of underlying corporate performance conditions relating to return on capital employed ("ROCE") and comparative total shareholder return ("TSR").

At the end of the three-year Performance Period, vested LTIP Units will be converted into nil-paid LTIP Options over sufficient shares to deliver the requisite value to participants. One third of such LTIP Options will become exercisable immediately; a third one year later; and the remaining third will be exercisable after two years. As a result, the incentive and retentive effect of the 2010 LTIP lasts for up to five years. The operation of the 2010 LTIP is illustrated below:



### *Performance Conditions*

The 2010 LTIP will only provide rewards to participants if the share price at the end of the three-year performance period is greater than the Base Price and the following Performance Conditions have been satisfied:

- the Return on Capital Employed of the Company is at least 12.5% per annum on average over the Performance Period ("the ROCE Condition"); and
- the Total Shareholder Return on a Share is at least equal to that of the total return on the Hoare Govett Smaller Companies Index ("HGSC") over the Performance Period ("the TSR Condition").

These Performance Conditions were selected for initial grants under the 2010 LTIP. The selection of Performance Conditions for subsequent grants is at the discretion of the Remuneration Committee although it is anticipated that, in foreseeable circumstances, similar conditions will be chosen.

The Performance Conditions have been selected for the following reasons:

*The ROCE Condition*
The ROCE Condition provides a measure of the quality of the Company's earnings and serves to promote the most effective allocation of capital investment within the business. The Board believes that an acceptable, consistent ROCE is important in providing attractive absolute returns to Shareholders. For the purpose of measuring the ROCE Condition for any grant of LTIP Units, the change in ROCE will normally be assessed by reference to the published financial statements of the Company immediately prior to the date of grant and immediately prior to the end of the Performance Period.

*The TSR Condition*
The TSR Condition is intended to ensure that participants are rewarded for outperformance of the Company's peer group and not just as a result of an improvement in general economic conditions. Comparative performance will be measured against the Hoare Govett Smaller Companies Index because the Company is a member of the Index and it is also the principal index used by a significant proportion of the Company's major shareholders to benchmark performance. For the purpose of measuring the TSR Condition for any grant of LTIP Units, relative share price performance will normally be assessed over the Performance Period, but in the case of initial grants, it will be measured over the three years ending 31 December 2012.

There are 1,000 LTIP Units in total. 626 LTIP Units have been granted to executive directors and other senior employees during 2010. Details of grants made to executive directors are set out in Part 3 of this report.

## Service contracts
It is the Company's policy that notice periods in service contracts for executive directors should not exceed 12 months and that termination payments should, where possible, be mitigated. Notice periods for other employees do not normally exceed three months. The Company is entitled to terminate the service contract of each executive director by paying, in lieu of the relevant notice period, a sum to compensate for the loss of salary and other contractual benefits (excluding bonuses). Other than as described, no benefit, payment or compensation of any kind is payable to any director upon termination of the service contract.

### Non-executive directors
Remuneration of the non-executive directors is set by the Board (without the participation of the non-executive directors themselves). The fees are benchmarked against fees paid by UK-listed companies of a similar size.

## Total shareholder return
The ordinary shares of the Company were admitted to the Official List and to trading on the London Stock Exchange on 19 December 2006. The performance of the Company's ordinary shares compared with the FTSE All Share Index and the FTSE General Financials Index is set out in the graph below which shows the value as at 31 December 2010 of £100 invested in Collins Stewart plc on 19 December 2006 compared with £100 invested in the FTSE All Share Index and the General Financials Index.



## 3. Financial summary of directors' remuneration and share-based incentive awards
### Directors' remuneration
The following table shows a breakdown of the remuneration of individual directors for the year ended 31 December 2010. The bonus pool for executive directors determined as described above amounted to £1.4m. The Remuneration Committee awarded bonuses to executive directors as shown below, although in determining the bonus payable to Paul Baines, the Committee awarded £175,000 from the executive directors' pool and £150,000 from the Hawkpoint pool, reflecting his roles and responsibilities within the Group. The bonuses set out below are subject to partial deferral as described in "Deferral of Annual Bonuses" above.

# Remuneration report continued

| | Salaries and fees 2010 £000 | Benefits 2010 £000 | Bonuses 2010 £000 | Total 2010 £000 | Total 2009 £000 |
|---|---|---|---|---|---|
| **Executive directors** | | | | | |
| Mark Brown | 300 | 2 | 1,000 | 1,302 | 1,160 |
| Paul Baines[1] | 225 | 15 | 325 | 565 | 689 |
| John Cotter[2] | 200 | 1 | 300 | 501 | 223 |
| | 725 | 18 | 1,625 | 2,368 | 2,072 |
| **Non–executive directors** | | | | | |
| Tim Ingram | 138 | – | – | 138 | – |
| Paul Hewitt | 50 | – | – | 50 | – |
| Nicholas Page | 25 | – | – | 25 | – |
| Giles Vardey | 18 | – | – | 18 | – |
| Terry Smith[3] | 98 | – | – | 98 | 200 |
| Keith Hamill[4] | 29 | – | – | 29 | 95 |
| Richard Kilsby[5] | – | – | – | – | 21 |
| Patrick O'Sullivan[6] | – | – | – | – | 45 |
| Iain Napier[5] | – | – | – | – | 19 |
| | 358 | – | – | 358 | 380 |
| **Total** | 1,083 | 18 | 1,625 | 2,726 | 2,452 |

Notes:
1   Benefits paid to Paul Baines during the year include cash payments of £12,511 in lieu of pension contributions.
2   John Cotter's remuneration in 2009 is in respect of the period since his appointment as a director on 23 June 2009.
3   Terry Smith was Executive Chairman until 1 April 2010 and non-executive Deputy Chairman thereafter until his retirement from the Board on 6 December 2010.
4   Keith Hamill retired from the Board on 18 May 2010.
5   Richard Kilsby and Iain Napier retired from the Board on 17 June 2009.
6   Patrick O'Sullivan retired from the Board on 31 December 2009.

## Details of service contracts and letters of appointment

The service contracts of each of the executive directors are summarised below:

| Executive directors | Date of service contract | Current salary | Notice period |
|---|---|---|---|
| Mark Brown | 9 October 2008 | £350,000 | 12 months |
| Paul Baines | 2 October 2000 | £225,000 | 6 months |
| John Cotter | 23 June 2009 | £250,000 | 6 months |

The Remuneration Committee approved the following increases in annual salary with effect from 1 March 2011: Mark Brown from £300,000 p.a. to £350,000 p.a.; John Cotter from £200,000 p.a. to £250,000 p.a..

The current terms of appointment of each of the non-executive directors are summarised below:

| Non-executive directors | Date of appointment | Annual fee | Notice period |
|---|---|---|---|
| Tim Ingram | 11 January 2010 | £180,000[1] | 12 months |
| Paul Hewitt | 11 January 2010 | £55,000[2] | 12 months |
| Nicholas Page | 5 July 2010 | £50,000 | 12 months |
| Giles Vardey | 1 September 2010 | £55,000[2] | 12 months |

Notes:
1   Tim Ingram received a fee at the rate of £50,000 per annum for the period from his appointment as a director on 11 January 2010 to 31 March 2010. His fee was increased to £180,000 per annum with effect from 1 April 2010 on his appointment as Chairman. Tim Ingram's fees were paid to Caledonia Investments plc until his retirement from the board of that company on 21 July 2010.
2   The annual fee payable to each of the non-executive directors is £50,000 per annum but with effect from 1 October 2010, the Board resolved that an additional fee of £5,000 per annum should be paid to directors who chair either the Audit or Remuneration Committees.
3   The non-executive directors do not participate in any of the Group's incentive or share schemes.

#### Directors' awards under share-based incentive plans
*2010 LTIP*

Details of LTIP Units held by executive directors under the terms of the 2010 LTIP are set out below:

| | Units held at 1 Jan 2010 | Granted on 25 May 2010 | Units held at 31 Dec 2010 | Performance period | Measurement date | Base price | Intermediate price |
|---|---|---|---|---|---|---|---|
| Mark Brown | – | 100 | **100** | 26/05/2010 – 25/05/2013 | 25/05/2013 | 75p | 100p |
| Paul Baines | – | 15 | **15** | 26/05/2010 – 25/05/2013 | 25/05/2013 | 75p | 100p |

As described above, LTIP Units may be converted into LTIP Options on the Measurement date subject to the satisfaction of the performance conditions.

#### Collins Stewart Long-Term Incentive Plan ("CSLTIP")

The CSLTIP was adopted by the Company in 2006 following the demerger of Collins Stewart Tullett plc. Following the approval of the 2010 LTIP, no further grants have been or will be made under the CSLTIP.

Awards granted under the CSLTIP provide the right to a specified number of ordinary shares of the Company subject to the achievement of any performance conditions prescribed by the Remuneration Committee.

The Remuneration Committee has discretion to determine appropriate performance targets for Awards granted under the CSLTIP. The performance conditions attaching to Awards granted to executive directors during the year are described below.

Details of awards held by directors under the CSLTIP are set out below:

| | Awards held at 1 Jan 2010 | Granted during the year | Awards held at 31 Dec 2010 | Grant date | Earliest exercise date | Final exercise date |
|---|---|---|---|---|---|---|
| Mark Brown | 400,000 | – | **400,000** | 12 Jan 2009 | 12 Jan 2012 | 11 Jan 2019 |
| Paul Baines | 173,120 | – | **173,120** | 3 Apr 2009 | 3 Apr 2012 | 2 Apr 2019 |

The performance conditions attaching to the award granted to Mark Brown require that the Company's Corporate Broking and US divisions have returned an operating profit in aggregate over the first two financial years of the performance period, being the 2009 and 2010 financial years. As this condition has not been satisfied, this award lapsed in 2011 on the announcement of the 2010 results.

There were no performance conditions attached to the award granted to Paul Baines as this award represented the deferred equity element of his 2008 annual bonus payment.

#### Collins Stewart plc Annual Bonus Equity Deferral Plan ("ABED")

The ABED was approved by the Board on 8 February 2010. Awards under the plan are granted to employees to provide the deferred equity element of their annual bonus. Awards take the form of nil-cost options or allocations of shares that vest three years after the date of grant provided the recipient has not resigned or been dismissed from the Group's employment for gross misconduct. No performance conditions apply to awards under the ABED as they are already considered to have been earned by reference to performance. Awards granted under the ABED must be satisfied through market-purchased shares.

Details of awards held by directors under the ABED are set out below:

| | Awards held at 1 Jan 2010 | Granted during the year | Awards held at 31 Dec 2010 | Grant date | Earliest exercise date | Final exercise date |
|---|---|---|---|---|---|---|
| Mark Brown | – | 117,417 | **117,417** | 22 Mar 2010 | 22 Mar 2013 | 22 Mar 2020 |
| Paul Baines | – | 41,378 | **41,378** | 22 Mar 2010 | 22 Mar 2013 | 22 Mar 2020 |
| John Cotter | – | 16,308 | **16,308** | 22 Mar 2010 | 22 Mar 2013 | 22 Mar 2020 |

# Remuneration report continued

### 4. Remuneration arrangements of key employees

Information on the remuneration arrangements of Senior Management and other staff whose professional activities have a material impact on the Company's risk profile ("Code Staff") is set out below. This is provided in accordance with the requirements of section 11.5 of the Prudential Sourcebook for Banks, Building Societies and Investment Firms issued by the FSA.

Information concerning the decision-making process used for determining the remuneration policy, including the composition and the mandate of the Remuneration Committee and the use of external consultants, is set out above. The Remuneration Committee's approach to linking pay and performance is also described above.

Aggregate remuneration in respect of Code Staff in each of the Group's business segments for the year ended 31 December 2010 is set out below. Central management remuneration is allocated to business segments on an appropriate basis.

|  | Total remuneration (£m) | Number of code staff |
|---|---|---|
| Wealth Management | 2.1 | 6 |
| Securities | 6.4 | 12 |
| Corporate Broking | 1.7 | 5 |
| Hawkpoint | 13.1 | 43 |

Aggregate quantitative information on remuneration, analysed by Senior Management and other Code Staff is set out below:

|  | Senior management | Other code staff | Total |
|---|---|---|---|
| Fixed remuneration (£m) | 3.3 | 6.1 | 9.4 |
| Variable remuneration (£m) | 7.3 | 6.6 | 13.9 |
| Number of staff | 22 | 44 | 66 |

Other Code Staff includes statutory directors of subsidiary companies and other employees registered in controlled functions with the FSA.

By order of the Board

**Giles Vardey**
Chairman of the Remuneration Committee
15 March 2011

# Statement of directors' responsibilities

The directors are responsible for preparing the Annual Report, the Remuneration Report and the Group and Parent Company financial statements in accordance with applicable law and regulations.

Company law requires the directors to prepare financial statements for each financial year. The directors are required by the IAS Regulation to prepare the Group financial statements under International Financial Reporting Standards ("IFRSs") as adopted by the European Union. The Group financial statements are also required by law to be properly prepared in accordance with the Companies Act 2006 and Article 4 of the IAS Regulation.

International Accounting Standard 1 requires that IFRS financial statements present fairly for each financial year the Group's financial position, financial performance and cash flows. This requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the International Accounting Standards Board's "Framework for the preparation and presentation of financial statements". In virtually all circumstances, a fair presentation will be achieved by compliance with all applicable IFRSs. However, the directors are also required to:

- Properly select and apply accounting policies;
- Present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information;
- Make an assessment of the Group's ability to continue to function as a going concern; and
- Provide additional disclosures when compliance with the specific requirements in IFRSs are insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance.

The directors have elected to prepare the Parent Company financial statements in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards and applicable law). The Parent Company financial statements are required by law to give a true and fair view of the state of affairs of the Company. In preparing these financial statements, the directors are required to:

- Select suitable accounting policies and then apply them consistently;
- Make judgements and estimates that are reasonable and prudent;
- State whether applicable UK Accounting Standards have been followed; and
- Prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Company will continue in business.

The directors are responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the Company and enable them to ensure that the Parent Company financial statements comply with the Companies Act 2006. They are also responsible for safeguarding the assets of the Company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

The directors are responsible for the maintenance and integrity of the corporate and financial information included on the Company's website. Legislation in the United Kingdom governing the preparation and dissemination of financial statements may differ from legislation in other jurisdictions.

# Responsibility Statement of the directors in respect of the Annual Report and the Accounts

Each of the directors as at the date of the Annual Report, whose names and functions are set out in the Board of Directors section on page 23 confirms that to the best of their knowledge:

- The Group and Parent Company accounts, prepared in accordance with applicable set of accounting standards, give a true and fair view of the assets, liabilities, financial position and profit or loss of the Company and the undertakings included in the consolidation taken as a whole; and

- The Management Report (which comprises the Directors' Report and the sections of the Annual Report incorporated to it by reference) includes a fair review of the development and performance of the business and the position of the Company and the undertakings included in the consolidation taken as a whole, together with a description of the principal risks and uncertainties they face.

By order of the Board

**Mark Brown**
Chief Executive
15 March 2011

# Independent Auditor's Report to the Members of Collins Stewart plc

We have audited the Group financial statements of Collins Stewart plc for the year ended 31 December 2010 which comprise the Consolidated Income Statement, the Consolidated Statement of Comprehensive Income, the Consolidated Statement of Changes in Equity, the Consolidated Balance Sheet, the Consolidated Cash Flow Statement, and the related notes 1 to 33. The financial reporting framework that has been applied in their preparation is applicable law and International Financial Reporting Standards (IFRSs) as adopted by the European Union.

This report is made solely to the Company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's members as a body, for our audit work, for this report, or for the opinions we have formed.

## Respective responsibilities of directors and auditor

As explained more fully in the Directors' Responsibilities Statement, the directors are responsible for the preparation of the Group financial statements and for being satisfied that they give a true and fair view. Our responsibility is to audit and express an opinion on the Group financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland). Those standards require us to comply with the Auditing Practices Board's Ethical Standards for Auditors.

## Scope of the audit of the financial statements

An audit involves obtaining evidence about the amounts and disclosures in the financial statements sufficient to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or error. This includes an assessment of: whether the accounting policies are appropriate to the Group's circumstances and have been consistently applied and adequately disclosed; the reasonableness of significant accounting estimates made by the directors; and the overall presentation of the financial statements.

## Opinion on financial statements

In our opinion the Group financial statements:

- give a true and fair view of the state of the Group's affairs as at 31 December 2010 and of its profit for the year then ended;
- have been properly prepared in accordance with IFRSs as adopted by the European Union; and
- have been prepared in accordance with the requirements of the Companies Act 2006 and Article 4 of the IAS Regulation.

## Separate opinion in relation to IFRSs as issued by the IASB

As explained in note 2 to the Group financial statements, the Group in addition to complying with its legal obligation to apply IFRSs as adopted by the European Union, has also applied IFRSs as issued by the International Accounting Standards Board (IASB).

In our opinion the Group financial statements comply with IFRSs as issued by the IASB.

## Opinion on other matter prescribed by the Companies Act 2006

In our opinion the information given in the Directors' Report for the financial year for which the Group financial statements are prepared is consistent with the Group financial statements.

## Matters on which we are required to report by exception

We have nothing to report in respect of the following:

Under the Companies Act 2006 we are required to report to you if, in our opinion:

- certain disclosures of directors' remuneration specified by law are not made; or
- we have not received all the information and explanations we require for our audit.

Under the Listing Rules we are required to review:

- the directors' statement, contained within the Business Review, in relation to going concern; and
- the part of the Corporate Governance Statement relating to the Company's compliance with the nine provisions of the June 2008 Combined Code specified for our review;
- certain elements of the report to shareholders by the Board on directors' remuneration.

## Other matter

We have reported separately on the Parent Company financial statements of Collins Stewart plc for the year ended 31 December 2010 and on the information in the Remuneration Report that is described as having been audited.

**Oliver Grundy FCA** (Senior statutory auditor)
for and on behalf of Deloitte LLP
Chartered Accountants and Statutory Auditor
London, United Kingdom
15 March 2011

# Consolidated income statement
for the year ended 31 December 2010

| | Notes | 2010 £m | 2009 £m |
|---|---|---|---|
| Revenue before share of loss of associates | | 215.7 | 186.6 |
| Share of loss of associates | | – | (0.2) |
| Revenue | 3 | 215.7 | 186.4 |
| Administrative expenses | | (195.5) | (167.9) |
| Operating profit | 3 | 20.2 | 18.5 |
| Finance income | 6 | 1.3 | 1.3 |
| Finance costs | 7 | (2.5) | (1.4) |
| | | (1.2) | (0.1) |
| Profit before tax | | 19.0 | 18.4 |
| Taxation | 8 | (4.4) | (5.0) |
| Profit for the year | 4 | 14.6 | 13.4 |
| Earnings per share | | | |
| Basic | 10 | 6.1p | 5.5p |
| Diluted | 10 | 5.8p | 5.4p |

All of the Group's revenue and operating profit was derived from continuing operations.

# Consolidated statement of comprehensive income

for the year ended 31 December 2010

|  | 2010 £m | 2009 £m |
|---|---|---|
| Profit for the year | 14.6 | 13.4 |
| Fair value loss on non-current available-for-sale financial assets, net of tax | (0.2) | (0.1) |
| Foreign exchange translation | 0.9 | (1.7) |
| Taxation on other items taken directly to equity | (0.2) | – |
| Total comprehensive income for the year | 15.1 | 11.6 |

# Consolidated statement of changes in equity
## for the year ended 31 December 2010

| | Share capital £m | Share premium £m | Merger reserve £m | Reverse acquisition reserve £m | Retained earnings £m | Total equity £m |
|---|---|---|---|---|---|---|
| Balance at 1 January 2009 | 61.9 | – | 70.9 | (275.0) | 386.6 | 244.4 |
| Profit for the year | – | – | – | – | 13.4 | 13.4 |
| Loss on available-for-sale assets | – | – | – | – | (0.1) | (0.1) |
| Foreign exchange translation | – | – | – | – | (1.7) | (1.7) |
| Total comprehensive income for the year | – | – | – | – | 11.6 | 11.6 |
| Dividends paid in the year | – | – | – | – | (6.1) | (6.1) |
| Share issue | 0.1 | 0.1 | – | – | (0.1) | 0.1 |
| Credit arising on share options | – | – | – | – | 3.4 | 3.4 |
| Balance at 31 December 2009 | 62.0 | 0.1 | 70.9 | (275.0) | 395.4 | 253.4 |
| Balance at 1 January 2010 | 62.0 | 0.1 | 70.9 | (275.0) | 395.4 | 253.4 |
| Profit for the year | – | – | – | – | 14.6 | 14.6 |
| Loss on available-for-sale assets | – | – | – | – | (0.2) | (0.2) |
| Foreign exchange translation | – | – | – | – | 0.9 | 0.9 |
| Taxation on items taken directly to equity | – | – | – | – | (0.2) | (0.2) |
| Total comprehensive income for the year | – | – | – | – | 15.1 | 15.1 |
| Dividends paid in the year | – | – | – | – | (6.3) | (6.3) |
| Purchase of treasury shares | – | – | – | – | (0.2) | (0.2) |
| Purchase of own shares by ESOT | – | – | – | – | (4.0) | (4.0) |
| Settlement of share options | – | – | – | – | (0.7) | (0.7) |
| Credit arising on share options | – | – | – | – | 5.4 | 5.4 |
| Balance at 31 December 2010 | 62.0 | 0.1 | 70.9 | (275.0) | 404.7 | 262.7 |

# Consolidated balance sheet
### as at 31 December 2010

| | Notes | 2010 £m | 2009 £m |
|---|---|---|---|
| **Non–current assets** | | | |
| Goodwill | 11 | **156.5** | 143.8 |
| Other intangible assets | 12 | **2.6** | 0.7 |
| Property, plant and equipment | 13 | **5.9** | 4.9 |
| Other financial assets | 14 | **2.6** | 2.8 |
| Investment in associates | 15 | **0.4** | 0.4 |
| Deferred tax assets | 16 | **1.8** | 0.2 |
| | | **169.8** | 152.8 |
| **Current assets** | | | |
| Trade and other receivables | 17 | **356.8** | 315.7 |
| Current tax assets | | **0.1** | 1.0 |
| Trading investments | | **103.5** | 32.8 |
| Cash and cash equivalents | 17 | **104.5** | 123.4 |
| | | **564.9** | 472.9 |
| **Total assets** | | **734.7** | 625.7 |
| **Current liabilities** | | | |
| Trade and other payables | 19 | **(387.4)** | (335.9) |
| Current tax liabilities | | **(4.1)** | (3.3) |
| Other financial liabilities | 20 | **(72.9)** | (22.9) |
| Interest-bearing loans and borrowings | 21 | **–** | (10.2) |
| Deferred consideration | | **(2.8)** | – |
| | | **(467.2)** | (372.3) |
| **Net current assets** | | **97.7** | 100.6 |
| **Total assets less current liabilities** | | **267.5** | 253.4 |
| **Non–current liabilities** | | | |
| Deferred consideration | | **(4.8)** | – |
| **Total liabilities** | | **(472.0)** | (372.3) |
| **Net assets** | | **262.7** | 253.4 |
| **Equity** | | | |
| Share capital | 22 | **62.0** | 62.0 |
| Share premium | | **0.1** | 0.1 |
| Merger reserve | | **70.9** | 70.9 |
| Reverse acquisition reserve | | **(275.0)** | (275.0) |
| Retained earnings | | **404.7** | 395.4 |
| **Total equity** | | **262.7** | 253.4 |

The consolidated financial statements of Collins Stewart plc (registered number 5807587) were approved by the Board of directors and authorised for issue on 15 March 2011 and are signed on its behalf by:

**Mark Brown**
Chief Executive

# Consolidated cash flow statement

for the year ended 31 December 2010

| | Notes | 2010 £m | 2009 £m |
|---|---|---|---|
| Net cash from operating activities | 24 | 8.0 | 14.0 |
| **Investing activities** | | | |
| Interest received | | 2.0 | 1.4 |
| Purchase of intangible fixed assets | 12 | (0.3) | (0.3) |
| Purchase of property, plant and equipment | 13 | (2.1) | (0.7) |
| Acquisition of subsidiaries (net of cash acquired) | 23 | (6.0) | – |
| Net cash from investing activities | | (6.4) | 0.4 |
| | | | |
| **Financing activities** | | | |
| Dividends paid | 9 | (6.3) | (6.1) |
| Repayment of loan facility | | – | (15.0) |
| Purchase of own shares by ESOT | | (4.0) | – |
| Exercise of share options | | (0.7) | – |
| Purchase of treasury shares | | (0.2) | – |
| Net cash used in financing activities | | (11.2) | (21.1) |
| | | | |
| Net decrease in cash and cash equivalents | | (9.6) | (6.7) |
| Net cash and cash equivalents at beginning of the year | | 113.2 | 121.6 |
| Effect of foreign exchange rate movements | 25 | 0.9 | (1.7) |
| Net cash and cash equivalents at the end of the year | 24,25 | 104.5 | 113.2 |
| Cash and cash equivalents | | 104.5 | 123.4 |
| Overdrafts | | – | (10.2) |
| Net cash and cash equivalents | 24,25,26 | 104.5 | 113.2 |

# Notes to the consolidated financial statements

## 1. General information

Collins Stewart plc is a company incorporated in Great Britain under the Companies Act 2006. The address of the registered office is given on the Company Information page. The nature of the Group's operations and its principal activities are set out in Note 3 and in the Business Review on pages 6 to 19.

The capital structure of the Group consists of issued share capital, reserves and retained earnings, as disclosed in the Consolidated Balance Sheet and Statement of Changes in Equity, and therefore forms the basis of the Board's management of capital. As set out in the Business Review, the Group is subject to the FSA's consolidated regulatory capital requirements and is therefore required to monitor its compliance with credit, market and operational risk requirements at a Group level, in addition to performing its own assessment of capital requirements as part of the Individual Capital Adequacy Assessment Process. Furthermore, a number of the Company's subsidiaries are individually regulated and are required to maintain capital that is appropriate to the risks entailed in their businesses according to definitions that vary according to each jurisdiction. In each case, it is the Group's policy to maintain capital at levels somewhat higher than the minimum required by regulations. The Company and its subsidiaries have been in compliance with all external regulatory capital requirements during the year.

## 2. Summary of significant accounting policies
### Basis of accounting

The consolidated financial statements of Collins Stewart plc and its subsidiaries have been prepared in accordance with International Financial Reporting Standards ("IFRSs") as issued by the International Accounting Standards Board. The financial statements have also been prepared in accordance with IFRSs adopted for use in the European Union ("EU") and therefore comply with Article 4 of the EU IAS Regulation.

These financial statements have been prepared on the historical cost basis, except for the revaluation of certain financial instruments.

The financial statements have been presented in pounds sterling because that is the currency of the primary economic environment in which the Group operates. Foreign operations have been included in accordance with the policies set out below. The financial statements are rounded to the nearest hundred thousand (expressed as millions to one decimal place – £m), except where otherwise indicated.

At the date of authorisation of these financial statements, the following Standards and Interpretations which have not been applied in these financial statements were in issue but not yet effective (and in some cases had not yet been adopted by the EU):

- IFRS 1 (amended)/IAS 27 (amended) Cost of an Investment in a Subsidiary, Jointly Controlled Entity or Associate
- IAS 28 (revised 2008) Investments in Associates
- IAS 32 (amended) Financial instruments: Presentation
- IAS 36 (amended) Impairment of assets
- IAS 39 (amended) Financial instruments: Recognition and measurement
- IFRS 2 (amended) Share-based payments
- IFRS 9 Financial instruments – Classification and measurement
- IFRIC 19 Extinguishing financial liabilities with equity instruments

- IAS 17 (amended) Leases
- IAS 7 (amended) Statement of Cash Flows
- Improvements to IFRS (Issued by IASB in May 2010)

Adoption of these Standards and Interpretations is not expected to have a material impact on the financial statements of the Group.

### Going concern

As discussed in the Business Review, these financial statements have been prepared on a going concern basis.

### Changes in accounting policy

In the current financial year, the Group has adopted International Financial Reporting Standard 3 "Business Combinations" (revised 2008) and International Accounting Standard 27 "Consolidated and Separate Financial Statements" (revised 2008). These standards require that, for acquisitions in annual reporting periods commencing on or after 1 July 2009:

- acquisition costs, such as legal fees, which do not represent consideration payable to vendors be included in operating expenses as incurred. Previously such amounts would have formed part of goodwill; and
- any changes to the cost of an acquisition, including contingent consideration accounted for as a liability under IAS 32 "Financial Instruments: Presentation", which result from events after the date of acquisition are required to be recognised in profit or loss. Previously such changes resulted in an adjustment to goodwill.

The financial impact in these consolidated financial statements has been to expense acquisition costs to operating expenses as set out in Note 23.

### Basis of consolidation

The consolidated financial statements incorporate the financial statements of the Company and entities controlled by the Company (and its subsidiaries) as of 31 December each year. Control is achieved where the Company has the power to govern the financial and operating policies of an investee enterprise so as to obtain benefits from its activities.

The results of subsidiaries acquired or disposed of during the year are included in the consolidated income statement from the effective date of acquisition or up to the effective date of disposal, as appropriate. Where necessary, adjustments are made to the financial statements of subsidiaries to bring the accounting policies used into line with those used by the Group.

All material inter-company transactions and balances between Group entities are eliminated on consolidation.

### Revenue

Revenue, which excludes value added tax, includes the profit on buying and selling securities, the profit or loss arising on positions held in securities, gross commissions and brokerage, and fees earned. Dividends and interest arising on long and short positions in securities form part of revenue, and, as they are also reflected in movements in market prices, are not identified separately. Fee income is recognised when the related services are completed and the income is considered receivable.

# Notes to the consolidated financial statements continued

**2. Summary of significant accounting policies** continued
Revenue also includes the net returns on managing segregated client money accounts, accrued on a time basis.

Dividend income from investments is recognised when the shareholder's right to receive the payment is established.

Operating profit
Operating profit is stated after interest income directly related to investment business but before other interest income.

Investment in associates
An associate is an entity over which the Group is in a position to exercise significant influence, but does not control or jointly-control, through participation in the financial and operating policies and decisions of the investee.

The results, assets and liabilities of associates are included in these financial statements using the equity method of accounting. Investments in associates are carried in the balance sheet at cost as adjusted by post-acquisition changes in the Group's share of the net assets of the associate, less any impairment in the value of individual investments. Losses of the associate in excess of the Group's interest in those associates are not recognised.

Any excess of the cost of acquisition over the Group's share of the fair values of the identifiable net assets of the associate at the date of acquisition is recognised as goodwill. Any deficiency of the cost of acquisition below the Group's share of the fair value of identifiable net assets of the associate at the date of acquisition (i.e. discount on acquisition) is credited in the profit and loss in the year of acquisition.

Where a Group company transacts with an associate of the Group, profits and losses are eliminated to the extent of the Group's interest in the relevant associate. Losses may provide evidence of impairment of the assets transferred in which case appropriate provision is made for impairment.

Investment in joint ventures
A joint venture is a contractual arrangement whereby the Group and other parties undertake an economic activity that is subject to joint control.

Where a Group company undertakes its activities under joint venture arrangements directly, the Group's share of jointly controlled assets and any liabilities incurred jointly with other venturers are recognised in the financial statements of the relevant company and classified according to their nature. Liabilities and expenses incurred in respect of interests in jointly controlled assets are accounted for on an accruals basis. Income from the sale or use of the Group's share of the output of jointly controlled assets, and its share of joint venture expenses, are recognised when it is probable that the economic benefits associated with the transactions will flow to/from the Group and the income can be measured reliably.

Joint venture arrangements, which involve the establishment of a separate entity in which each venture has an interest, are referred to as jointly controlled entities. The Group reports its interests in jointly-controlled entities using proportionate consolidation – the Group's share of the assets, liabilities, income and expenses of

jointly-controlled entities are combined with the equivalent items in the consolidated financial statements on a line-by-line basis.

Goodwill
Goodwill arising on consolidation represents the excess of the cost of acquisition over the Group's interest in the fair value of the identifiable assets, liabilities and contingent liabilities of a subsidiary or associate at the date of acquisition. Goodwill is initially recognised as an asset at cost and is subsequently measured at cost less any accumulated impairment losses. It is reviewed for impairment at least annually, or where such other occasions or changes in circumstances indicate that it might be impaired. Any impairment is recognised immediately in the income statement and is not subsequently reversed. Goodwill arising on acquisition is allocated to cash-generating units for the purpose of impairment testing.

Goodwill arising on the acquisition of an associate is included within the carrying value of the associate. Goodwill arising on the acquisition of a subsidiary is presented separately in the balance sheet. On disposal of a subsidiary or associate, the attributed amount of goodwill that has not been subject to impairment is included in the determination of the profit or loss on disposal.

Goodwill arising on acquisitions before the date of transition to IFRSs has been retained at the previous UK GAAP amounts subject to being tested for impairment.

Other intangible assets
*Software and software development costs*
An internally generated intangible asset arising from the Group's software development is recognised only if all of the following conditions are met:

- an asset is created that can be identified;
- it is probable that the asset created will generate future economic benefits; and
- the development costs of the asset can be measured reliably.

Where the above conditions are not met, costs are expensed as incurred.

|  | Software purchased or developed | Software licences |
| --- | --- | --- |
| Useful life | Finite | Finite |
| Method used | Three years straight-line | Amortised over life of licences |
| Internally generated or acquired | Internally generated and acquired | Acquired |
| Impairment testing/recoverable amount testing | Method reviewed at each financial year-end | Method reviewed at each financial year-end |

*Acquired separately or from a business combination*
Other intangible assets acquired separately are capitalised at cost. Intangible assets acquired in a business acquisition are capitalised at fair value at the date of acquisition. The useful lives of those intangible assets are assessed to be either finite or indefinite. Where amortisation is charged on finite assets, this is on a straight-line basis over the effective useful life, which ranges between five and 10 years, and the expense is taken to the income statement through "administrative expenses".

Intangible assets, excluding development costs, created within the business are not capitalised and expenditure is charged to the income statement in the year in which the expenditure is incurred.

### Property, plant and equipment
Freehold land is stated at cost. Buildings, furniture, fixtures and equipment are stated at cost less accumulated depreciation and any recognised impairment loss.

Depreciation is provided on all tangible fixed assets at rates calculated to write off the cost, less estimated residual value based on prices prevailing at the date of acquisition, of each asset on a straight-line basis over its expected useful life as follows:

| | |
|---|---|
| Fixtures and fittings and equipment | 10%–33% p.a. |
| Leasehold land and buildings | Over the period of the lease |
| Freehold land | Nil |
| Freehold buildings | 1% p.a. |

The gain or loss arising on the disposal or retirement of an asset is determined as the difference between the sales proceeds and the carrying amount of the asset and is recognised in income.

### Impairment
At each balance sheet date, the Group reviews the carrying amounts of its tangible and intangible assets with finite lives to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where the asset does not generate cash flows that are independent from other assets, the Group estimates the recoverable amount of the cash-generating unit to which the asset belongs.

Recoverable amount is the higher of fair value less any cost to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present values using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (or cash-generating unit) is reduced to its recoverable amount. Impairment losses are recognised as an expense immediately. Where an impairment loss subsequently reverses, as may be the case for assets other than goodwill, the carrying amount of the asset (or cash-generating unit) is increased to the revised estimate of its recoverable amount, but so that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognised for the asset (or cash-generating unit) in prior years. A reversal of an impairment loss is recognised as income immediately, unless the relevant asset is carried at a revalued amount, in which case the reversal of the impairment loss is treated as a revaluation increase.

### Financial assets and liabilities
Financial assets and liabilities are recognised on trade date and de-recognised on either trade date, if applicable, or on maturity or repayment. On initial recognition, IAS 39 requires that financial assets be classified into the following categories: at fair value through profit and loss, loans and receivables, held-to-maturity investments or available for sale.

The Group does not hold any assets that are classified as held-to-maturity investments.

### *Financial assets at fair value through profit and loss ("FVTPL")*
This category comprises financial assets held for trading, defined as those primarily acquired for the purpose of selling in the short term. These financial assets are initially recognised at fair value, with the transaction costs recorded immediately in the income statement and are subsequently measured at fair value. Gains and losses arising from changes in fair value or on de-recognition are recognised in the income statement within revenue. Interest and dividend income from financial assets at fair value through profit or loss is recognised in trading income.

### *Loans and receivables*
Loans and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in active markets. Loans and receivables are initially recorded at fair value, including any transaction costs, and are subsequently measured at amortised cost using the effective interest rate method. (The effective interest rate is that which exactly discounts estimated future cash flows to the net carrying amount.)

### *Available-for-sale investments*
Available-for-sale investments comprise non-derivative financial assets that are either designated as available-for-sale on initial recognition or are not classified into the categories described above. Available-for-sale investments include loans that do not meet the criteria for classification as loans and receivables as they are quoted in an active market. They are initially recognised at fair value, including direct and incremental transaction costs, and are subsequently measured at fair value.

Gains and losses arising from changes in the fair value of available-for-sale financial assets are recognised in equity until the financial asset is sold, at which time the cumulative gain or loss is transferred to the income statement. Interest (determined using the effective interest rate method), impairment losses and translation differences on monetary items are recognised in the income statement as they arise. Dividends on available-for-sale equity instruments are recognised in the income statement when the Group's right to receive payment is established.

### *Determination of fair value*
The fair value of quoted investments in active markets is based on current bid or offer prices, as appropriate. For investments where there is no quoted market price, fair value is determined by reference to the current market value of another instrument which is substantially the same or is calculated based on the expected cash flows of the investment or the net asset base.

# Notes to the consolidated financial statements continued

**2. Summary of significant accounting policies** continued
*Financial liabilities*
Except for derivatives and held-for-trading investments, which are classified at fair value through profit and loss on initial recognition, all financial liabilities are carried at amortised cost using the effective interest rate method.

*De-recognition of financial assets*
The Group de-recognises financial assets when:

- the contractual rights to cash flows arising from a financial asset has expired; or
- it transfers the financial asset including substantially all of the risks and rewards of the ownership of the asset; or
- it transfers the financial asset, neither retaining nor transferring substantially all the risks and rewards of the asset, but no longer retains control of the asset.

*Impairment of financial assets*
Available-for-sale assets and those carried at amortised cost are assessed at each balance sheet date to determine whether there is objective evidence that a financial asset or group of financial assets is impaired.

Impairment losses are incurred if there is objective evidence of impairment as a result of one or more events occurring after initial recognition of the asset, and that event has an impact on the estimated future cash flows of the financial asset or group of financial assets that can be reliably estimated. Objective evidence that a financial asset is impaired includes observable data about the following loss events:

- significant financial difficulty of the issuer;
- a breach of contract, such as a default or delinquency in interest or principal repayment;
- granting to the borrower a concession, for economic or legal reasons relating to the borrower's financial difficulty, that the lender would not otherwise consider; or
- it becoming probable that the borrower will enter bankruptcy or other financial reorganisation.

*Investments in securities*
Investments in securities are recognised and de-recognised on a trade-date basis where a purchase or sale of an investment is under a contract whose terms require delivery of the investment within the timeframe established by the market concerned. They are measured initially at fair value plus, in the case of investments not at fair value through profit or loss, directly attributable transaction costs.

*Derivatives*
Derivatives are measured initially at fair value and subsequently re-measured to fair value. Fair values are obtained from quoted prices prevailing in active markets, including recent market transactions, and valuation techniques, including discounted cash flow models and option pricing models as appropriate. All derivatives are included as assets when their fair value is positive, and liabilities when their fair value is negative.

*Settlement balances*
Certain Group companies are involved as principal in the purchase of and simultaneous commitment to sell securities between third parties.

Such trades are complete only when both sides of the deal are settled, and the Group is exposed to risk in the event that one side of the transaction remains unmatched. The amounts due to and payable by counterparties in respect of matched principal business are shown gross within trade receivables or trade payables as appropriate.

*Securities borrowing*
Securities are borrowed in the ordinary course of business. All such borrowing is collateralised and such collateral is included in trade receivables.

*Interest-bearing loans and borrowings*
All loans and borrowings are initially recognised at cost, being the fair value of the consideration received net of issue costs associated with the borrowing. They are subsequently measured at amortised cost using the effective interest method.

*Client money*
The Group holds money on behalf of clients in accordance with the client money rules of the Financial Services Authority and other regulatory bodies. Such money and the corresponding liabilities to clients are not shown on the face of the balance sheet, as the Group is not beneficially entitled thereto. The amounts held on behalf of clients at the balance sheet date are stated in Note 30.

*Cash and cash equivalents*
Cash comprises cash in hand and demand deposits, which may be accessed without penalty. Cash equivalents comprise short-term highly-liquid investments with a maturity of less than three months from the date of acquisition. For the purposes of the consolidated cash flow statement, cash and cash equivalents consist of cash and cash equivalents as defined above, net of outstanding bank overdrafts.

*Equity instruments*
Equity instruments issued by the Company are recorded at the proceeds received, net of any direct issue costs. An equity instrument is any contract that evidences a residual interest in the assets of the Group after deducting all of its liabilities. Equity instruments are classified according to the substance of the contractual arrangements entered into.

*Provisions*
Provisions are recognised when the Group has a present obligation (legal or constructive) as a result of a past event which it is probable will result in an outflow of economic benefits that can be reasonably estimated.

*Foreign currencies*
Transactions in currencies other than pounds sterling are recorded at the rates of exchange prevailing on the dates of the transactions. At each balance sheet date, monetary assets and liabilities that are denominated in foreign currencies are retranslated at the rates prevailing on the balance sheet date. Gains and losses arising on retranslation are included in the income statement. Non-monetary assets and liabilities carried at fair value that are denominated in foreign currencies are translated at the rates prevailing at the date when the fair value was determined.

## 2. Summary of significant accounting policies continued

On consolidation, the assets and liabilities of the Group's overseas operations are translated at exchange rates prevailing on the balance sheet date. Income and expense items are translated at the average exchange rates for the year. Exchange differences arising, if any, are classified as equity. Such translation differences are recognised as income or expense in the year in which the operation is disposed of.

Goodwill and fair value adjustments arising on the acquisition of a foreign entity are treated as assets and liabilities of the foreign entity and translated at the closing rate. The Group has elected to treat goodwill and fair value adjustments arising on acquisitions before the date of transition to IFRSs as sterling-denominated assets and liabilities.

### Taxation

The tax expense represents the sum of tax currently payable and movements in deferred tax.

The tax currently payable is based on taxable profit for the year. Taxable profit differs from net profit as reported in the income statement because it excludes items of income or expense that are taxable or deductible in other years and it further excludes items that are never taxable or deductible. The Group's liability for current tax is calculated using tax rates that have been enacted or substantively enacted by the balance sheet date.

Deferred tax is accounted for using the balance sheet liability method in respect of temporary differences arising from differences between the carrying amount of assets and liabilities in the financial statements and the corresponding tax basis used in the computation of taxable profit. In principle, deferred tax liabilities are recognised for all temporary differences and deferred tax assets are recognised to the extent that it is probable that taxable profits will be available against which deductible temporary differences may be utilised. Such assets and liabilities are not recognised if the temporary difference arises from goodwill or from initial recognition (other than in a business combination) of other assets and liabilities in a transaction, which affects neither the tax profit nor the accounting profit.

Deferred tax liabilities are recognised for taxable temporary differences arising on investments in subsidiaries and associates, except where the Group is able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. The carrying amounts of deferred tax assets are reviewed at each balance sheet date and reduced to the extent that it is no longer probable that sufficient taxable profits will be available to allow all or part of the asset to be recovered.

Deferred tax is calculated at the rates that are expected to apply when the asset or liability is settled or when the asset is realised. Deferred tax is charged or credited in the income statement, except when it relates to items credited or charged directly to equity, in which case the deferred tax is also dealt with in equity.

Deferred tax assets and liabilities are offset when they relate to income taxes levied by the same taxation authority and the Group intends to settle its current tax assets and liabilities on a net basis.

### Operating leases

Operating lease payments are recognised as an expense in the income statement on a straight-line basis over the lease term.

### Staff costs

Defined contributions made to employees' personal pension plans are charged to the profit and loss as and when incurred.

Short-term employee benefits, such as bonuses, are included in the profit and loss account where the Group has a present legal or constructive obligation to make such payments as a result of past events and a reliable estimate of the obligation can be made.

### Share-based payments

The Group has applied the requirements of IFRS 2: "Share-based Payment". In accordance with the transitional provisions, IFRS 2 has been applied to all grants of equity instruments after 7 November 2002 that had not vested as of 1 January 2005.

The Group issues equity-settled share-based payments to certain employees. Equity-settled share-based payments are measured at fair value at the date of grant. The fair value determined at the grant date of the equity-settled share-based payments are expensed on a straight-line basis over the vesting period, based on the Group's estimate of shares that will eventually vest.

The fair value of share options issued is determined using either a Black Scholes or Monte Carlo valuation model. The expected life used in the model has been adjusted based on management's best estimate for the effects of non-transferability, exercise restrictions, and behavioural considerations.

### Employee share ownership trusts ("ESOTs")

Dividends have been waived by the trustees of the Collins Stewart plc ESOT and the Collins Stewart (CI) Limited ESOT, but not the Hawkpoint ESOT nor the Collins Stewart Inc ESOT, on shares that have not yet vested unconditionally pursuant to employee awards. Shares, which have not yet vested unconditionally pursuant to employee awards, are excluded from the denominator in the earnings per share calculation.

### Critical accounting judgements and key sources of estimation uncertainty
#### Impairment of goodwill

In the process of applying the Group's accounting policies, which are described above, the principal area of judgement that has a significant effect on the amounts recognised in the financial statements is the carrying value of goodwill. Determining whether goodwill is impaired requires an estimation of the value in use of the cash-generating units to which goodwill has been allocated. The value in use calculation requires the Group entity to estimate the future cash flows expected to arise from the cash-generating units and a suitable discount rate in order to calculate present value. This calculation has not resulted in any impairment in 2010 (2009: £nil).

# Notes to the consolidated financial statements continued

### 3. Segmental information

The Group is currently managed through four operating segments; Wealth Management, Securities, Corporate Broking and Hawkpoint. Since 1 January 2010, internal allocations in relation to Corporate Broking revenues and costs, some of which were previously reported in Securities, have been changed to reflect more accurately the activities associated with Corporate Broking and the relationship with other divisions. Consistent with the presentation in the Group's 2010 Interim Report, the 2009 comparatives have been restated accordingly.

| Year ended 31 Dec 2010 | Wealth management £m | Securities £m | Corporate broking £m | Hawkpoint £m | Total £m |
|---|---|---|---|---|---|
| Revenue | 48.3 | 106.5 | 21.8 | 39.1 | 215.7 |
| Operating profit before share-based payment charges | 9.3 | 4.5 | 6.4 | 5.4 | 25.6 |
| Share-based payment charges | (2.3) | (1.4) | (0.3) | (1.4) | (5.4) |
| Operating Profit | 7.0 | 3.1 | 6.1 | 4.0 | 20.2 |
| Finance income | | | | | 1.3 |
| Finance costs | | | | | (2.5) |
| Profit before tax | | | | | 19.0 |
| Taxation | | | | | (4.4) |
| Profit after tax | | | | | 14.6 |

| Year ended 31 Dec 2009 | Wealth management £m | Securities £m | Corporate broking £m | Hawkpoint £m | Total £m |
|---|---|---|---|---|---|
| Revenue | 43.7 | 97.2 | 17.2 | 28.3 | 186.4 |
| Operating profit before share-based payment charges | 10.1 | 3.0 | 4.1 | 4.7 | 21.9 |
| Share-based payment charges | (2.4) | 1.2 | – | (2.2) | (3.4) |
| Operating Profit | 7.7 | 4.2 | 4.1 | 2.5 | 18.5 |
| Finance income | | | | | 1.3 |
| Finance costs | | | | | (1.4) |
| Profit before tax | | | | | 18.4 |
| Taxation | | | | | (5.0) |
| Profit after tax | | | | | 13.4 |

All revenue and operating profit is derived from external customers.

The accounting policies of the reportable segments are the same as the Group's accounting policies which are described in Note 2. Segmental results represent the operating profit earned by each segment before net interest and taxation. This is the measure reported to the Group Chief Executive for the purposes of resource allocation and assessment of segmental performance.

| Segmental Assets | 2010 £m | 2009 £m |
|---|---|---|
| Wealth Management | 69.1 | 43.0 |
| Securities | 425.6 | 329.6 |
| Corporate Broking | 4.2 | 1.1 |
| Hawkpoint | 124.7 | 121.6 |
| Total segmental assets | 623.6 | 495.3 |
| Unallocated assets | 111.1 | 130.4 |
| Consolidated total assets | 734.7 | 625.7 |

### 3. Segmental information continued

For the purposes of monitoring segmental performance and allocation of resources between segments, the Group Chief Executive monitors the tangible, intangible and financial assets attributable to each segment. All assets are allocated to reportable segments, with the exception of available-for-sale assets, current and deferred tax assets, cash and cash equivalents and accrued interest.

| | Depreciation & amortisation | | Additions to non-current assets | |
|---|---|---|---|---|
| | 2010 £m | 2009 £m | 2010 £m | 2009 £m |
| Wealth Management | 0.6 | 0.4 | 2.7 | 0.5 |
| Securities | 0.6 | 0.6 | 1.2 | 0.4 |
| Corporate Broking | 0.1 | 0.1 | 0.3 | 0.1 |
| Hawkpoint | 0.3 | 0.3 | 0.3 | – |
| Total | 1.6 | 1.4 | 4.5 | 1.0 |

The following table shows revenue and non-current assets (excluding deferred tax, investments in associates and available-for-sale financial assets) in the UK and other material countries in which the Group operates.

No individual customer accounts for more than 10% of the Group's revenue.

| | Revenue from external customers | | Non-current assets | |
|---|---|---|---|---|
| | 2010 £m | 2009 £m | 2010 £m | 2009 £m |
| UK (country of domicile) | 97.9 | 98.2 | 141.7 | 136.3 |
| North America | 58.9 | 41.1 | 1.4 | 0.7 |
| Channel Isles | 34.8 | 34.2 | 22.2 | 12.3 |
| Other | 24.1 | 12.9 | 0.1 | 0.1 |
| Total | 215.7 | 186.4 | 165.4 | 149.4 |

### 4. Profit for the year

Profit for the year has been arrived at after crediting/(charging):

| | 2010 £m | 2009 £m |
|---|---|---|
| Income | | |
| Fees earned on financial assets or liabilities not held for trading nor designated at fair value, other than fees included in effective interest rate calculations on these types of assets and liabilities | 81.0 | 87.5 |
| Fees earned on trust and other fiduciary activities where the Group holds or invests assets on behalf of its customers | 22.8 | 18.6 |
| Net gains on financial instruments that are carried at fair value through profit and loss: | | |
| – held for trading | 48.4 | 34.7 |
| Expense | | |
| Fees payable on trust and other fiduciary activities where the Group holds or invests assets on behalf of its customers | (1.3) | (1.6) |
| Impairment loss on financial instruments | (0.5) | (0.5) |
| Net foreign exchange losses | (0.1) | (0.8) |
| Depreciation of property, plant and equipment (Note 13) | (1.2) | (1.2) |
| Amortisation of intangible assets (Note 12) | (0.4) | (0.2) |
| Staff costs (Note 5) | (131.9) | (112.6) |
| Release of non-current provision | – | 2.4 |
| Auditors' remuneration for audit services | (0.7) | (0.6) |

# Notes to the consolidated financial statements continued

### 4. Profit for the year continued
A more detailed analysis of auditors' remuneration is provided below:

| | 2010 | | 2009 | |
|---|---|---|---|---|
| | £m | % | £m | % |
| Audit services | | | | |
| – statutory audit in respect of the Company | 0.2 | 29 | 0.2 | 33 |
| – statutory audit in respect of subsidiaries | 0.4 | 57 | 0.3 | 50 |
| – audit-related regulatory reporting | 0.1 | 14 | 0.1 | 17 |
| | 0.7 | 100 | 0.6 | 100 |

### 5. Staff costs
The average number of employees and directors of the Group, all of whom were employed in financial services, was:

| Average number of employees and directors employed | 2010 No. | 2009 No. |
|---|---|---|
| EU | 426 | 401 |
| Channel Islands | 171 | 165 |
| North America | 150 | 138 |
| Asia | 10 | 8 |
| | 757 | 712 |

The aggregate employment costs of staff and directors were:

| | 2010 £m | 2009 £m |
|---|---|---|
| Wages, salaries, and other fixed compensation costs | 59.9 | 49.0 |
| Variable compensation and incentive payments | 55.8 | 49.0 |
| Social security costs | 9.1 | 9.5 |
| Pension costs | 1.7 | 1.7 |
| Share-based payment charges | 5.4 | 3.4 |
| | 131.9 | 112.6 |

### 6. Finance income

| | 2010 £m | 2009 £m |
|---|---|---|
| Interest receivable and similar income | 1.3 | 1.3 |

### 7. Finance costs

| | 2010 £m | 2009 £m |
|---|---|---|
| Interest payable on bank loans and overdrafts | 0.3 | 0.7 |
| Interest payable on inventory financing and stock borrowing | 2.2 | 0.7 |
| | 2.5 | 1.4 |

## 8. Taxation

|  | 2010 £m | 2009 £m |
|---|---|---|
| **Current tax** |  |  |
| UK corporation tax | 5.5 | 2.7 |
| Double tax relief | (0.9) | (0.2) |
|  | 4.6 | 2.5 |
| Overseas tax | 1.7 | 0.7 |
| Prior year UK corporation tax (over)/under-provided | (0.3) | 0.7 |
| Prior year overseas tax (over)/under-provided | (0.1) | 0.2 |
|  | 5.9 | 4.1 |
| **Deferred tax** |  |  |
| Current year | (1.5) | 0.9 |
|  | 4.4 | 5.0 |

Taxation for other jurisdictions is calculated at the rates prevailing in the respective jurisdictions.

The charge for the year can be reconciled to the profit per the income statement as follows:

|  | 2010 £m | 2009 £m |
|---|---|---|
| Profit before tax | 19.0 | 18.4 |
| Tax on profit at standard rate of 28% (2009: 28%) | 5.3 | 5.2 |
| Factors affecting the charge for the year: |  |  |
| Disallowable expenditure | 1.0 | 1.0 |
| Tax effect of stock options | 0.2 | 0.2 |
| Unrecognised losses | 1.4 | 2.8 |
| Re-measurement of deferred tax balances at 27% | 0.1 | – |
| Effect of different tax rates of subsidiaries | (3.4) | (3.5) |
| Adjustments in respect of prior years | (0.2) | (0.7) |
|  | 4.4 | 5.0 |

## 9. Dividends

|  | 2010 £m | 2009 £m |
|---|---|---|
| Final dividend of 1.3p (2009: 1.3p) | 3.1 | 3.0 |
| Interim dividend of 1.3p (2009: 1.3p) | 3.2 | 3.1 |
|  | 6.3 | 6.1 |

The Board has recommended a final dividend for the year of 1.7p per share, which if approved, will be paid on 26 May 2011 to shareholders on the register on 6 May 2011.

# Notes to the consolidated financial statements continued

## 10. Earnings per share

The calculation of basic and diluted earnings per share is based on the following data:

|  | 2010 £m | 2009 £m |
|---|---|---|
| Earnings for the purposes of basic earnings per share | 14.6 | 13.4 |

| Weighted average number of shares | 2010 No. (m) | 2009 No. (m) |
|---|---|---|
| Weighted average number of shares | 240.8 | 242.0 |
| Dilutive effect of options | 7.2 | 7.2 |
| Dilutive effect of contingently issuable shares | 3.9 | – |
| Diluted earnings per share denominator | 251.9 | 249.2 |
| Basic earnings per share | 6.1p | 5.5p |
| Diluted earnings per share | 5.8p | 5.4p |

As at 31 December 2010, 2.6m options (2009: 2.7m) were not dilutive due to their exercise price being higher than the average share price for the year.

## 11. Goodwill

|  | 2010 £m | 2009 £m |
|---|---|---|
| **Cost** |  |  |
| As at 1 January | 143.8 | 143.8 |
| Additions | 12.7 | – |
| As at 31 December | 156.5 | 143.8 |

Goodwill acquired through business combinations has been allocated to individual cash-generating units for impairment testing as follows:

|  | 2010 £m | 2009 £m |
|---|---|---|
| Corporate Broking | 0.2 | 0.2 |
| Wealth Management | 42.1 | 29.4 |
| Hawkpoint | 114.2 | 114.2 |
|  | 156.5 | 143.8 |

The recoverable amount of goodwill for the individual cash-generating units shown above has been determined based on a value-in-use calculation. To calculate this, cash flow projections are based on financial budgets approved by senior management covering the next financial year, extrapolated for a period not exceeding five years. Growth and inflation rates thereafter are projected at 2% and 3% respectively. The discount rate applied to cash flow projections is 8.1% (2009: 8.6%) based on the Group's pre-tax weighted average cost of capital.

Key sensitivities in the goodwill impairment calculation are the discount rate and future cash flows. In the case of the discount rate, the carrying value of goodwill attributable to Hawkpoint and Wealth Management is supported at rates up to 11.2% and 25.1% respectively, assuming all other variables are held constant. The carrying value of goodwill is supported with a decline in operating cash flows of 49.9% and 83.9% for Hawkpoint and Wealth Management respectively, assuming all other variables are held constant.

## 12. Other intangible assets

| Developed software | 2010 £m | 2009 £m |
|---|---|---|
| **Cost** |  |  |
| As at 1 January | 2.2 | 1.9 |
| Additions | 0.3 | 0.3 |
| As at 31 December | 2.5 | 2.2 |
| **Amortisation** |  |  |
| As at 1 January | (1.5) | (1.3) |
| Charged during the year | (0.3) | (0.2) |
| As at 31 December | (1.8) | (1.5) |
| **Carrying amount** | 0.7 | 0.7 |

## 12. Other intangible assets continued

| Customer-related | 2010 £m | 2009 £m |
|---|---|---|
| **Cost** | | |
| As at 1 January | – | – |
| Acquired on acquisition of subsidiaries | 2.0 | – |
| As at 31 December | 2.0 | – |
| **Amortisation** | | |
| As at 1 January | – | – |
| Charged during the year | (0.1) | – |
| As at 31 December | (0.1) | – |
| Carrying amount | 1.9 | – |

| Other intangible assets | 2010 £m | 2009 £m |
|---|---|---|
| **Cost** | | |
| As at 1 January | 1.8 | 1.8 |
| As at 31 December | 1.8 | 1.8 |
| **Amortisation** | | |
| As at 1 January | (0.3) | (0.3) |
| As at 31 December | (0.3) | (0.3) |
| **Impairment** | | |
| As at 1 January | (1.5) | (1.5) |
| As at 31 December | (1.5) | (1.5) |
| Carrying amount | – | – |
| Total | 2.6 | 0.7 |

## 13. Property, plant and equipment

| | Land, buildings and leasehold improvements £m | Equipment, fixtures and fittings £m | Total £m |
|---|---|---|---|
| **Cost** | | | |
| As at 1 January 2009 | 4.9 | 9.2 | 14.1 |
| Additions | – | 0.7 | 0.7 |
| Disposals | – | – | – |
| As at 31 December 2009 | 4.9 | 9.9 | 14.8 |
| Additions | 0.6 | 1.5 | 2.1 |
| Acquired on acquisition | – | 0.1 | 0.1 |
| Disposals | – | (0.2) | (0.2) |
| As at 31 December 2010 | 5.5 | 11.3 | 16.8 |
| **Depreciation** | | | |
| As at 1 January 2009 | (3.3) | (5.4) | (8.7) |
| Disposals | – | – | – |
| Charge for the year | (0.2) | (1.0) | (1.2) |
| As at 31 December 2009 | (3.5) | (6.4) | (9.9) |
| Disposals | – | 0.2 | 0.2 |
| Charge for the year | (0.2) | (1.0) | (1.2) |
| As at 31 December 2010 | (3.7) | (7.2) | (10.9) |
| **Carrying Amount** | | | |
| As at 31 December 2009 | 1.4 | 3.5 | 4.9 |
| As at 31 December 2010 | 1.8 | 4.1 | 5.9 |

# Notes to the consolidated financial statements continued

## 14. Other financial assets

|  | 2010 £m | 2009 £m |
|---|---|---|
| Available-for-sale investment | 2.6 | 2.8 |

## 15. Investments in associates

| Associates | 2010 £m | 2009 £m |
|---|---|---|
| Total assets | 0.4 | 0.4 |
| Total liabilities | – | – |
| Net assets | 0.4 | 0.4 |
| Revenue | – | (0.2) |
| Operating loss | – | (0.2) |

## 16. Deferred tax

|  | 2010 £m | 2009 £m |
|---|---|---|
| Deferred tax assets | 1.8 | 0.5 |
| Deferred tax liabilities | – | (0.3) |
|  | 1.8 | 0.2 |

The movement for the year in the Group's net deferred tax position was as follows:

|  | 2010 £m | 2009 £m |
|---|---|---|
| As at 1 January | 0.2 | 1.1 |
| Acquired with subsidiary undertaking | 0.1 | – |
| Credit/(charge) to income for the year | 1.5 | (0.9) |
| Credit to equity for the year | – | – |
| As at 31 December | 1.8 | 0.2 |

The following were the deferred tax liabilities and assets recognised by the Group and movements thereon during the year.

|  | Consolidated balance sheet | | Consolidated income statement | |
|---|---|---|---|---|
|  | 2010 £m | 2009 £m | 2010 £m | 2009 £m |
| Losses available for offset against future taxable income | 0.1 | – | – | – |
| Differences between depreciation and capital allowances | 0.2 | 0.2 | – | (0.1) |
| Share options | 1.2 | 0.7 | 0.5 | (0.2) |
| Other timing differences | 0.3 | (0.7) | 1.0 | (0.6) |
|  | 1.8 | 0.2 | 1.5 | (0.9) |

At the balance sheet date, the aggregate amount of temporary differences in respect of corporation tax losses of overseas subsidiaries for which a deferred tax asset has not been recognised was £11.8m (2009: £44.3m). No asset has been recognised as the likelihood of future economic benefit is not sufficiently assured. The movement for the year includes £33.4m relating to Collins Stewart ISTC plc which ceased trading during the period.

### 17. Other current assets
Trade and other receivables

| | 2010 £m | 2009 £m |
|---|---|---|
| Trade receivables | 338.2 | 300.3 |
| Other receivables | 10.5 | 6.2 |
| Prepayments and accrued income | 8.1 | 9.2 |
| | 356.8 | 315.7 |

The directors consider that the carrying amount of trade and other receivables approximates their fair value.

Cash and cash equivalents

| | 2010 £m | 2009 £m |
|---|---|---|
| Cash and cash equivalents | 104.5 | 123.4 |

Cash and cash equivalents comprise cash held by the Group and short-term bank deposits with an original maturity of three months or less. The carrying amount of these assets approximates their fair value.

### 18. Financial instruments
The following table indicates the classification of financial instruments:

| | Loans and receivables £m | FVTPL £m | Available for sale £m | Amortised cost £m | Non-financial instruments £m | Total £m |
|---|---|---|---|---|---|---|
| As at 31 December 2010 | | | | | | |
| Goodwill | – | – | – | – | 156.5 | 156.5 |
| Other intangible assets | – | – | – | – | 2.6 | 2.6 |
| Property, plant and equipment | – | – | – | – | 5.9 | 5.9 |
| Other financial assets | – | – | 2.6 | – | – | 2.6 |
| Investment in associates | – | – | – | – | 0.4 | 0.4 |
| Deferred tax assets | – | – | – | – | 1.8 | 1.8 |
| Trade and other receivables | 349.6 | – | – | – | 7.2 | 356.8 |
| Current tax assets | – | – | – | – | 0.1 | 0.1 |
| Trading investments | – | 103.5 | – | – | – | 103.5 |
| Cash and cash equivalents | 104.5 | – | – | – | – | 104.5 |
| Trade and other payables | – | – | – | (383.9) | (3.5) | (387.4) |
| Current tax liabilities | – | – | – | – | (4.1) | (4.1) |
| Other financial liabilities | – | (72.9) | – | – | – | (72.9) |
| Interest-bearing loans and borrowings | – | – | – | – | – | – |
| Deferred consideration | – | (7.6) | – | – | – | (7.6) |
| | 454.1 | 23.0 | 2.6 | (383.9) | 166.9 | 262.7 |

58   Collins Stewart plc
Annual Report and Accounts
2010

# Notes to the consolidated financial statements continued

## 18. Financial instruments continued

| | Loans and receivables £m | FVTPL £m | Available for sale £m | Amortised cost £m | Non-financial instruments £m | Total £m |
|---|---|---|---|---|---|---|
| **As at 31 December 2009** | | | | | | |
| Goodwill | – | – | – | – | 143.8 | 143.8 |
| Other intangible assets | – | – | – | – | 0.7 | 0.7 |
| Property, plant and equipment | – | – | – | – | 4.9 | 4.9 |
| Other financial assets | – | – | 2.8 | – | – | 2.8 |
| Investment in associates | – | – | – | – | 0.4 | 0.4 |
| Deferred tax assets | – | – | – | – | 0.2 | 0.2 |
| Trade and other receivables | 308.8 | – | – | – | 6.9 | 315.7 |
| Current tax assets | – | – | – | – | 1.0 | 1.0 |
| Trading investments | – | 32.8 | – | – | – | 32.8 |
| Cash and cash equivalents | 123.4 | – | – | – | – | 123.4 |
| Trade and other payables | – | – | – | (331.9) | (4.0) | (335.9) |
| Current tax liabilities | – | – | – | – | (3.3) | (3.3) |
| Other financial liabilities | – | (22.9) | – | – | – | (22.9) |
| Interest-bearing loans and borrowings | – | – | – | (10.2) | – | (10.2) |
| Deferred consideration | – | – | – | – | – | – |
| | 432.2 | 9.9 | 2.8 | (342.1) | 150.6 | 253.4 |

The directors consider that the carrying amount of the above approximates to their fair value.

### 18.1 Credit risk

The Group's credit risk is primarily attributable to its trade receivables. The amounts presented in the balance sheet are net of allowances for doubtful receivables, estimated by the Group's management based on prior experience and their assessment of the current economic environment.

As a large proportion of the Group's business is contracted on a matched principal basis, the main credit risk is more akin to market risk, as the exposure in such cases is to movements in security prices.

The Group has no significant concentration of credit risk, with exposure spread over a large number of counterparties and customers.

The following table discloses the maximum exposure to credit risk on financial assets.

| | Trade and other receivables | | | | | | |
|---|---|---|---|---|---|---|---|
| | Delivery versus payment £m | Other trade receivables £m | Other receivables and accrued income £m | Other financial assets £m | Trading investments £m | Cash and cash equivalents £m | Total £m |
| **As at 31 December 2010** | 300.7 | 39.4 | 9.5 | 2.6 | 103.5 | 104.5 | 560.2 |
| As at 31 December 2009 | 262.7 | 38.3 | 7.8 | 2.8 | 32.8 | 123.4 | 467.8 |

The Group is exposed to credit risk from counterparties to a securities transaction during the period between the trade date and the settlement date. This period is generally three business days but can be longer in some markets. In addition, the Group has credit exposure that extends beyond the original settlement date if the counterparty fails either to make payment or to deliver securities. The majority of these transactions are with financial institutions.

Settlement risk is substantially mitigated as a result of the delivery versus payment mechanism whereby if a counterparty fails to make payment, the securities would not be delivered to the counterparty. They could however be sold in the market and therefore the economic substance of the transaction is that securities serve as collateral in the case of delivery versus payment trade receivables. Consequently the risk exposure is effectively to an adverse movement in market prices from the time of purchase and sale respectively.

Risk exposure in relation to cash and cash equivalents is mitigated by placing deposits across a number of large banks with strong credit ratings.

**18. Financial instruments** continued

An aged analysis of financial assets that are past due at reporting date but not impaired is set out below.

| | Delivery versus payment £m | Other trade receivables £m | Other receivables and accrued income £m | Total £m |
|---|---|---|---|---|
| **As at 31 December 2010** | | | | |
| Neither impaired nor past due on reporting date | 287.6 | 30.0 | 5.8 | 323.4 |
| Past due less than 30 days | 12.5 | 5.6 | 2.6 | 20.7 |
| Between 30 and 60 days | 0.5 | 1.6 | 0.4 | 2.5 |
| Between 61 and 90 days | 0.1 | 0.5 | 0.6 | 1.2 |
| Between 91 and 180 days | – | 1.2 | – | 1.2 |
| Between 181 and 360 days | – | 0.5 | – | 0.5 |
| More than 360 days | – | – | 0.1 | 0.1 |
| | 300.7 | 39.4 | 9.5 | 349.6 |

| | Delivery versus payment £m | Other trade receivables £m | Other receivables and accrued income £m | Total £m |
|---|---|---|---|---|
| **As at 31 December 2009** | | | | |
| Neither impaired nor past due on reporting date | 243.8 | 33.5 | 5.5 | 282.8 |
| Past due less than 30 days | 16.8 | 3.0 | 1.7 | 21.5 |
| Between 30 and 60 days | 1.8 | 0.9 | 0.4 | 3.1 |
| Between 61 and 90 days | 0.3 | 0.4 | – | 0.7 |
| Between 91 and 180 days | – | 0.3 | 0.2 | 0.5 |
| Between 181 and 360 days | – | 0.1 | – | 0.1 |
| More than 360 days | – | 0.1 | – | 0.1 |
| | 262.7 | 38.3 | 7.8 | 308.8 |

The movements on credit provisions were as follows:

| | 2010 £m | 2009 £m |
|---|---|---|
| Opening credit provision | 1.1 | 0.9 |
| Charge to income during the year | 0.8 | 0.7 |
| Released from income during the year | (0.2) | (0.2) |
| Profit impact for the year | 0.6 | 0.5 |
| Written off to provision in year | 0.6 | – |
| Charged against underlying asset during the year | (0.7) | (0.3) |
| Closing credit provision | 1.6 | 1.1 |

Outstanding receivables are individually assessed for impairment and provisions are made as required.

**18.2 Liquidity Risk**

The Group is cash-generative on an operating basis and also holds significant liquid assets. Overdrafts are used for foreign failed trades where our settlement agent funds the trade for which it holds the stock as collateral. Additionally, the Group has a £25m two year committed facility, which was agreed in July 2010. The facility was undrawn throughout the period to 31 December 2010 and remains undrawn at the date of the signing of these accounts.

# Notes to the consolidated financial statements continued

### 18. Financial instruments continued
*Maturity analysis*
The table below analyses the contractual undiscounted cash flows of financial liabilities in relevant groupings based on the remaining period, the balance sheet date, and the contractual maturity date.

| | Repayable on demand £m | 3 months or less but not repayable on demand £m | 1 year or less but over 3 months £m | More than 1 year £m | Total £m |
|---|---|---|---|---|---|
| **As at 31 December 2010** | | | | | |
| Trade and other payables | 323.7 | 59.3 | 0.4 | 0.5 | **383.9** |
| Other financial liabilities | 72.9 | – | – | – | **72.9** |
| Interest-bearing borrowings and loans | – | – | – | – | **–** |
| Deferred consideration | – | – | 2.8 | 4.8 | **7.6** |
| Cash flows arising from financial liabilities | **396.6** | **59.3** | **3.2** | **5.3** | **464.4** |

| | Repayable on demand £m | 3 months or less but not repayable on demand £m | 1 year or less but over 3 months £m | More than 1 year £m | Total £m |
|---|---|---|---|---|---|
| **As at 31 December 2009** | | | | | |
| Trade and other payables | 243.3 | 87.1 | 0.8 | 0.7 | 331.9 |
| Other financial liabilities | 22.9 | – | – | – | 22.9 |
| Interest-bearing borrowings and loans | 10.2 | – | – | – | 10.2 |
| Deferred consideration | – | – | – | – | – |
| Cash flows arising from financial liabilities | 276.4 | 87.1 | 0.8 | 0.7 | 365.0 |

### 18.3 Market risk
The Group is exposed to market risk in respect of both its trading in equities and debt instruments and in its role as an intermediary between buyers and sellers of financial instruments. The Group makes markets in smaller company stocks, Australian securities, investment trusts and fixed-income securities, primarily in order to facilitate liquidity in the securities of clients to whom it acts as market maker, broker or adviser. These positions are carried in current assets and liabilities at fair value. Limits are set on the size of individual and aggregate positions. Senior management undertakes day-to-day risk monitoring.

In addition, as an intermediary, the Group acts on an agency or matched principal basis so its exposure to market price movements in this capacity is limited to when there is a trade mismatch or error, or if one matched counterparty fails to fulfil its obligations. The impact of these risks is minimised by strict limits and monitoring controls.

*Sensitivity analysis*
*Interest rate risk*
The table below shows the effect on finance costs, profit and equity after tax as at 31 December from a 10% adverse/favourable movement in interest rates at that date on a net asset basis with all other variables held constant.

| | Finance costs Year ended 31 Dec | | Net profit As at 31 Dec | | Equity As at 31 Dec | |
|---|---|---|---|---|---|---|
| | **2010 £m** | 2009 £m | **2010 £m** | 2009 £m | **2010 £m** | 2009 £m |
| If interest rates were 10% higher with all other variables held constant – (decrease)/increase | **(0.3)** | 0.1 | **(0.1)** | – | **(0.1)** | – |
| If interest rates were 10% lower with all other variables held constant – increase/(decrease) | **0.3** | (0.1) | **0.1** | – | **0.1** | – |

**18. Financial instruments** continued
The table below analyses financial instruments between non-interest bearing and interest-bearing at 31 December.

| | Non-interest bearing £m | Floating £m | Fixed £m | Non financial assets/ liabilities £m | Total £m |
|---|---|---|---|---|---|
| **2010** | | | | | |
| Cash and cash equivalents | 4.8 | 99.7 | – | – | **104.5** |
| Interest-bearing loans and borrowings | – | – | – | – | **–** |
| Other financial investments: | | | | | |
| – Available-for-sale | 2.6 | – | – | – | **2.6** |
| – Trading investments at fair value through profit and loss | 77.0 | – | 26.5 | – | **103.5** |
| Trade and other receivables: | | | | | |
| – Loans and receivables | 323.3 | 26.3 | – | 7.2 | **356.8** |
| Financial liabilities at fair value through profit and loss | (52.2) | – | (20.7) | – | **(72.9)** |
| Trade and other payables | (354.2) | (29.7) | – | (3.5) | **(387.4)** |
| Deferred consideration | (7.6) | – | – | – | **(7.6)** |
| | (6.3) | 96.3 | 5.8 | 3.7 | **99.5** |

| | Non-interest bearing £m | Floating £m | Fixed £m | Non financial assets/ liabilities £m | Total £m |
|---|---|---|---|---|---|
| **2009** | | | | | |
| Cash and cash equivalents | 1.8 | 121.6 | – | – | 123.4 |
| Interest-bearing loans and borrowings | – | (10.2) | – | – | (10.2) |
| Other financial investments: | | | | | |
| – Available-for-sale | 2.8 | – | – | – | 2.8 |
| – Trading investments at fair value through profit and loss | 26.0 | – | 6.8 | – | 32.8 |
| Trade and other receivables: | | | | | |
| – Loans and receivables | 279.9 | 28.8 | 0.1 | 6.9 | 315.7 |
| Financial liabilities at fair value through profit and loss | (18.8) | – | (4.1) | – | (22.9) |
| Trade and other payables | (309.2) | (22.7) | – | (4.0) | (335.9) |
| Deferred consideration | – | – | – | – | – |
| | (17.5) | 117.5 | 2.8 | 2.9 | 105.7 |

*Foreign currency risk*
Foreign currency balances are held to meet the settlement obligations of clients who bear the currency risk in accordance with the terms and conditions of trading. Foreign currency is bought and sold at the time of trading. Where possible the Group deals in foreign currencies on a matched basis on behalf of clients, limiting foreign exchange exposure.

The following table shows the effect on profit and equity after tax as at 31 December from a 10% adverse/favourable movement in exchange rates at that date on a net asset basis with all other variables held constant.

| | Net profit As at 31 Dec | | Equity As at 31 Dec | |
|---|---|---|---|---|
| | 2010 £m | 2009 £m | 2010 £m | 2009 £m |
| If exchange rates were 10% higher with all other variables held constant | | | | |
| – increase/(decrease) | **2.7** | (0.7) | **2.7** | (0.7) |
| If exchange rates were 10% lower with all other variables held constant | | | | |
| – (decrease)/increase | **(2.7)** | 0.7 | **(2.7)** | 0.7 |

A sensitivity of 10% represents a reasonable movement given the level of volatility observed in respect of the main foreign currencies the Group is normally exposed to in its day-to-day operations.

# Notes to the consolidated financial statements continued

### 18. Financial instruments continued

The following table summarises exposure to foreign currency exchange rate risk. Included in the table are financial assets and liabilities at carrying amounts, categorised by currency.

|  | GBP | Euro | USD | Other | Total |
|---|---|---|---|---|---|
| **2010** | | | | | |
| Cash and cash equivalents | 71.0 | 2.5 | 25.6 | 5.4 | 104.5 |
| Interest bearing loans and borrowings | – | – | – | – | – |
| Trading investments | 45.5 | 6.6 | 49.3 | 2.1 | 103.5 |
| Available-for-sale assets | – | 2.6 | – | – | 2.6 |
| Trade and other receivables | 77.2 | 5.5 | 256.1 | 10.8 | 349.6 |
| Other financial liabilities | (33.2) | (0.1) | (38.9) | (0.7) | (72.9) |
| Trade and other payables | (95.5) | (9.9) | (262.0) | (16.5) | (383.9) |
| Deferred consideration | (7.6) | – | – | – | (7.6) |
| Net exposure | **57.4** | **7.2** | **30.1** | **1.1** | **95.8** |

|  | GBP | Euro | USD | Other | Total |
|---|---|---|---|---|---|
| **2009** | | | | | |
| Cash and cash equivalents | 97.0 | 6.5 | 16.3 | 3.6 | 123.4 |
| Interest bearing loans and borrowings | (0.5) | (6.4) | (0.9) | (2.4) | (10.2) |
| Trading investments | 25.0 | 4.9 | 1.4 | 1.5 | 32.8 |
| Available-for-sale assets | – | 2.8 | – | – | 2.8 |
| Trade and other receivables | 74.7 | 16.5 | 212.2 | 5.4 | 308.8 |
| Other financial liabilities | (19.3) | (2.5) | (1.1) | – | (22.9) |
| Trade and other payables | (82.7) | (12.3) | (231.9) | (5.0) | (331.9) |
| Deferred consideration | – | – | – | – | – |
| Net exposure | 94.2 | 9.5 | (4.0) | 3.1 | 102.8 |

*Other price risk*

Trading investments during the year were:

|  | Highest exposure £m | Lowest exposure £m | Average exposure £m | Exposure as at 31 Dec Total |
|---|---|---|---|---|
| **2010** | | | | |
| Long | 103.5 | 32.7 | 70.0 | 103.5 |
| Short | (72.9) | (23.0) | (45.7) | (72.9) |
| Net exposure | **30.6** | **9.7** | **24.3** | **30.6** |

|  | Highest exposure £m | Lowest exposure £m | Average exposure £m | Exposure as at 31 Dec Total |
|---|---|---|---|---|
| **2009** | | | | |
| Long | 50.0 | 35.7 | 37.5 | 32.8 |
| Short | (31.9) | (45.6) | (29.7) | (22.9) |
| Net exposure | 18.1 | (9.9) | 7.8 | 9.9 |

**18. Financial instruments** continued
*Fair value of financial instruments*
The following table shows financial instruments recognised at fair value, analysed between those whose fair value is based on:

- Quoted prices in active markets for identical assets or liabilities (Level 1);
- Those involving inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly (as prices) or indirectly (derived from prices) (Level 2); and
- Those with inputs for the asset or liability that are not based on observable market data (unobservable inputs) (Level 3).

| | Level 1
£m | Level 2
£m | Level 3
£m | Total
£m |
|---|---|---|---|---|
| **2010** | | | | |
| **Long** | | | | |
| Non-derivative financial assets held for trading | 103.5 | – | – | **103.5** |
| Available-for-sale assets | – | 2.6 | – | **2.6** |
| | 103.5 | 2.6 | – | **106.1** |
| **Short** | | | | |
| Non-derivative financial assets held for trading | (72.9) | – | – | **(72.9)** |
| Net | **30.6** | **2.6** | – | **33.2** |

| | Level 1
£m | Level 2
£m | Level 3
£m | Total
£m |
|---|---|---|---|---|
| **2009** | | | | |
| **Long** | | | | |
| Non-derivative financial assets held for trading | 32.8 | – | – | 32.8 |
| Available-for-sale assets | – | 2.8 | – | 2.8 |
| | 32.8 | 2.8 | – | 35.6 |
| **Short** | | | | |
| Non-derivative financial assets held for trading | (22.9) | – | – | (22.9) |
| Net | 9.9 | 2.8 | – | 12.7 |

There were no transfers between Level 1 and 2 during the year.

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Financial instruments measured at fair value on an ongoing basis include trading assets and liabilities and financial investments classified as available-for-sale.

**19. Trade and other payables**

| | 2010
£m | 2009
£m |
|---|---|---|
| Trade creditors | **328.5** | 281.7 |
| Tax and social security | **3.3** | 4.0 |
| Other creditors | **3.0** | 2.4 |
| Accruals and deferred income | **52.6** | 47.8 |
| | **387.4** | 335.9 |

The directors consider that the carrying amount of trade payables approximates to their fair value.

**20. Other financial liabilities**

| | 2010
£m | 2009
£m |
|---|---|---|
| Fair value through profit and loss: | | |
| – held for trading | **72.9** | 22.9 |
| | **72.9** | 22.9 |

# Notes to the consolidated financial statements continued

## 21. Interest-bearing loans and borrowings

|  | 2010 £m | 2009 £m |
|---|---|---|
| Bank overdrafts | – | 10.2 |

The directors consider that the carrying amount of interest-bearing loans and borrowings approximates to their fair value.

The borrowings are repayable as follows:

|  | 2010 £m | 2009 £m |
|---|---|---|
| On demand or within one year | – | 10.2 |

The average effective interest rates paid were as follows:

|  | 2010 % | 2009 % |
|---|---|---|
| Bank overdrafts (including inventory financing) | 3.0 | 3.4 |
| Short-term loans | – | 7.4 |
| Weighted average | 3.0 | 4.1 |

Analysis of borrowings by currency (sterling equivalents):

|  | GBP £m | Euro £m | USD £m | AUD £m | Total £m |
|---|---|---|---|---|---|
| **2010** |  |  |  |  |  |
| Bank overdrafts | – | – | – | – | – |
|  | – | – | – | – | – |
| **2009** |  |  |  |  |  |
| Bank overdrafts | 0.5 | 6.4 | 0.9 | 2.4 | 10.2 |
|  | 0.5 | 6.4 | 0.9 | 2.4 | 10.2 |

## 22. Share capital

|  | 2010 No. (m) | 2009 No. (m) |
|---|---|---|
| **Authorised** |  |  |
| Ordinary shares of 25p | 319.8 | 319.8 |
| Redeemable shares of £1 | 0.1 | 0.1 |
|  | 319.9 | 319.9 |
| **Allotted, issued and fully paid** |  |  |
| Ordinary shares of 25p | 248.1 | 248.1 |
| Redeemable shares of £1 | – | – |
|  | 248.1 | 248.1 |

|  | 2010 £m | 2009 £m |
|---|---|---|
| **Authorised** |  |  |
| Ordinary shares of 25p | 80.0 | 80.0 |
| Redeemable shares of £1 | 0.1 | 0.1 |
|  | 80.1 | 80.1 |
| **Allotted, issued and fully paid** |  |  |
| Ordinary shares of 25p | 62.0 | 62.0 |
| Redeemable shares of £1 | – | – |
|  | 62.0 | 62.0 |

During the year, the Company issued 17,433 shares to satisfy the exercise of share options.

### 23. Acquisitions

On 17 March 2010, the Group acquired 100% of the share capital of Corazon Capital Group Limited ("Corazon"), an independent, Guernsey-based investment manager.

On 16 June 2010, the Group acquired 100% of the share capital of Andersen Charnley Limited ("ACL"), an independent private client wealth manager offering both discretionary portfolio management and independent financial advice.

As described in the Business Review, each of these acquisitions form part of the Board's strategy of developing the wealth management division and, in particular, increasing assets under management.

| Corazon | Book value £m | Fair value adjustments £m | Fair values £m |
|---|---|---|---|
| Net assets acquired | | | |
| Customer-related intangible assets | – | 0.5 | 0.5 |
| Property, plant and equipment | 0.1 | – | 0.1 |
| Trade and other receivables | 0.2 | – | 0.2 |
| Prepayments and accrued income | 0.1 | – | 0.1 |
| Cash and cash equivalents | 0.3 | – | 0.3 |
| Trade and other payables | (0.4) | (0.5) | (0.9) |
| | 0.3 | – | 0.3 |
| Goodwill | | | 5.0 |
| | | | 5.3 |
| Satisfied by | | | |
| Cash consideration paid | | | 0.8 |
| Deferred consideration | | | 4.5 |
| | | | 5.3 |
| Net cash used for acquisition | | | |
| Cash consideration | | | 0.8 |
| Cash acquired | | | (0.3) |
| Net cash spent on acquisition | | | 0.5 |

| Andersen Charnley | Book value £m | Fair value adjustments £m | Fair values £m |
|---|---|---|---|
| Net assets acquired | | | |
| Customer-related intangible assets | – | 1.5 | 1.5 |
| Trade and other receivables | 0.9 | – | 0.9 |
| Prepayments and accrued income | 0.1 | – | 0.1 |
| Cash and cash equivalents | 1.0 | – | 1.0 |
| Trade and other payables | (1.6) | – | (1.6) |
| | 0.4 | 1.5 | 1.9 |
| Goodwill | | | 7.7 |
| | | | 9.6 |
| Satisfied by | | | |
| Cash consideration paid | | | 5.0 |
| Market-purchased equity | | | 1.5 |
| Deferred consideration | | | 3.1 |
| | | | 9.6 |
| Net cash used for acquisition | | | |
| Cash consideration | | | 6.5 |
| Cash acquired | | | (1.0) |
| Net cash spent on acquisition | | | 5.5 |

# Notes to the consolidated financial statements continued

### 23. Acquisitions continued

Corazon contributed £1.7m of revenue and £nil operating profit (after integration costs of £0.6m) in the financial period. ACL contributed £2.6m of revenue and £nil operating profit (after integration costs of £0.7m) in the financial period. If both acquisitions had been completed on the first day of the financial period, Group revenue and operating profit would have been £2.7m higher and £0.5m lower respectively.

Both acquisitions have been accounted for under the purchase method of accounting. Acquisition costs of £0.1m and £0.4m have been charged to the profit and loss account for the period in respect of the Corazon and ACL acquisitions respectively.

Deferred consideration in respect of the acquisition of Corazon is payable based on its performance during the 12 months post acquisition. The estimated fair value of such deferred consideration, which may range between £3.0m and £6.0m, is £4.5m. The consideration will be satisfied by the issue of up to 8,050,089 of Collins Stewart plc ordinary shares in three annual instalments commencing 12 months from the date of acquisition. The value of the shares to be issued has been determined as the average of the closing market prices on the 30 days prior to the date of acquisition. The deferred consideration, which was initially classified within equity in the preliminary disclosures in the 2010 interim report has now been reclassified as a liability as required under IAS 32 "Financial Instruments: Presentation".

Deferred consideration in respect of the acquisition of ACL is payable based on its performance during the 24 months post-acquisition. The estimated fair value of such deferred consideration, which may be up to £5.5m, is £3.1m. The consideration will be determined after 12 months and 24 months from the date of acquisition and will be satisfied in cash and the issue or transfer of Collins Stewart plc ordinary shares. The value of the shares to be issued is based on the average of the closing market prices on the 10 days prior to the date of issue or transfer. The deferred consideration has been accounted for as a liability under IAS 32 "Financial Instruments: Presentation".

### 24. Statement of cash flows
#### Reconciliation of operating profit to net cash from operating activities

|  | 2010 £m | 2009 £m |
|---|---|---|
| Operating profit | 20.2 | 18.5 |
| Adjust for: | | |
| Expense arising from share option plans | 5.4 | 3.4 |
| Decrease in the carrying value of associates | – | 1.2 |
| Depreciation of property, plant and equipment | 1.2 | 1.2 |
| Amortisation of intangible assets | 0.4 | 0.2 |
| Decrease in provisions for liabilities and charges | – | (3.1) |
| Operating cash flows before movement in working capital | 27.2 | 21.4 |
| Increase in trade and other receivables | (40.6) | (159.1) |
| (Increase)/decrease in net long and short positions | (20.7) | 0.5 |
| Increase in trade and other payables | 48.9 | 153.1 |
| Cash generated from operations | 14.8 | 15.9 |
| Income tax paid | (4.4) | (0.5) |
| Interest paid | (2.4) | (1.4) |
| Net cash flows from operating activities | 8.0 | 14.0 |

#### Cash and cash equivalents

Cash and cash equivalents comprise cash at bank and other short-term highly liquid investments with maturity of three months or less. Cash at bank earns interest principally at floating rates based on daily bank deposit rates. Short-term deposits are made for varying periods of between one day and 90 days depending on the immediate cash requirements of the Group, and earn interest at the respective short-term deposit rates.

For the purposes of the consolidated cash flow statement, cash and cash equivalents comprised the following at 31 December.

|  | 2010 £m | 2009 £m |
|---|---|---|
| Cash and cash equivalents | 104.5 | 123.4 |
| Bank overdrafts | – | (10.2) |
|  | 104.5 | 113.2 |

67 | Collins Stewart plc
Annual Report and Accounts
2010

## 25. Reconciliation of net cash flow to movements in net funds

| | 2010 £m | 2009 £m |
|---|---|---|
| Net decrease in cash and cash equivalents during the year | (9.6) | (6.7) |
| Decrease in net funds resulting from cash flows | (9.6) | (6.7) |
| Repayment of loan facility | – | 15.0 |
| Currency translation differences | 0.9 | (1.7) |
| (Decrease)/increase in net funds | (8.7) | 6.6 |
| Net funds at the end of the year | 104.5 | 113.2 |

## 26. Analysis of net funds

| | As at 1 Jan 2010 £m | Cash flow £m | Exchange differences £m | As at 31 Dec 2010 £m |
|---|---|---|---|---|
| Cash in hand and at bank | 114.2 | (35.6) | 0.9 | 79.5 |
| Cash equivalents | 7.0 | 16.3 | – | 23.3 |
| Client settlement monies | 2.2 | (0.5) | – | 1.7 |
| Bank overdrafts | (10.2) | 10.2 | – | – |
| Total net funds | 113.2 | (9.6) | 0.9 | 104.5 |

## 27. Contingent liabilities

The Group is subject to litigation in respect of a number of claims. The Group believes the basis of these claims to be without foundation and will if necessary mount robust defences. After taking legal advice, the directors are of the opinion that there will be no significant financial impact other than the legal costs involved for which accrual has been made in the financial statements.

In the ordinary course of business the Group has given letters of indemnity in respect of lost share certificates and stock transfers. Although the contingent liability arising therefrom cannot be precisely quantified, it is not believed to be material.

## 28. Operating lease commitments

| | 2010 £m | 2009 £m |
|---|---|---|
| Minimum lease payments under operating leases recognised in expense for the year | 8.4 | 8.0 |

The Group had outstanding commitments for future minimum lease payments under non-cancellable operating leases, the majority of which related to buildings, which fall due as follows:

| | 2010 £m | 2009 £m |
|---|---|---|
| – within one year | 8.4 | 7.6 |
| – within two to five years | 30.7 | 22.2 |
| – over five years | 17.9 | 12.7 |
| | 57.0 | 42.5 |

Operating lease payments represent rentals payable by the Group for certain of its office properties. Leases have an average term of 10 years and rentals are reviewed annually based on movements in market rents.

# Notes to the consolidated financial statements continued

## 29. Share–based payments

The Group has a number of share incentive plans for granting of non-transferable options to certain employees and executives. Options granted under the plans normally vest on the first day on which they become exercisable, which is typically three to four years after grant date. The maximum life of an option is 10 years. These options are normally settled in equity once exercised and, dependent on the option scheme, are settled either with new shares issued or shares purchased in the market.

The following table summarises the share option schemes that existed during the 12 months to 31 December 2010 and 12 months to 31 December 2009 respectively and the estimated fair values of the options granted.

| | 2010 No. | 2009 No. | Estimated fair value |
|---|---|---|---|
| **As at 31 December** | | | |
| Unapproved Share Option Schemes[1] | **2,628,638** | 2,823,341 | 17p–100p |
| Long-Term Incentive Plan[1] | **13,902,847** | 14,277,293 | 60p–200p |
| Hawkpoint Share Option Plan | **410,391** | 1,008,089 | 72p–153p |
| | **16,941,876** | 18,108,723 | |
| **As at 31 December** | | | |
| 2010 LTIP units | **626** | – | £7,080 |
| | **626** | – | |

1  Grants of the above options occurred on several dates.

The weighted average contractual life for the share options outstanding as at 31 December 2010 was 6.7 years (2009: 8.0 years).

The estimated fair value of each option granted was calculated by applying a Black Scholes or Monte Carlo option-pricing model. The model inputs were the weighted average share price at grant date, weighted average exercise price, expected volatility, expected dividends, expected life of the option until exercise and a risk-free interest rate based on government securities with a similar maturity profile.

| Long-Term Incentive Plan & Hawkpoint Share Option Plans | 2010 | 2009 |
|---|---|---|
| Weighted average share price at date of grant | **82p–86p** | 60p–89p |
| Weighted average exercise price | **nil** | nil |
| Expected volatility | **42%** | 29% |
| Expected life (years) | **3** | 3 |
| Risk free rate | **3.6%** | 3.7%–4.7% |
| Expected dividend yield | **3.4%** | 4.2% |
| Likelihood of ceasing employment before vesting | **0%** | 0% |
| Proportion meeting performance criteria | **100%** | 100% |

Grants within these schemes occurred on several dates and therefore input ranges reflect the rates and terms applicable at grant date.

The following table shows the number and weighted average exercise price for all share options outstanding.

| Share options | Weighted average exercise price (p) | Year to 31 Dec 2010 No. | Weighted average exercise price (p) | Year to 31 Dec 2009 No. |
|---|---|---|---|---|
| Outstanding as at 1 January | **16** | **18,108,723** | 25 | 21,546,971 |
| Granted in the year | **–** | **3,501,641** | – | 5,776,892 |
| Forfeited | **–** | **(1,479,434)** | 36 | (5,971,047) |
| Exercised in the year | **–** | **(3,189,054)** | 6 | (3,244,093) |
| | **16** | **16,941,876** | 16 | 18,108,723 |
| Exercisable at end of the year | **93** | **2,628,638** | 100 | 2,823,341 |

## 29. Share-based payments continued

| 2010 LTIP units | Weighted average exercise price (p) | Year to 31 Dec 2010 No. | Weighted average exercise price (p) | Year to 31 Dec 2009 No. |
|---|---|---|---|---|
| Outstanding as at 1 January | – | – | – | – |
| Granted in the year | – | 626 | – | – |
| Forfeited | – | – | – | – |
| Exercised in the year | – | – | – | – |
| | – | 626 | – | – |
| Exercisable at end of the year | – | – | – | – |

The weighted average share price at the date of exercise for share options exercised during the period was 84p (2009: 71p). During the year, 650,000 options with an exercise price of nil lapsed due to the failure to satisfy relevant performance conditions.

| | 2010 £m | 2009 £m |
|---|---|---|
| Expense arising under share plans | 5.4 | 3.4 |

## 30. Client money

Client money, held in segregated accounts, at 31 December 2010 was £643.3m (2009: £464.9m). This comprised £1.7m (2009: £2.2m) of balances held by the Group on behalf of clients to settle outstanding bargains and £641.6m (2009: £462.7m) of segregated deposits, held on behalf of clients, which are not reflected on the balance sheet. Movements in settlement balances are reflected in operating cash flows.

## 31. Events after the balance sheet date

There were no significant events after the balance sheet date.

## 32. Related party transactions

Transactions between the Company and its subsidiaries, which are related parties, have been eliminated on consolidation and are not disclosed in this note.

| | Year ended | |
|---|---|---|
| | 31 Dec 2010 £m | 31 Dec 2009 £m |
| Transactions with related parties: | | |
| Tullett Prebon plc | | |
| Management fees expenditure | 0.1 | 0.1 |
| | 0.1 | 0.1 |
| Partnerships | | |
| Management fee income | – | (0.1) |
| | – | (0.1) |
| Total | 0.1 | – |

Amounts due to and from related parties are set out below. All transactions between related parties are at arms length.

| | As at | |
|---|---|---|
| | 31 Dec 2010 £m | 31 Dec 2009 £m |
| Amounts due from related parties | | |
| Tullett Prebon plc | 0.6 | 0.6 |
| | 0.6 | 0.6 |

Collins Stewart plc and Tullett Prebon plc are related parties as key members of management personnel of Collins Stewart plc during the year participated in the financial and operating policy decisions of Tullett Prebon plc.

# Notes to the consolidated financial statements continued

### 32. Related party transactions continued
#### Remuneration of key management personnel
IAS 24: "Related Parties Disclosures" requires remuneration of key management personnel of the Group to be separated into specified categories. The Board considers that the key management personnel comprise the directors whose individual remuneration is disclosed in the Remuneration Report on page 34. The aggregate remuneration in the year ended 31 December 2010 (or from the date of appointment, if later) was £3.0m (2009: £2.6m), comprising £2.7m (2009: £2.5m) of short-term benefits and £0.3m (2009: £0.1m) in respect of share-based payments.

### 33. Principal subsidiary undertakings, joint ventures and associates
At 31 December 2010, the following companies were the Group's principal trading subsidiary undertakings, principal intermediate holding companies, joint ventures and associates.

| Subsidiary undertakings | Country of incorporation | Principal activities | Issued ordinary shares held, all voting |
| --- | --- | --- | --- |
| Andersen Charnley Limited | Great Britain | Wealth Management | 100% |
| Collins Stewart Europe Limited | Great Britain | Stockbroking | 100% |
| Collins Stewart Fund Management Limited | Guernsey | Investment fund management | 100% |
| Collins Stewart Inc. & Subsidiaries | USA | Stockbroking | 100% |
| Collins Stewart Portfolio Management Limited | Guernsey | Investment fund management | 100% |
| Collins Stewart Pte. Limited | Singapore | Stockbroking | 100% |
| Collins Stewart (CI) Limited | Guernsey | Stockbroking | 100% |
| Collins Stewart (Offshore) Limited | Jersey | Stockbroking | 100% |
| Hawkpoint Partners Limited | Great Britain | Corporate advisory | 100% |

With the exception of Andersen Charnley Limited and Collins Stewart Europe Limited, all of the above subsidiary undertakings are held indirectly.

The assets and liabilities of the Collins Stewart plc ESOT, Collins Stewart Inc. ESOT, Collins Stewart (CI) Limited ESOT and the Hawkpoint ESOT are included in the Group's balance sheet.

| Joint ventures | Country of incorporation | Principal activities | Issued ordinary shares held, all voting |
| --- | --- | --- | --- |
| Collins Stewart Inga Pvt Limited | India | Investment banking | 50% |

The Group's share of the results, assets and liabilities are included in the Group's financial statements by proportionate consolidation.

# Independent auditor's report to the members of Collins Stewart plc

We have audited the Parent Company financial statements of Collins Stewart plc for the year ended 31 December 2010 which comprise the Company Balance Sheet, and the related notes a to i. The financial reporting framework that has been applied in their preparation is applicable law and United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice).

This report is made solely to the Company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's members as a body, for our audit work, for this report, or for the opinions we have formed.

## Respective responsibilities of directors and auditor

As explained more fully in the Directors' Responsibilities Statement, the directors are responsible for the preparation of the Parent Company financial statements and for being satisfied that they give a true and fair view. Our responsibility is to audit and express an opinion on the Parent Company financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland). Those standards require us to comply with the Auditing Practices Board's Ethical Standards for Auditors.

## Scope of the audit of the financial statements

An audit involves obtaining evidence about the amounts and disclosures in the financial statements sufficient to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or error. This includes an assessment of: whether the accounting policies are appropriate to the Parent Company's circumstances and have been consistently applied and adequately disclosed; the reasonableness of significant accounting estimates made by the directors; and the overall presentation of the financial statements.

## Opinion on financial statements

In our opinion the Parent Company financial statements:
- give a true and fair view of the state of the Company's affairs as at 31 December 2010;
- have been properly prepared in accordance with United Kingdom Generally Accepted Accounting Practice; and
- have been prepared in accordance with the requirements of the Companies Act 2006.

## Opinion on other matters prescribed by the Companies Act 2006

In our opinion:
- the part of the Directors' Remuneration Report to be audited has been properly prepared in accordance with the Companies Act 2006; and
- the information given in the Directors' Report for the financial year for which the financial statements are prepared is consistent with the Parent Company financial statements.

## Matters on which we are required to report by exception

We have nothing to report in respect of the following matters where the Companies Act 2006 requires us to report to you if, in our opinion:
- adequate accounting records have not been kept by the Parent Company, or returns adequate for our audit have not been received from branches not visited by us; or
- the Parent Company financial statements and the part of the Remuneration Report to be audited are not in agreement with the accounting records and returns; or
- certain disclosures of directors' remuneration specified by law are not made; or
- we have not received all the information and explanations we require for our audit.

## Other matter

We have reported separately on the Group financial statements of Collins Stewart plc for the year ended 31 December 2010.

**Oliver Grundy FCA** (Senior statutory auditor)
for and on behalf of Deloitte LLP
Chartered Accountants and Statutory Auditor
London, United Kingdom
15 March 2011

# Company balance sheet
## as at 31 December 2010

| | Notes | 2010 £m | 2009 £m |
|---|---|---|---|
| **Non–current assets** | | | |
| Investment in subsidiaries | d | 469.3 | 455.2 |
| | | 469.3 | 455.2 |
| **Current Assets** | | | |
| Debtors due within one year | e | 12.0 | 11.3 |
| Cash at bank and in hand | | – | 1.6 |
| | | 12.0 | 12.9 |
| Total assets | | 481.3 | 468.1 |
| **Current liabilities** | | | |
| Creditors due within one year | f | (55.4) | (35.8) |
| | | (55.4) | (35.8) |
| Net current liabilities | | (43.4) | (22.9) |
| Total assets less current liabilities | | 425.9 | 432.3 |
| **Non–current liabilities** | | | |
| Deferred consideration | | (4.8) | – |
| | | (4.8) | – |
| Total liabilities | | (60.2) | (35.8) |
| Net assets | | 421.1 | 432.3 |
| **Capital and reserves** | | | |
| Called-up share capital | g | 62.0 | 62.0 |
| Share premium | g | 0.1 | 0.1 |
| Merger reserve | g | 70.9 | 70.9 |
| Profit and loss account | g | 288.1 | 299.3 |
| Shareholders' funds | | 421.1 | 432.3 |

The financial statements of Collins Stewart plc (registered number 5807587) were approved by the Board of directors and authorised for issue on 15 March 2011 and are signed on its behalf by:

**Mark Brown**
Chief Executive

# Notes to the company financial statements

### a. Summary of significant accounting policies

**Basis of Accounting**

The separate financial statements of the Company are presented as required by the Companies Act 2006. They have been prepared under the historical cost convention and in accordance with applicable United Kingdom law and United Kingdom Generally Accepted Accounting Practice.

The principal accounting policies are summarised below. They have all been applied consistently throughout the year.

**Investments**

Fixed asset investments in subsidiaries are shown at cost less provision for impairment.

For investments in subsidiaries acquired for consideration including the issue of shares qualifying for merger relief, cost is measured by reference to the nominal value only of the shares issued. Any premium is ignored.

**Cash flow statement**

The results, assets and liabilities of the Company are included in the consolidated financial statements of Collins Stewart plc. Consequently, the Company has taken advantage of the exemption from preparing a cash flow statement under the terms of FRS 1 (revised): Cash flow statements.

### b. Profit for the year

As permitted in section 408 of the Companies Act 2006 the Company has elected not to present its own profit and loss account for the year. Collins Stewart plc reported a loss for the period of £0.7m (2009: profit of £55.0m).

The auditors' remuneration for the audit services to the Company was £0.2m (2009: £0.2m).

### c. Directors' emoluments and employee information

Certain directors are remunerated by the Company for their services to the Group as a whole. Full details of the directors' emoluments are given in the Remuneration Report in the Group consolidated financial statements. Amounts paid by the Company for 2010 were £0.3m (2009: £0.2m).

The average number of employees during 2010 was seven (2009: eight).

### d. Investment in subsidiary undertakings

A detailed list of subsidiary undertakings is listed in Note 33 of the consolidated financial statements.

### e. Debtors

|  | 2010 £m | 2009 £m |
| --- | --- | --- |
| **Amounts falling due within one year:** | | |
| Amounts due from subsidiaries | 10.6 | 10.3 |
| Amounts due from related parties | 0.6 | 0.6 |
| Other debtors | 0.8 | 0.4 |
| | 12.0 | 11.3 |

### f. Creditors

|  | 2010 £m | 2009 £m |
| --- | --- | --- |
| **Amounts falling due within one year:** | | |
| Accruals and deferred income | 0.3 | 0.2 |
| Amounts owed to subsidiaries | 52.3 | 35.6 |
| Deferred consideration | 2.8 | – |
| | 55.4 | 35.8 |

# Notes to the company financial statements continued

### g. Reconciliation of movement in shareholders' funds

| | Called up share capital £m | Share premium £m | Merger reserve £m | Profit and loss account £m | Total shareholders' funds £m |
|---|---|---|---|---|---|
| Shareholders' funds as at 1 January 2009 | 61.9 | – | 70.9 | 250.5 | 383.3 |
| Profit for the year | – | – | – | 55.0 | 55.0 |
| Dividends paid | – | – | – | (6.1) | (6.1) |
| Issue of shares | 0.1 | 0.1 | – | (0.1) | 0.1 |
| Shareholders' funds as at 31 December 2009 | 62.0 | 0.1 | 70.9 | 299.3 | 432.3 |
| Loss for the year | – | – | – | (0.7) | (0.7) |
| Dividends paid | – | – | – | (6.3) | (6.3) |
| Purchase of treasury shares | – | – | – | (0.2) | (0.2) |
| Purchase of shares by ESOT | – | – | – | (4.0) | (4.0) |
| Shareholders' funds as at 31 December 2010 | 62.0 | 0.1 | 70.9 | 288.1 | 421.1 |

### h. Called–up share capital

| | 2010 No. (m) | 2009 No. (m) |
|---|---|---|
| Authorised | | |
| Ordinary shares of 25p | 319.8 | 319.8 |
| Redeemable shares of £1 | 0.1 | 0.1 |
| | 319.9 | 319.9 |
| Allotted, issued and fully paid | | |
| Ordinary shares of 25p | 248.1 | 248.1 |
| Redeemable shares of £1 | – | – |
| | 248.1 | 248.1 |

| | 2010 £m | 2009 £m |
|---|---|---|
| Authorised | | |
| Ordinary shares of 25p | 80.0 | 80.0 |
| Redeemable shares of £1 | 0.1 | 0.1 |
| | 80.1 | 80.1 |
| Allotted, issued and fully paid | | |
| Ordinary shares of 25p | 62.0 | 62.0 |
| Redeemable shares of £1 | – | – |
| | 62.0 | 62.0 |

During the year, the Company issued 17,433 shares to satisfy the exercise of share options.

### i. Related party transactions

Transactions between the Company and its subsidiaries, which are related parties, were:

| | Year ended | |
|---|---|---|
| | 31 Dec 2010 £m | 31 Dec 2009 £m |
| Transactions with related parties: | | |
| Amount received/receivable from related parties | | |
| Collins Stewart Europe Limited | | |
| Dividends | – | 45.0 |
| Hawkpoint Holdings Limited | | |
| Dividends | – | 10.0 |
| Collins Stewart Inc | | |
| Loan | 9.7 | 10.2 |
| Interest | 0.9 | 0.1 |
| | 10.6 | 65.3 |
| Amount paid/payable to related parties | | |
| Collins Stewart Pte Ltd | | |
| Loan | 1.0 | – |
| Hawkpoint Partners Limited | | |
| Loan | 6.0 | – |
| Interest | 0.1 | 0.1 |
| | 7.1 | 0.1 |

Amounts due to and from related parties are set out below.

| | As at | |
|---|---|---|
| | 31 Dec 2010 £m | 31 Dec 2009 £m |
| Amounts due from related parties | | |
| Collins Stewart Inc | 10.6 | 10.3 |
| Tullett Prebon plc | 0.6 | 0.6 |
| | 11.2 | 10.9 |
| Amounts due to related parties | | |
| Collins Stewart Europe Limited | 39.2 | 26.3 |
| Collins Stewart Pte Ltd | 1.0 | – |
| Collins Stewart (CI) Limited | 6.0 | 6.0 |
| Hawkpoint Partners Limited | 6.1 | 3.3 |
| | 52.3 | 35.6 |

The Company had no transactions with other related parties, including key management personnel (2009: £nil).

# Notes

# Company Information

## Financial Calendar 2011

| | |
|---|---|
| Preliminary Announcement | 15 March |
| Ex-dividend Date | 4 May |
| Final Dividend Record Date | 6 May |
| AGM | 19 May |
| Final Dividend Payment | 26 May |

## Secretary & Registered Office

**Simon Pearce**
**Collins Stewart plc**
88 Wood Street
London EC2V 7QR
United Kingdom

Tel: +44 (0)20 7523 8000

email: cosec@collinsstewart.com

## Website

www.collinsstewart.com

## Registrar

Capita Registrars
The Registry
34 Beckenham Road
Beckenham
Kent
BR3 4TU

Tel: 0871 664 0300 (UK)

Calls cost 10p per minute plus
network extras

Tel: +44 (0)20 8639 3399 (overseas)

Lines are open 8.30am to 5.30pm
Monday – Friday

## Office Locations

### Europe

**Collins Stewart Europe Ltd**
88 Wood Street
London EC2V 7QR
United Kingdom

Tel: +44 (0)20 7523 8000

**Hawkpoint Partners Ltd**
41 Lothbury
London EC2R 7AE
United Kingdom

Tel: +44 (0)20 7665 4500

**Collins Stewart Europe Ltd**
First Floor, South Dock House
Hanover Quay
Dublin 2
Republic of Ireland

Tel: +353 (0) 635 0210

**Hawkpoint Partners Ltd**
(Succursale de Paris)
Washington Plaza
29 rue de berri
75008 Paris
France

Tel: +33 (0)1 56 69 66 66

**Hawkpoint Partners Ltd**
Opern Turm
Bockenheimer Landstr 2–4
60306 Frankfurt am Main
Germany

Tel: +49 (0)69 67 776 5000

**Collins Stewart**
**Wealth Management**
Collins Stewart House
The Grange
St Peter Port
Guernsey GY1 4QA
Channel Islands

Tel: +44 (0)1481 712 889

**Collins Stewart**
**Wealth Management**
38 The Esplanade
St Helier
Jersey JE4 0XQ
Channel Islands

Tel: +44 (0)1534 708 090

**Collins Stewart**
**Wealth Management**
Anglo International House
Bank Hill
Douglas
Isle of Man IM1 4LN

Tel: +44 (0)1624 690 100

**Collins Stewart**
**Wealth Management**
7, Avenue
Pictet-de-Rochemont
CP 1277
1207 Genéve

Tel: +41 (0)22 707 0030

### North America

**Collins Stewart LLC**
225 Franklin Street
26th Floor
Boston MA 02110
USA

Tel: +1 (617) 217 2061

**Collins Stewart LLC**
350 Madison Avenue
New York, NY 10017
USA

Tel: +1 (212) 389 8000

**Collins Stewart LLC**
505 Montgomery Street
11th Floor
San Francisco CA 94111
USA

Tel: +1 (415) 659 2222

### Asia

**Collins Stewart Pte Ltd**
77 Robinson Road
#21-02
Singapore
068896

Tel: +65 6854 6150

Designed and produced by Emperor Design Consultants Ltd
Telephone +44 (0)20 7729 9090  www.emperordesign.co.uk

Collins Stewart plc
88 Wood Street
London EC2V 7QR
United Kingdom
Tel: +44 (0)20 7523 8000

www.collinsstewart.com



# Exhibit E

| Date | SAC Position | +/- position | YHOO SHARE PRICE Open | High | Low | Close Price | % change | Volume | SPY Price (S&P 500 ETF) Close Pric | % change | MSFT Price Close Pric | % change | GOOG Price Close Price | % change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Friday, July 31, 2009 | 1,145,800 | 0 | 14.72 | 14.89 | 14.29 | 14.32 | -1.9% | 62,659,900 | 98.81 | 0.1% | 23.52 | -1.2% | 220.69777 | -0.6% |
| Thursday, July 30, 2009 | 1,145,800 | 350,000 | 15.13 | 15.14 | 14.24 | 14.60 | -3.6% | 100,889,000 | 98.67 | 1.0% | 23.81 | 0.0% | 221.98793 | 2.2% |
| Wednesday, July 29, 2009 | 795,800 | -500,000 | 16 | 16.2 | 15.05 | 15.14 | -12.1% | 126,807,700 | 97.65 | -0.2% | 23.8 | 1.4% | 217.30548 | -0.8% |
| Tuesday, July 28, 2009 | 1,295,800 | -47,261 | 16.969999 | 17.49 | 16.52 | 17.22 | 1.3% | 36,152,600 | 97.89 | -0.5% | 23.47 | 1.6% | 219.10375 | -1.1% |
| Monday, July 27, 2009 | 1,343,061 | 0 | 17.370001 | 17.48 | 16.85 | 17.00 | -2.7% | 19,951,800 | 98.35 | 0.3% | 23.11 | -1.4% | 221.5695 | -0.4% |
| Sunday, July 26, 2009 | | | | | | | | | | | | | | |
| Saturday, July 25, 2009 | | | | | | | | | | | | | | |
| Friday, July 24, 2009 | 1,343,061 | -186,139 | 17.43 | 17.59 | 17.02 | 17.48 | 0.7% | 19,944,700 | 98.06 | 0.4% | 23.45 | -8.3% | 222.52593 | 2.1% |
| Thursday, July 23, 2009 | 1,529,200 | -1,970,800 | 17.41 | 17.68 | 17.16 | 17.36 | -0.1% | 37,524,900 | 97.66 | 2.2% | 25.56 | 3.1% | 217.85344 | 2.3% |
| Wednesday, July 22, 2009 | 3,500,000 | -1,260,000 | 16.190001 | 17.48 | 16.120001 | 17.37 | 3.7% | 53,615,500 | 95.55 | 0.0% | 24.8 | -0.1% | 213.04645 | 0.0% |
| Tuesday, July 21, 2009 | 4,760,000 | 1,100,851 | 17.049999 | 17.11 | 16.440001 | 16.75 | -1.5% | 33,601,800 | 95.57 | 0.5% | 24.83 | 1.2% | 213.15106 | -0.5% |
| Monday, July 20, 2009 | 3,659,149 | 0 | 17.18 | 17.43 | 16.65 | 17.01 | 1.0% | 27,760,800 | 95.13 | 1.1% | 24.53 | 1.0% | 214.28182 | 0.0% |
| Sunday, July 19, 2009 | | | | | | | | | | | | | | |
| Saturday, July 18, 2009 | | | | | | | | | | | | | | |
| Friday, July 17, 2009 | 3,659,149 | 0 | 16.75 | 16.91 | 16.450001 | 16.840 | 4.0% | 32,514,700 | 94.13 | 1.1% | 24.29 | -0.6% | 214.32167 | -2.8% |
| Thursday, July 16, 2009 | 3,659,149 | 0 | 15.8 | 16.25 | 15.78 | 16.190 | 3.1% | 21,919,500 | 93.11 | -0.2% | 24.44 | 1.3% | 220.47362 | 1.0% |
| Wednesday, July 15, 2009 | 3,659,149 | -300,000 | 15.23 | 15.74 | 15.15 | 15.710 | 3.5% | 18,813,600 | 93.26 | 2.9% | 24.12 | 4.4% | 218.26688 | 3.2% |
| Tuesday, July 14, 2009 | 3,959,149 | 59,149 | 15.07 | 15.22 | 14.98 | 15.180 | 1.1% | 13,039,500 | 90.61 | 0.6% | 23.11 | -0.5% | 211.55205 | 0.1% |
| Monday, July 13, 2009 | 3,900,000 | 0 | 14.95 | 15.06 | 14.64 | 15.010 | 0.5% | 13,174,400 | 90.1 | 2.4% | 23.23 | 3.8% | 211.35777 | 2.4% |
| Sunday, July 12, 2009 | | | | | | | | | | | | | | |
| Saturday, July 11, 2009 | | | | | | | | | | | | | | |
| Friday, July 10, 2009 | 3,900,000 | 725,000 | 14.78 | 15.18 | 14.75 | 14.93 | 2.6% | 23,061,200 | 87.96 | -0.2% | 22.39 | -0.2% | 206.42627 | 1.0% |
| Thursday, July 9, 2009 | 3,175,000 | 175,000 | 14.48 | 14.68 | 14.25 | 14.55 | 1.2% | 15,598,200 | 88.17 | 0.2% | 22.44 | -0.5% | 204.42876 | 2.0% |
| Wednesday, July 8, 2009 | 3,000,000 | 400,000 | 14.44 | 14.69 | 14.22 | 14.38 | -0.4% | 15,352,700 | 88 | -0.1% | 22.56 | 0.1% | 200.4935 | 1.5% |
| Tuesday, July 7, 2009 | 2,600,000 | 600,000 | 14.92 | 14.93 | 14.36 | 14.44 | -3.2% | 22,021,700 | 88.06 | -1.9% | 22.53 | -2.9% | 197.57445 | -3.2% |
| Monday, July 6, 2009 | 2,000,000 | | 14.83 | 14.93 | 14.55 | 14.91 | -2.2% | 13,690,700 | 89.8 | 0.0% | 23.2 | -0.7% | 204.04021 | 0.3% |
| | | | 15.24 | 15.28 | 14.88 | | | 16,919,900 | 89.81 | -2.7% | 23.37 | -2.8% | 203.4823 | -2.5% |
| | | | 15.49 | 15.69 | 15.35 | | | 12,716,100 | 92.33 | | 24.04 | | 208.71269 | |

| | |
|---|---|
| YHOO Price from Jul 10 to Jul 29 | 1.41% |
| SPY Price from Jul 10 to Jul 29 | 11.02% |
| MSFT Price from Jul 10 to Jul 29 | 6.30% |
| GOOG Price from Jul 10 to Jul 29 | 5.27% |

| | | | |
|---|---|---|---|
| YHOO 7/9 Close | 14.55 | | |
| YHOO 7/10 Open | 14.78 | YHOO 7/10 Low | 14.75 |
| YHOO 7/10 Close | 14.93 | YHOO 7/10 High | 15.18 |

# Exhibit F

1

D7N7LEEP

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4           v.                          13 Cr. 539 (PGG)

 5
     RICHARD LEE,
 6                 Defendant.

 7   ------------------------------x

 8                                       July 23, 2013
                                         10:15 a.m.
 9

10   Before:

11                    HON. PAUL G. GARDEPHE
                                         District Judge
12

13                        APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     BY:  ARLO DEVLIN-BROWN
16        Assistant United States Attorney

17   RICHARD D. OWENS
          Attorney for Defendant
18
     ALSO PRESENT:  MATTHEW THORESEN, F.B.I.
19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

XD7N7LEEP

1          (Cased called)

2          (In open court)

3          MR. DEVLIN-BROWN:  Good morning, your Honor.  Arlo

4  Devlin-Brown for the government.  With me at counsel table is

5  Matthew Thoresen, a special agent with the F.B.I.  I also have

6  a pretrial service officer at the table.

7          MR. OWENS:  Good morning, your Honor.  Richard Owens

8  of Latham & Watkins for defendant Richard Lee.  I am joined at

9  counsel by my colleague Eric Tappet and defendant.

10          THE COURT:  Good morning.  Let me begin with the

11  government's application to seal the courtroom for this

12  proceeding.

13          There is a public right of access to plea hearings and

14  to documents filed in connection with me hearings.  See United

15  States v. Haller, 837 F.2d 84, 86-87 (1988).  The right of

16  access is not absolute, however, and "may give way in certain

17  cases to other rights or interests, such as the defendant's

18  right to a fair trial or the government's interest in

19  inhibiting disclosure of sensitive information."  Waller v.

20  Georgia, 467 U.S. 39, 45 (1984).  In Waller, the Supreme Court

21  set forth a four-factor test for closing criminal proceedings:

22  (1) "the party seeking to close the hearing must advance an

23  overriding interest that is likely to be prejudiced;" (2) "the

24  closure must be no broader than necessary to protect that

25  interest;" (3) "the trial court must consider reasonable

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

XD7N7LEEP

1   alternatives to closing the proceeding;" and (4) "it must make

2   findings adequate to support the closure."  Id. at 48; see also

3   United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995)

4   (articulating similar four-part test for courtroom closures).

5   I am not convinced that these four factors are satisfied here.

6          The government represents that if this proceeding and

7   the documents to be filed in connection with it are to be made

8   public, the defendant's cooperation will be exposed and the

9   government's ongoing investigation will be jeopardized.  See

10   Devlin-Brown Affirmation paragraphs 5 and 8.  In particular,

11   the government represents that it is currently considering

12   whether to arrest and charge one of the defendant's alleged

13   coconspirators who happens to be in the United States for a

14   short-term visit, and that if this proceeding is made public,

15   there is a risk that the coconspirator might flee.  Id. at

16   paragraph 5.

17          The Second Circuit has recognized that protecting the

18   secrecy of ongoing criminal investigations is a "higher value"

19   justifying some limitation on public access to criminal

20   proceedings.  837 F.2d at 88.  However, while the sensitivity

21   of an ongoing criminal investigations and the potential that

22   targets might be tipped off may be justification for sealing or

23   redacting certain documents and docket entries, it is not

24   sufficient for closing the courtroom entirely.  See id. at 88

25   (affirming district court order, entered after public plea

4

XD7N7LEEP

 1    hearing, redacting of portions of plea agreement that might

 2    alert targets to ongoing investigation); see also United States

 3    v. Milken, 780 F.Supp. 123, 127, (S.D.N.Y. 1991) (permitting

 4    redaction of defendant's motion for sentence reduction that

 5    revealed "information that identifies the target, subject or

 6    status of a particular government investigation"); In re

 7    Application of Times-Union, Gannett Co., Inc., 1990 WL 6605, at

 8    *1, *3-4, (W.D.N.Y. January 26, 1990) (denying request to close

 9    courtroom for initial appearance but permitting sealing of

10    documents that would reveal the potential targets in the

11    direction of an ongoing investigation).  Accordingly, while the

12    government has an interest in protecting the secrecy of its

13    ongoing investigation, complete closure of the courtroom would

14    be a remedy "broader than necessary to protect that interest."

15    Waller, 467 U.S. at 48.

16          Here, the ongoing investigation against the target

17    company and its employees is not a closely guarded government

18    secret.  There have been countless press reports about the

19    investigation.  Numerous defendants have already pleaded guilty

20    to charges stemming from their criminal activities while

21    employed there.  The particular co-conspirator being targeted

22    now has known long before today's proceeding that he may be

23    implicated in the government's broader investigation, and yet

24    he apparently chose to travel to the United States.  Given the

25    fact that the general nature of the government's investigation

5

XD7N7LEEP

1    is widely known, complete closure of the courtroom is not

2    warranted.  See United States v. Huntley, 2013 WL 1881536, at

3    *4, (E.D.N.Y. May 7, 2013) (unsealing sentencing submission

4    when information about government investigation was "widely

5    reported by the press and disclosed by the government in court

6    filings" and there would be "no surprise to the potential

7    accused by the revelations of their names"); Milken, 780

8    F.Supp. at 127 (approving redaction of information about

9    ongoing investigation that had "not previously been publicly

10   revealed").

11           Furthermore, the government has had control over the

12   timing of this proceeding, and it has control over the timing

13   of the arrest of the alleged co-conspirator.

14           Finally, there is no evidence that the defendant faces

15   any risk of harm, or that he is actually working in an

16   undercover capacity, and in a capacity would be undermined if

17   the courtroom is not closed today.

18           For all of these reasons, I'm denying the request to

19   close the courtroom.  I will, however, order that the docket

20   for this case remain anonymous, that is, that the docket as

21   United States v. John Doe, and that the transcript and all

22   documents filed in connection with today's proceeding be

23   sealed.  However, the government must make an application for

24   continued sealing by July 30, 2013, or the case will be

25   unsealed.

6

XD7N7LEEP

```
 1                 All right.  I am told that Mr. Lee intends to plead
 2      guilty to a two count information.  Is that correct, Mr. Owens?
 3                 MR. OWENS:  Yes, your Honor.
 4                 THE COURT:  Mr. Lee, would you please stand.
 5                 Mr. Rouco, would you please swear the defendant.
 6                 (Defendant sworn)
 7                 THE COURT:  Mr. Lee, you should understand that you
 8      are now under oath and that if you answer my questions falsely,
 9      your answers may later be used against you in another
10      prosecution for perjury or making a false statement.  Do you
11      understand that?
12                 THE DEFENDANT:  I understand, your Honor.
13                 THE COURT:  You are here with Mr. Owens.  He is your
14      attorney today, is that correct?
15                 THE DEFENDANT:  Yes, your Honor.
16                 THE COURT:  Have you received a copy of the
17      information which reflects the charges against you?
18                 THE DEFENDANT:  Yes, your Honor.
19                 THE COURT:  Have you had an opportunity to discuss the
20      charges with Mr. Owens?
21                 THE DEFENDANT:  Yes, your Honor.
22                 THE COURT:  The information charges you with
23      conspiracy to commit securities fraud, as well as a substantive
24      count of securities fraud.  Do you wish me to read the
25      information to you now?
```

7

XD7N7LEEP

1              THE DEFENDANT:  It's not necessary, your Honor.

2              THE COURT:  I have before me a waiver of indictment

3      form that appears to have been signed by you and by Mr. Owens

4      and by my courtroom deputy.  Is this your signature on the

5      waiver of indictment form?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Before you signed the waive of indictment

8      form, did you have an opportunity to discuss it with Mr. Owens?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Do you understand you have no obligation

11     to waive indictment?

12             THE DEFENDANT:  Pardon me, your Honor?

13             THE COURT:  All right.  Let me say it again.  Do you

14     understand that have no obligation to waive indictment, in

15     other words, you don't have to do it?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  Have any threats been made against you, or

18     any promises been made to you, to induce you to waive

19     indictment?

20             THE DEFENDANT:  No, your Honor.

21             THE COURT:  You should understand that if you did not

22     waive indictment, the government would be required to present

23     your case to a grand jury, which might or might not choose to

24     indict you.  Do you understand that?

25             THE DEFENDANT:  I understand, your Honor.

XD7N7LEEP

1          THE COURT:  Do you realize that by signing this waiver

2     of indictment, you have given up your right to have your case

3     presented to a grand jury, and that instead the case against

4     you will proceed on the basis of the information signed by the

5     United States attorney?

6          THE DEFENDANT:  Yes, your Honor, I understand.

7          THE COURT:  All right.  Then I find that you have

8     knowingly and voluntarily waived your right to have your case

9     presented to a grand jury, and the case will proceed by way of

10     information.

11          I also have a written advice of rights form before me

12     that appears to bear your signature and the signature of Mr.

13     Owens and today's date.  Is this your signature on the advice

14     of rights form?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  And, finally, I have a plea agreement that

17     appears to bear your signature, the signature of Mr. Owens and

18     the signatures of representatives of the United States

19     attorney's office.  Is this your signature on the plea

20     agreement?

21          THE DEFENDANT:  It is, your Honor.

22          THE COURT:  All right.  Then I will mark the advice of

23     rights form as Exhibit 1 to these proceedings, the plea

24     agreement as Exhibit 2.

25          Before deciding whether to accept your plea, I am

9

XD7N7LEEP

1    required to ask you certain questions.  It is important that

2    you answer these questions honestly and completely.  The

3    purpose of these proceedings is to make sure that you

4    understand your rights and for me to make certain that you are

5    pleading guilty of your own free will and to make sure that you

6    are pleading guilty because you are in fact guilty and not for

7    some other reason.  Do you understand that?

8              THE DEFENDANT:  I understand.

9              THE COURT:  If you don't understand any of my

10   questions, or you want to consult with your attorneys at any

11   time, please say so, because it is important you understand

12   every question before you answer.

13             Could you state your full name for the record.

14             THE DEFENDANT:  My name is Richard Sahng Lee.

15             THE COURT:  How old are you?

16             THE DEFENDANT:  34 years old.

17             THE COURT:  And how far did you go in school?

18             THE DEFENDANT:  I completed a Bachelor's degree, sir.

19             THE COURT:  And have you ever been addicted to any

20   drugs or alcohol, or been treated for any addiction?

21             THE DEFENDANT:  No, your Honor.

22             THE COURT:  Are you now or have you recently been

23   under the care of any kind of doctor?

24             THE DEFENDANT:  No, your Honor.

25             THE COURT:  In the past 24 hours, have you taken any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XD7N7LEEP

1    drugs, medicine or pills, or drunk any alcohol?

2         THE DEFENDANT:  No, your Honor.

3         THE COURT:  Is your mind clear today, and do you

4    understand what is happening?

5         THE DEFENDANT:  Yes, your Honor.

6         THE COURT:  Mr. Owens, do you have any doubt as to

7    Mr. Lee's competence to plead guilty?

8         MR. OWENS:  No, your Honor.

9         THE COURT:  On the basis of Mr. Lee's responses to my

10   questions, and my observations of his demeanor, I find that he

11   is fully competent to enter an informed plea.

12        Mr. Lee, have you had enough time to discuss your case

13   with Mr. Owens, as well as your intention to plead guilty this

14   morning?

15        THE DEFENDANT:  Yes, your Honor.

16        THE COURT:  Has he told you about the consequences of

17   pleading guilty?

18        THE DEFENDANT:  Yes, your Honor.

19        THE COURT:  And are you satisfied with Mr. Owen's

20   representation of you?

21        THE DEFENDANT:  Yes, your Honor.

22        THE COURT:  I must explain certain constitutional

23   rights that you have.  These are rights you will be giving up

24   if you enter a guilty plea.  Listen carefully to what I'm about

25   to say.  If you don't understand something, stop me, and either

XD7N7LEEP

1    myself or Mr. Owens will explain the matter to you more fully.

2              Under the Constitution and laws of the United States,

3    you have a right to a speedy and a public trial by a jury on

4    the charges contained in the information.  Do you understand

5    that?

6              THE DEFENDANT:  I understand.

7              THE COURT:  If there were a trial -- do you want a

8    moment?

9              If there were a trial, you would be presumed innocent,

10   and the government would be required to prove your guilt by

11   competent evidence and beyond a reasonable doubt.  You would

12   not have to prove you were innocent at a trial.  Do you

13   understand that?

14             THE DEFENDANT:  I understand, your Honor.

15             THE COURT:  If there were a trial, a jury composed of

16   12 people selected from this district would have to agree

17   unanimously before you could be found guilty.  Do you

18   understand that?

19             THE DEFENDANT:  I understand.

20             THE COURT:  If you decided to go to trial, at that

21   trial, and at every stage of your case, you would have the

22   right to be represented by an attorney, and if you could not

23   afford one, an attorney would be appointed to represent you at

24   government expense and at no cost to you.  If you decided to

25   retain a lawyer and you ran out of money, an attorney would be

12

XD7N7LEEP

1    appointed to continue to represent you to handle your case all

2    the way through trial and not just for purposes of a guilty

3    plea.  So, your decision to plead guilty here today should not

4    depend on whether you can afford a lawyer.  Do you understand

5    that?

6              THE DEFENDANT:  I understand, your Honor.

7              THE COURT:  If there were a trial, you would have the

8    right to see and hear all of the witnesses against you, and

9    your attorney could cross-examine them.

10             You would have the right to have your attorney object

11   to the government's evidence and to offer evidence on your

12   behalf if you so desired.

13             You would have the right to have subpoenas issued to

14   compel witnesses to testify in your defense.  Do you understand

15   that?

16             THE DEFENDANT:  I understand.

17             THE COURT:  If there were a trial, you would have the

18   right to testify if you wanted to, but no one could force you

19   to testify if you did not want to.

20             Furthermore, no inference or suggestion of guilt could

21   be drawn if you chose not to testify at trial.  Do you

22   understand that?

23             THE DEFENDANT:  I understand, your Honor.

24             THE COURT:  If you were convicted at a trial, you

25   would have the right to appeal that verdict to a higher court.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

XD7N7LEEP

1    Do you understand that?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Even now as you are entering this plea,

4    you have the right to change your mind, plead not guilty and go

5    to trial on the charges contained in the information.  Do you

6    understand that?

7              THE DEFENDANT:  I understand, your Honor.

8              THE COURT:  If you plead guilty and I accept your

9    plea, you will give up your right to a trial and the other

10   rights I have just discussed, other than the right to an

11   attorney, which you have regardless whether or not you plead

12   guilty.

13             If you do plead guilty, I will enter a judgment of

14   guilty and sentence you on the basis of your plea after I have

15   considered a presentence report and arguments from the lawyers

16   for both sides.  Do you understand that?

17             THE DEFENDANT:  I understand, your Honor.

18             THE COURT:  If you plead guilty, you will have to give

19   up your right not to incriminate yourself, because I will ask

20   you questions about what you did in order to satisfy myself

21   that you are guilty as charged, and you will have to admit and

22   acknowledge your guilt.  Do you understand that?

23             THE DEFENDANT:  I understand, your Honor.

24             THE COURT:  It is now my responsibility to go through

25   the elements of the offenses set forth in the information.

14

XD7N7LEEP

1    This is what the government would have to prove beyond a
2    reasonable doubt if the case were to go to trial.
3           You are charged in Count One of the information with
4    conspiracy to commit securities fraud.  The elements of that
5    crime are as follows:  First, the government would have to
6    prove that there was an agreement or understanding between two
7    or more people to violate those laws and regulations that make
8    it a crime to commit securities fraud.
9           Second, the government would have to prove that you
10   knowingly and willfully became a member of that conspiracy.
11          Third, the government would have to prove that you or
12   one of the other co-conspirators knowingly and willfully
13   committed at least one overt act in furtherance of the
14   conspiracy and during the life of the conspiracy.
15          Do you understand that those are the elements of the
16   offense charged in Count One of the information?
17          THE DEFENDANT:  Yes, I understand, your Honor.
18          THE COURT:  In Count Two you are charged with a
19   substantive count of securities fraud.
20          The government would have to prove that in connection
21   with the purchase or sale of securities you did one or more of
22   the following:
23          One, that you employed a device, scheme or artifice to
24   defraud, or, two, you made an untrue statement of a material
25   fact, or omitted to state the material fact, which made what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  was said under the circumstances misleading, or, three, that

2  you engaged in an act, practice or course of business that

3  operate or would operate as a fraud or deceit upon a purchaser

4  or seller.

5          In the context of insider trade -- which is the

6  context for the charge in Count Two -- the government would

7  have to prove that you obtained material nonpublic information

8  in breach of a fiduciary or similar duty of trust and

9  confidence, and that you traded while in possession of that

10 information, or you disclosed the information to someone in

11 exchange for a personal benefit, and that that person traded in

12 possession of this information.

13         Secondly, the government would have to prove that you

14 acted knowingly, willfully and with the intent to defraud, that

15 is, with the intent to obtain money or property.

16         Third, that you knowingly used, or caused to be used,

17 any means or instruments, transportation, or communication in

18 interstate commerce, the facilities of the National Securities

19 Exchange or the use of the mails in furtherance of the

20 fraudulent conduct.

21         Do you understand that these are the elements of the

22 offense charged in Count Two of the information, again elements

23 which the government would have to prove beyond a reasonable

24 doubt?

25         THE DEFENDANT:  Yes, your Honor.

XD7N7LEEP

1          THE COURT:  I'm required to tell you the maximum and

2     any minimum possible penalty for these crimes.  The maximum

3     means the most punishment that could possibly be imposed.  It

4     does not necessarily mean that is what you will receive.  But

5     you have to understand that by pleading guilty you are exposing

6     yourself to the possibility of receiving any combination of

7     punishments up to the maximum I am about to describe.  Do you

8     understand that?

9          THE DEFENDANT:  I understand, your Honor.

10          THE COURT:  Count One carries a maximum sentence of

11    five years' imprisonment; a maximum term of three years of

12    supervised release; a maximum fine of the greatest of $250,000,

13    or twice the gross pecuniary gain derived from the offense, or

14    twice the gross pecuniary loss to a person other than yourself

15    as a result of the offense.  There is also a mandatory $100

16    special assessment applicable to Count One.

17          Count Two carries a maximum sentence of 20 years'

18    imprisonment; a maximum term of three years' supervised

19    release; a maximum fine of the greatest of $5 million, twice

20    the gross pecuniary gain derived from the offense, or twice the

21    gross pecuniary loss again to a person other than yourself as a

22    result of the offense.  There is also a mandatory $100 special

23    assessment that applies to Count Two.

24          Accordingly, the maximum possible sentence of

25    incarceration on both counts in the information is 25 years'

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    imprisonment.

2             You should understand that parole has been abolished

3    in the federal system, and that if you are sentenced to prison,

4    you will not be released early on parole.  There is a limited

5    opportunity to earn credit for good behavior, but you have to

6    understand that you will have to serve at least 85 percent of

7    the time you are sentenced to.  Do you understand that?

8             THE DEFENDANT:  I understand, your Honor.

9             THE COURT:  As part of your sentence, I have the

10   authority to order that you make restitution to anyone injured

11   as a result of your criminal conduct, and I can also order you

12   to forfeit certain property to the government.  Do you

13   understand that?

14            THE DEFENDANT:  I understand, your Honor.

15            THE COURT:  Being convicted of a felony may have other

16   consequences such as the loss of licenses or the right to

17   possess a firearm.  If you are a citizen of the United States,

18   you could lose your right to vote.  If you are not a citizen of

19   the United States, you will likely lose your right to remain in

20   the United States, and you may be deported.

21            This is not a full list of the consequences of a

22   felony conviction; these are examples.  Do you understand?

23            THE DEFENDANT:  I understand, your Honor.

24            THE COURT:  There are sentencing guidelines that I am

25   required to consult in order to determine an appropriate

XD7N7LEEP

1    sentence in your case.  Have you talked with Mr. Owens about

2    the sentencing guidelines?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  You should understand that I will not able

5    to determine what the relevant guideline sentence is until

6    after a presentence report has been prepared by the probation

7    department and your lawyer or the government have had a chance

8    to challenge the facts as they are reported by the probation

9    office.  Do you understand that?

10             THE DEFENDANT:  I understand, your Honor.

11             THE COURT:  You should also understand that after I

12   determine what the recommended sentence is under the

13   guidelines, and after I have determined whether a departure is

14   appropriate either upward or downwards from the guidelines

15   range, I will then determine what an appropriate sentence is in

16   your case, having in mind not only the sentencing guidelines

17   but also, among other things, the seriousness of the offenses,

18   the need to promote respect for the law, to provide just

19   punishment and to afford adequate deterrence.  Do you

20   understand that?

21             THE DEFENDANT:  I understand.

22             THE COURT:  You should further understand that if your

23   attorney or anyone else has attempted to estimate or predict

24   what your sentence will be, that their estimate or prediction

25   could be wrong.  Do you understand that?

XD7N7LEEP

1          THE DEFENDANT:  I understand, your Honor.

2          THE COURT:  You should further understand that even if

3    your sentence is different from what your attorney or anyone

4    else told you it might be, or if it is different than what you

5    expect, you will still be bound by your guilty plea and you

6    will not be allowed to withdraw your plea of guilty.  Do you

7    understand that?

8          THE DEFENDANT:  I understand, your Honor.

9          THE COURT:  I have a plea agreement in front of me

10    which I have marked as Exhibit 2.  You told me that it bears

11    your signature.  Did you read the plea agreement before you

12    signed it?

13          THE DEFENDANT:  I did, your Honor.

14          THE COURT:  Did you discuss it with Mr. Owens before

15    you signed it?

16          THE DEFENDANT:  I did, your Honor.

17          THE COURT:  And did you understand all of the terms of

18    the agreement before you signed it?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Does this plea agreement constitute your

21    complete and total understanding of the entire agreement

22    between you and the government as to this matter?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Has anyone offered you any inducements, or

25    threatened you, or forced you to plead guilty or to enter into

XD7N7LEEP

1    this plea agreement?

2         THE DEFENDANT:  No, your Honor.

3         THE COURT:  Mr. Owens, are you aware of any valid

4    defense that would prevail at trial, or any other reason why

5    Mr. Lee should not be permitted to plead guilty?

6         THE DEFENDANT:  No, your Honor.

7         THE COURT:  And do you believe there is an adequate

8    factual basis to support a guilty plea?

9         MR. OWENS:  Yes, your Honor.

10        THE COURT:  Mr. Devlin-Brown, does the government

11   represent there is an adequate basis to support a guilty plea?

12        MR. DEVLIN-BROWN:  Yes, your Honor.

13        THE COURT:  Mr. Lee, we have reached the point in the

14   proceedings where I need you to tell me what you did that makes

15   you believe that you are guilty of the charges set forth in the

16   information.

17        THE DEFENDANT:  Your Honor, I have prepared an

18   allocution.  May I please read from it?

19        THE COURT:  You may.

20        THE DEFENDANT:  Your Honor, from April 2009 through

21   May of 2011 I was employed as a portfolio manager at SAC

22   Capital Advisors LP in New York.  As a portfolio manager, my

23   job was to buy and sell securities on behalf of investment

24   funds managed by SAC.

25        THE COURT:  Take your time, Mr. Lee.  There is no rush

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XD7N7LEEP

1  here.  Take your time.

2         THE DEFENDANT:  On a number of occasions, I traded

3  while in possession of material nonpublic information that I

4  had received from others under circumstances where I knew, or

5  had reason to believe, other persons had breached a fiduciary

6  duty or a duty of confidentiality.

7         For example, on one occasion in April 2009, at my

8  urging, somebody I knew provided me with a copy of an earnings

9  release for Yahoo Incorporated before that earnings release was

10  made public.  I thereafter traded in Yahoo before that release

11  was made public.  I knew at the time I should not have traded

12  on that information, but I did anyway.

13         On another occasion in July 2009, I obtained material

14  nonpublic information by Yahoo from a sell-side analyst.  I

15  thereafter traded while in possession of that information.  I

16  knew at the time it was wrong for me to trade.

17         On another occasion in November 2010, I obtained

18  material nonpublic information about a company called 3Com

19  Corporation through a consultant.  I thereafter traded while in

20  possession of that information.  I knew at the time it was

21  wrong for me to trade.

22         THE COURT:  And what's the government's theory on

23  venue?

24         MR. DEVLIN-BROWN:  Your Honor, some of the securities

25  in question were traded on stock exchanges in New York.

XD7N7LEEP

1    Additionally, the defendant was working at the time in offices

2    for the hedge fund in New York.

3          THE COURT:  And what's the government's theory as to

4    the co-conspirators?  Is it the person who provided the

5    information?  Is that the theory?  Or is it someone else?

6          MR. DEVLIN-BROWN:  With respect to the co-conspirators

7    in count one, your Honor?

8          THE COURT:  Yes.

9          MR. DEVLIN-BROWN:  I'm not sure I understand the

10    court's question.

11          THE COURT:  Well, the allocution as it is currently

12    framed, it's not clear to me who Mr. Lee may have conspired

13    with other than possibly the person who provided the

14    information.  It's not clear to me that the person who provided

15    the information knew what Mr. Lee was going to do with it.  So,

16    that's why I'm inquiring what the government's theory is as to

17    the co-conspirators, and more broadly, if the government

18    believes the allocution is sufficient.

19          MR. DEVLIN-BROWN:  First of all, your Honor, the

20    government believes that it would prove in any trial that

21    Mr. Lee conspired with others, including the individuals he

22    referred to in his allocution in connection with the offense.

23          I think it is perfectly appropriate to ask Mr. Lee if

24    when he engaged in trading on material inside information that

25    was in connection with agreements with others.

23

XD7N7LEEP

1           THE COURT:  All right.  Mr. Lee, what can you tell me

2     about that subject?

3           THE DEFENDANT:  In each of the instances that I cited,

4     I believe each of the individuals that had given me that

5     information gave it with the understanding that they knew I

6     would trade on that information.

7           THE COURT:  All right.  Mr. Devlin-Brown, anything

8     else that you want me to ask of Mr. Lee?

9           MR. DEVLIN-BROWN:  No, your Honor.

10          THE COURT:  Mr. Lee, are you pleading guilty because

11    you are in fact guilty?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  And are you pleading guilty voluntarily

14    and of your own free will?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Then I will ask you now as to each charge

17    in the information how do you plead.  Beginning with Count One,

18    guilty or not guilty?

19          THE DEFENDANT:  Guilty, your Honor.

20          THE COURT:  And as to Count Two, guilty or not guilty?

21          THE DEFENDANT:  Guilty, your Honor.

22          THE COURT:  Mr. Devlin-Brown, do you wish me to

23    allocute the defendant on the forfeiture allegation?

24          MR. DEVLIN-BROWN:  Yes, your Honor.  If you would just

25    ask the defendant if he admits to the forfeiture allegation,

XD7N7LEEP

1   which he has acknowledged he will do so in connection with

2   signing the plea agreement.  It's the first paragraph of the

3   second page of the plea agreement.

4          THE COURT:  All right.  Mr. Lee, there is a forfeiture

5   allegation information in which the government gives notice.

6   It will seek from you the forfeiture of all property, real and

7   personal, that constitutes or is derived from proceeds

8   traceable to the commission of the offenses charged in this

9   information.  Do you admit the forfeiture allegations set forth

10  in the information?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  All right.  Mr. Lee, because you

13  acknowledge that you are guilty as charged in the information,

14  because I find that you know your rights and that you are

15  waiving them knowingly and voluntarily, because I find that

16  your plea is entered knowingly and voluntarily, and is

17  supported by the independent basis in fact containing each of

18  the essential elements of the charged offenses, I accept your

19  guilty plea and adjudge you guilty of the offenses to which you

20  have pled guilty.

21         Mr. Devlin-Brown, what do you suggest in terms of a

22  sentencing date?

23         MR. DEVLIN-BROWN:  I'm not sure what your Honor's

24  practice is in this regard.  We would anticipate not being in a

25  position to make a judgment with respect to whether a 5K1.1

XD7N7LEEP

1    letter should be submitted for at least 12 months.  But if your

2    Honor prefers to set sentencing earlier -- with us to apply, if

3    warranted, for an adjournment -- that's fine.

4              THE COURT:  Yes, I'm not comfortable with a date 12

5    months out.  I'm going to set a control date towards the end of

6    the year.  And if it's necessary to adjourn, you obviously will

7    send me a letter, and it will be adjourned.

8              So, for control date purposes I'm going to put it down

9    for December 9 at 2:30.  And then, as I've said, if that proves

10   inappropriate, then you will let me know, and I will adjourn it

11   to a date that makes more sense.

12             With respect to the preparation of a presentence

13   report, I assume the parties wish me not to order that at this

14   point.  Is that correct?

15             MR. DEVLIN-BROWN:  That's correct.

16             THE COURT:  Anything else?  Well, I guess we have to

17   make a bail application.  What is the government's position as

18   to bail?

19             MR. DEVLIN-BROWN:  Your Honor, having consulted with

20   defense counsel, and reviewing the pretrial services report, we

21   would propose the following, which I believe defense counsel

22   consents to:

23             The defendant would sign a personal recognizance bond

24   in the amount of $1 million;

25             That a second signatory, namely his wife, be required

XD7N7LEEP

1    to sign the bond by next Friday, but that the defendant be

2    released upon his own signature today.  His wife is in Chicago.

3          And given the sealed nature of some of the filings,

4    this would make more sense to the government from a practical

5    perspective and not materially increase any risk of flight.

6          In addition, the government would propose that the

7    defendant surrender his passport by next Friday as well.

8          THE COURT:  You say next Friday.  You mean August 2?

9          MR. DEVLIN-BROWN:  That's correct, your Honor.

10          THE COURT:  OK.

11          MR. DEVLIN-BROWN:  And that the defendant's travel be

12    limited to the continental United States with no new travel

13    applications.

14          And, finally, that the defendant be placed upon

15    standard pretrial services supervision in the district of his

16    residence, which is Chicago, the Northern District of Illinois.

17          THE COURT:  All right.  I take it these terms are

18    acceptable to you, Mr. Owens?

19          MR. OWENS:  Yes, your Honor.

20          THE COURT:  Then the defendant will be released upon

21    execution of a personal recognizance bond in the amount of $1

22    million.  The bond will be cosigned by his wife by August 2,

23    2013.  The defendant will surrender his passport by August 2.

24    His travel will be limited to the continental U.S., and he will

25    be subject to standard pretrial supervision in the Northern

27

XD7N7LEEP

1    District of Illinois.

2         Anything else?

3         MR. DEVLIN-BROWN:  Your Honor, just to clarify with

4    respect to your ruling on the application to seal.  If I

5    understand correctly, the filings today, including the

6    transcript, will be under seal, and there won't be any docket

7    entries, including any caption listed to this case, until July

8    30.  Is that correct?

9         THE COURT:  The case will be docketed as United States

10   v. John Doe.  All of the documents associated with today's

11   proceeding will be sealed.  I will continue that in effect

12   until July 30, at which time you will have to make another

13   submission justifying the continued sealing.

14        MR. DEVLIN-BROWN:  And, your Honor, we are cognizant

15   of the public's right to access.  So, accordingly, if there is

16   a reason why before July 30 there is no longer a law

17   enforcement need to maintain some of these filings under seal,

18   should we approach your Honor to have it unsealed, or a

19   magistrate?

20        THE COURT:  Yes.  I would like it unsealed as soon as

21   the law enforcement reason for sealing dissipates.

22        So, based on your affirmation and the concerns the

23   government expressed about possible flight of the alleged

24   co-conspirator, I have determined it's appropriate to docket

25   the case under a John Doe name and to seal all the documents

28

XD7N7LEEP

1   associated with today's proceeding, but I want to lift that

2   order as soon as I possibly can.

3         So, yes, if you will let me know anytime before July

4   30 that the law enforcement need to keep these materials sealed

5   is no longer in effect, please do that.

6         MR. DEVLIN-BROWN:  Thank you, your Honor.

7         THE COURT:  Anything else?

8         MR. OWENS:  Thank you, your Honor.

9         THE COURT:  All right.  Thank you.

10                          - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit G

# Yahoo! Inc.



## US | Global Internet | YHOO

July 10, 2009

# Early Positive Impressions for Bing, Positive for MSFT/YHOO Deal

| Fiscal Year Ends: Dec | | 2008A | 2009E | 2010E |
|---|---|---|---|---|
| Revenue (MM) | | $5,399 | $4,824 | $5,243 |
| PF Earnings per Share | | | | |
| | Q1 | $0.18 | $0.15A | NA |
| | Q2 | $0.16 | $0.15 | NA |
| | Q3 | $0.15 | $0.16 | NA |
| | Q4 | $0.21 | $0.18 | NA |
| Year | | $0.70 | $0.63 | $0.72 |
| P/E ProForma | | 21.3x | 23.7x | 20.7x |
| Diluted Shares (MM) | | 1,395.0 | 1,410.0 | 1,424.0 |
| *EPS:PF EPS includes SBC.* | | | | |

### ■ Summary

In our view, early first impressions for Bing are net positive for a likely MSFT/YHOO search deal. Why? Our view has been that MSFT/YHOO could not reconcile the bid/ask spread for a search deal (esp. rev share for TAC) and disagreement on some operational issues. However, nearly six weeks of positive reception for Bing helps MSFT to come from the position of power for any negotiations with Yahoo! very similar to how Yahoo! gained some position of power after it started stabilizing its search market share in the past 6-7 months. We believe that if Bing continues to be successful (in core relevancy, RPS and vertical offerings such as travel and shopping) it provides additional comfort to YHOO when it comes to choosing a search partner. Additionally, Microsoft can not only address some operational issues for YHOO but can also broaden the deal scope for YHOO from "search only" to search and perhaps display to make the likely deal economically more attractive for YHOO without committing very high TAC. We reit Buy/$20 PT. However as mentioned in our last YHOO note, we would not be long in YHOO solely for a possible MSFT deal in near-term (though we are a little more encouraged by early Bing success).

### ■ How MSFT/Bing benefits from a likely YHOO search deal?

In our view, Microsoft's search offerings have been ready for prime time (and Bing makes them better) but MSFT suffers from reach of end-users and scale of advertisers. With a likely YHOO search deal, MSFT increases reach for its search technology and thus attracts more advertisers and that can translate into higher repeat users etc. In our view, Bing success will likely make MSFT more aggressive with its Internet ambitions and justifies a need for YHOO deal to reach 20% market share in search (a minimum level to remain meaningful and sustainable in search in our view). We think in addition to just sheer size of Internet ad/search market, MSFT wants to be a bigger player in search to provide ad supported business model for its future cloud computing offerings.

## Recommendation

| | |
|---|---|
| **Recommendation** | **BUY** |
| **Price** | **$14.93** |
| **Target** | **$20.00** |

*Price:July 10, 2009 closing price*

### Key Data

| | |
|---|---|
| 52-Week Range | $24.80-$8.94 |
| Shares Outstanding (MM) | 1,394.9 |
| Market Cap (MM) | $20,826 |
| Avg. Daily Volume (000) | 21,658 |
| Float (MM) | 1,262.5 |
| % Held Institutionally | 83.2% |
| Long Term Growth Rate | 6% |
| Total Debt (MM) | $0.0 |
| Cash Per Share | $2.62 |

### Stock Performance



| | 1m | 3m | 12m |
|---|---|---|---|
| **Performance** | -11.3% | 8.0% | -38.9% |

*Source: Bloomberg*

*Yahoo! is one of the largest Internet destinations globally offering content, communication, search, and community services to end users and some premium services to businesses. Yahoo! is the world leader in display advertising market and second largest player in search market. Yahoo! has significant investments in China, Japan and Korea with other Internet companies. The company was founded 1994 and is headquartered in Sunnyvale, California.*

**Please see page 2 for price targets, valuation methods, and risks to achieving those targets.**

### Contact

**Sandeep Aggarwal**
415-659-2260
saggarwal@collinsstewartllc.com

**Stan Velikov, CFA**
415-659-2241
svelikov@collinsstewartllc.com

Disclaimers regarding the content of this report as well as full disclosure of Collins Stewart LLC's ratings and information on the firm's position(s) in securities mentioned herein appear on pages 10 - 11 of this report.

**New York**
Collins Stewart LLC
350 Madison Avenue
New York
NY 10017
(212) 389 8000

**San Francisco**
Collins Stewart LLC
22nd Floor
456 Montgomery Street
San Francisco, CA 94104
415 659 2222

**London**
Collins Stewart Europe Limited
9th Floor
88 Wood Street
London EC2V 7QR
+44 (0)20 7523 8000

**Dublin**
Collins Stewart Europe Limited
First Floor
South Dock House
Hanover Quay, Dublin 2
+353 1 635 0210



Collins Stewart

Independent thinking

## Valuation

MSFT: We arrive at our $30 PT by using P/E and P/FCF multiples on our CY10 estimates. We assign a P/E multiple of 14.0x to our CY2010 GAAP EPS of $2.05 to reach $29. We assign a P/FCF multiple of 12.0x to our CY2010 FCF/share of $2.62 to reach $31.

YHOO: Our $20 PT is a combination of fundamental thesis and likely event thesis. We reach $16 by assigning 7x to our 2010E EBITDA per share of $1.36, adjusting for $3.24 per share in net cash for 2009 and $2.93 in offbalance sheet assets (Yahoo Japan and Alibaba post illiquidity discount and tax and NOLs). Our event thesis assumes a strategic alternative for search with Microsoft that may give $8 to $10 per share lift to YHOO. In short we are adding $4 to our fundamental price as a premium for a likely event.

## Investment Risks

MSFT: 1) Competition; 2) Slowing PC market growth; 3) Disappointing ramp-up of the online business so far; 4) Piracy; 5) Investment mode; 6) Cloud Computing/SaaS; 7) Virtualization; 8) Exposed to macro-economic headwinds.

YHOO: 1) YHOO is worth significantly less in the absence of any hope for a MSFT Search deal; 2) Increasing competitive pressure from Google and others; 3) Current growth materially lower than overall Internet ad growth; 4) Limited traction internationally; 5) Mass talent attrition; 6) Execution risk with recent acquisitions; 7) Future business strategy not fully firmed up.

**Collins Stewart**
Independent thinking

06/15/09
**YHOO - Income Statement**
($ Thousands, Except EPS)

| | 2008 | | | | 2009E | | | | Annual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/08 | 6/08 | 9/08 | 12/08 | 3/09A | 6/09E | 9/09E | 12/09E | 2008A | 2009E | 2010E | 2011E |
| Gross Revenues | 1,817,592 | 1,798,085 | 1,786,426 | 1,806,389 | 1,580,042 | 1,589,837 | 1,610,224 | 1,777,786 | 7,208,487 | 6,527,889 | 7,139,685 | 7,981,598 |
| Net Revenues (excludes TAC) | 1,352,048 | 1,345,969 | 1,325,312 | 1,375,243 | 1,156,247 | 1,156,274 | 1,193,882 | 1,317,846 | 5,398,572 | 4,824,249 | 5,243,387 | 5,799,214 |
| Marketing Services | 1,106,900 | 1,134,840 | 1,101,608 | 1,162,943 | 959,386 | 971,225 | 995,879 | 1,124,793 | 4,506,291 | 4,051,283 | 4,489,745 | 5,007,890 |
| Fees | 245,148 | 211,129 | 223,704 | 212,300 | 196,861 | 185,049 | 198,003 | 193,053 | 892,281 | 772,966 | 753,642 | 791,324 |
| *Rev Guidance (Net revenue)* | *1,330* | *1,355* | *1,390* | | *1,186* | | | | *5,625* | | | |
| *Rev Guidance (Gross revenue)* | | *1,830* | *1,880* | *1,870* | *1,625* | *1,525* | | | *7,275* | | | |
| *Street* | *1,324* | *1,374* | *1,370* | *1,371* | *1,204* | *1,145* | *1,167* | *1,274* | *5,393* | *4,734* | *4,963* | *5,478* |
| Cost of Revenues | 286,249 | 310,246 | 306,880 | 296,244 | 273,363 | 254,380 | 256,685 | 280,042 | 1,199,619 | 1,064,470 | 1,140,437 | 1,232,333 |
| Gross Profit | 1,065,799 | 1,035,723 | 1,018,432 | 1,078,999 | 882,884 | 901,894 | 937,197 | 1,037,804 | 4,198,953 | 3,759,779 | 4,102,950 | 4,566,881 |
| Operating Expenses | 945,182 | 935,202 | 948,258 | 1,357,348 | 782,199 | 804,917 | 819,843 | 868,085 | 4,185,990 | 3,275,044 | 3,447,870 | 3,736,667 |
| Product Development | 257,524 | 268,277 | 267,800 | 250,095 | 251,765 | 237,036 | 238,776 | 260,275 | 1,043,696 | 987,852 | 970,027 | 1,087,353 |
| Sales & Marketing | 359,053 | 348,593 | 345,922 | 326,919 | 271,215 | 290,803 | 307,425 | 329,462 | 1,380,487 | 1,198,904 | 1,363,281 | 1,464,301 |
| G&A | 150,691 | 171,940 | 177,709 | 141,683 | 118,031 | 116,784 | 121,179 | 129,808 | 642,023 | 485,802 | 524,339 | 565,423 |
| Amortization of Intangibles | 23,740 | 23,224 | 24,228 | 16,358 | 9,667 | 9,667 | 10,167 | 10,167 | 87,550 | 39,668 | 39,668 | 39,668 |
| Payroll Taxes on Option Exercises | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stock Compensation Expense | 125,005 | 123,168 | 132,599 | 44,787 | 126,720 | 115,627 | 137,296 | 138,374 | 425,559 | 518,018 | 550,556 | 579,921 |
| Other | 29,169 | 0 | 0 | 577,506 | 4,801 | 35,000 | 5,000 | 0 | 606,675 | 44,801 | 0 | 0 |
| Operating Income | 120,617 | 100,521 | 70,174 | (278,349) | 100,685 | 96,977 | 117,354 | 169,719 | 12,963 | 484,734 | 655,081 | 830,214 |
| Other Income, net | 14,665 | 24,583 | 8,881 | 25,621 | 4,960 | 8,960 | 12,960 | 20,960 | 73,750 | 47,840 | 52,434 | 57,992 |
| Earnings in Equity Interests | 454,782 | 54,927 | 27,762 | 59,508 | 48,934 | 48,934 | 48,934 | 48,934 | 596,979 | 195,736 | 235,952 | 260,965 |
| Minority Interest | 75 | (1,214) | (1,892) | (2,734) | (1,137) | (837) | (537) | (237) | (5,765) | (2,748) | (2,748) | 1,000 |
| Dep. & Amort of Purch. Tech. | 163,771 | 203,357 | 207,605 | 191,560 | 181,573 | 185,906 | 187,406 | 189,406 | 766,293 | 744,291 | 729,250 | 811,890 |
| EBITDA | 438,562 | 427,046 | 410,378 | 542,273 | 406,978 | 433,510 | 447,056 | 497,499 | 1,811,490 | 1,791,844 | 1,934,886 | 2,222,025 |
| *EBITDA Guidance* | *425* | *450* | *435* | *530* | *390* | *400* | | | *1,902* | | | |
| *Street* | *430* | *458* | *432* | *515* | *390* | *410* | *418* | *488* | *1,831* | *1,736* | *1,873* | *2,093* |
| *Street (EBITDA w/Stock Comp)* | *274* | *366* | *309* | *416* | *298* | *284* | *286* | *345* | *1,473* | *1,200* | *1,396* | *1,717* |
| Pretax Income | 590,139 | 178,817 | 104,925 | (195,954) | 153,442 | 154,034 | 178,711 | 239,376 | 677,927 | 725,562 | 940,719 | 1,150,171 |
| Taxes | 53,299 | 47,656 | 50,577 | 107,474 | 35,884 | 46,612 | 57,338 | 83,899 | 259,006 | 223,733 | 293,619 | 368,606 |
| Net Income (GAAP) | 536,840 | 131,161 | 54,348 | (303,428) | 117,558 | 107,421 | 121,373 | 155,477 | 418,921 | 501,829 | 647,100 | 781,565 |
| SBC | 137,289 | 123,168 | 132,599 | 44,787 | 126,720 | 115,627 | 137,296 | 138,374 | 437,843 | 518,018 | 550,556 | 579,921 |
| Advisory Cost (MSFT unsolicited offer) | 13,856 | 22,300 | 36,555 | 6,769 | 0 | 0 | 0 | 0 | 79,480 | 0 | 0 | 0 |
| Workforce Realignment | 16,885 | 0 | 0 | 89,969 | 4,801 | 35,000 | 5,000 | 0 | 106,854 | 44,801 | 0 | 0 |
| Non-Cash Gain from Alibaba IPO | (401,090) | 0 | 30,188 | 0 | 0 | 0 | 0 | 0 | (370,902) | 0 | 0 | 0 |
| Tax Benefits | (57,713) | (51,374) | (40,267) | (30,265) | (42,855) | (42,855) | (42,855) | (42,855) | (179,619) | (171,420) | (171,420) | (171,420) |
| Goodwill Impairment Charge | 0 | 0 | 0 | 487,537 | 0 | 0 | 0 | 0 | 487,537 | 0 | 0 | 0 |
| Net Income (Non-GAAP) | 246,067 | 225,255 | 213,423 | 295,369 | 206,224 | 215,194 | 220,814 | 250,996 | 980,114 | 893,228 | 1,026,236 | 1,190,067 |
| EPS (GAAP) | $0.37 | $0.09 | $0.04 | ($0.22) | $0.08 | $0.08 | $0.09 | $0.11 | $0.30 | $0.36 | $0.45 | $0.54 |
| EPS (Non-GAAP) | $0.18 | $0.16 | $0.15 | $0.21 | $0.15 | $0.15 | $0.16 | $0.18 | $0.70 | $0.63 | $0.72 | $0.83 |
| *Street (GAAP)* | *$0.12* | *$0.10* | *$0.08* | *$0.12* | *$0.08* | *$0.08* | *$0.08* | *$0.11* | *$0.63* | *$0.36* | *$0.42* | *$0.53* |
| *Street (Non-GAAP)* | | | | | | *$0.16* | *$0.15* | *$0.23* | | *$0.70* | *$0.85* | *$0.92* |
| Diluted Shares Outstanding (000s) | 1,395,416 | 1,399,277 | 1,397,573 | 1,387,758 | 1,408,331 | 1,409,531 | 1,411,031 | 1,412,531 | 1,395,006 | 1,410,356 | 1,424,460 | 1,438,704 |

*Source: Company reports; Collins Stewart LLC estimates*

**Collins Stewart**
Independent thinking

06/15/09
**YHOO - P&L Trends**

| | 2008 | | | | 2009E | | | | Annual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/08 | 6/08 | 9/08 | 12/08 | 3/09A | 6/09E | 9/09E | 12/09E | 2008A | 2009E | 2010E | 2011E |
| **Growth Analysis Y/Y** | | | | | | | | | | | | |
| Revenue Y/Y | 14% | 8% | 3% | -2% | -14% | -14% | -10% | -4% | 6% | -11% | 9% | 11% |
| Revenue Q/Q | -4% | 0% | -2% | 4% | -16% | 0% | 3% | 10% | -- | -- | -- | -- |
| Operating Expenses Y/Y | 19% | 12% | 8% | 44% | -17% | -14% | -14% | -36% | 21% | -22% | 5% | 8% |
| Product Development Y/Y | 35% | 24% | 20% | 6% | -2% | -12% | -11% | 4% | 21% | -5% | -2% | 12% |
| Sales & Marketing Y/Y | 13% | 3% | 2% | -11% | -24% | -17% | -11% | 1% | 1% | -13% | 14% | 7% |
| G&A Y/Y | 30% | 39% | 26% | -10% | -22% | -32% | -32% | -8% | 20% | -24% | 8% | 8% |
| **Margins Analysis (% of net rev)** | | | | | | | | | | | | |
| Gross Margin | 78.8% | 76.9% | 76.8% | 78.5% | 76.4% | 78.0% | 78.5% | 78.8% | 77.8% | 77.9% | 78.3% | 78.8% |
| Operating Margin | 8.9% | 7.5% | 5.3% | -20.2% | 8.7% | 8.4% | 9.8% | 12.9% | 0.2% | 10.0% | 12.5% | 14.3% |
| EBITDA Margin | 32.4% | 31.7% | 31.0% | 39.4% | 35.4% | 37.5% | 37.4% | 37.8% | 33.6% | 37.1% | 36.9% | 38.3% |
| Incremental EBITDA Margin (Y/Y) | -12.7% | -45.6% | -131.0% | -143.5% | 15.1% | -3.4% | -27.9% | 78.0% | -22.2% | 3.4% | 34.1% | 51.7% |
| Net Income Margin | 39.7% | 9.7% | 4.1% | -22.1% | 10.2% | 9.3% | 10.2% | 11.8% | 7.8% | 10.4% | 12.3% | 13.5% |
| **Expense Analysis (% of net rev)** | | | | | | | | | | | | |
| Total Operating Expense | 70% | 69% | 72% | 99% | 68% | 70% | 69% | 66% | 78% | 68% | 66% | 64% |
| Product Development | 19.0% | 19.9% | 20.2% | 18.2% | 21.8% | 20.5% | 20.0% | 19.8% | 19.3% | 20.5% | 18.5% | 18.8% |
| Sales & Marketing | 26.6% | 25.9% | 26.1% | 23.8% | 23.5% | 25.2% | 25.8% | 25.0% | 25.6% | 24.9% | 26.0% | 25.3% |
| G&A | 11.1% | 12.8% | 13.4% | 10.3% | 10.2% | 10.1% | 10.2% | 9.9% | 11.9% | 10.1% | 10.0% | 9.8% |
| Amorization of Intangibles | 1.8% | 1.7% | 1.8% | 1.2% | 0.8% | 0.8% | 0.9% | 0.8% | 1.6% | 0.8% | 0.8% | 0.7% |
| Stock Compensation | 9.2% | 9.2% | 10.0% | 3.3% | 11.0% | 10.0% | 11.5% | 10.5% | 7.9% | 10.7% | 10.5% | 10.0% |
| Tax Rate | 39.4% | 38.1% | 64.0% | -42.5% | 34.0% | 44.0% | 44.0% | 44.0% | 298.7% | 42.0% | 41.5% | 41.5% |

*Source: Company reports; Collins Stewart LLC estimates*



**Collins Stewart**
Independent thinking

06/15/09
**YHOO - Revenue By Business Segment**
*($ Thousands)*

| | 2008 | | | | 2009E | | | | Annual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/08 | 6/08 | 9/08 | 12/08 | 3/09A | 6/09E | 9/09E | 12/09E | 2008A | 2009E | 2010E | 2011E |
| **Total Revenue (Gross)** | 1,817,592 | 1,798,085 | 1,786,426 | 1,806,384 | 1,580,042 | 1,559,837 | 1,610,224 | 1,777,786 | 7,208,487 | 6,527,889 | 7,139,685 | 7,981,598 |
| **Total Revenue (Net)** | 1,352,048 | 1,345,969 | 1,325,312 | 1,375,243 | 1,156,247 | 1,156,274 | 1,193,882 | 1,317,846 | 5,398,572 | 4,824,249 | 5,243,387 | 5,799,214 |
| **Marketing Services (Gross)** | 1,572,444 | 1,586,956 | 1,562,722 | 1,594,084 | 1,383,181 | 1,374,788 | 1,412,221 | 1,584,733 | 6,316,206 | 5,754,924 | 6,386,043 | 7,190,274 |
| Y/Y Growth | 7% | 7% | 1% | 0% | -12% | -13% | -10% | -1% | 4% | -9% | 11% | 13% |
| Q/Q Growth | -1% | 1% | -2% | 2% | -13% | -1% | 3% | 12% | -- | -- | -- | -- |
| **Total Traffic Acquisition Cost (TAC)** | 465,544 | 452,116 | 461,114 | 431,141 | 423,795 | 403,564 | 416,342 | 459,940 | 1,809,915 | 1,703,640 | 1,896,298 | 2,182,384 |
| Y/Y Growth | -5% | 0% | -5% | 1% | -9% | -11% | -10% | 7% | -3% | -6% | 11% | 15% |
| Q/Q Growth | 9% | -3% | 2% | -7% | -2% | -5% | 3% | 10% | -- | -- | -- | -- |
| TAC as a #% of Gross Revenue | 26% | 25% | 26% | 24% | 27% | 26% | 26% | 26% | 25% | 26% | 27% | 27% |
| **Marketing Services (Net)** | 1,106,900 | 1,134,840 | 1,101,608 | 1,162,943 | 959,386 | 971,225 | 995,879 | 1,124,793 | 4,506,291 | 4,051,283 | 4,489,745 | 5,007,890 |
| Y/Y Growth | 13% | 10% | 4% | 0% | -13% | -14% | -10% | -3% | 6% | -10% | 11% | 12% |
| Q/Q Growth | -5% | 3% | -3% | 6% | -18% | 1% | 3% | 13% | -- | -- | -- | -- |
| % of Net Revenue | 82% | 84% | 83% | 85% | 83% | 84% | 83% | 85% | 83% | 84% | 86% | 86% |
| **Yahoo! O&O Revenue** | 966,000 | 1,016,000 | 1,001,900 | 1,062,000 | 871,764 | 887,472 | 908,591 | 1,028,163 | 4,045,900 | 3,695,990 | 4,102,119 | 4,569,575 |
| Y/Y Growth | 18% | 19% | 19% | 3% | -10% | -13% | -9% | -3% | 10% | -9% | 11% | 11% |
| **Yahoo! Display Ad O&O** | 426,000 | 457,000 | 434,700 | 506,000 | 371,000 | 400,680 | 398,677 | 478,412 | 1,823,700 | 1,648,769 | 1,764,182 | 1,940,601 |
| Y/Y Growth | 16% | 11% | 3% | -2% | -13% | -12% | -8% | -5% | 6% | -10% | 7% | 10% |
| Q/Q Growth | -18% | 7% | -5% | 16% | -27% | 8% | -1% | 20% | -- | -- | -- | -- |
| **Yahoo! Search O&O** | 410,000 | 424,000 | 437,500 | 436,000 | 399,000 | 379,940 | 404,131 | 445,554 | 1,707,500 | 1,628,625 | 1,894,224 | 2,140,890 |
| Y/Y Growth | 20% | 18% | 17% | 11% | -3% | -10% | -8% | 2% | 16% | -5% | 16% | 13% |
| Q/Q Growth | 5% | 3% | 3% | 0% | -8% | -5% | 6% | 10% | -- | -- | -- | -- |
| **Listing and Other Marketing Services** | 130,000 | 135,000 | 129,700 | 120,000 | 101,764 | 106,852 | 105,784 | 104,197 | 514,700 | 418,597 | 443,713 | 488,084 |
| Y/Y Growth | 18% | 13% | 3% | -4% | -22% | -21% | -18% | -13% | 7% | -19% | 6% | 10% |
| Q/Q Growth | 4% | 4% | -4% | -7% | -15% | 5% | -1% | -2% | -- | -- | -- | -- |
| **Yahoo! Affiliate Revenue** | 606,444 | 570,956 | 560,822 | 532,084 | 511,417 | 487,316 | 503,630 | 556,570 | 2,270,306 | 2,058,933 | 2,283,924 | 2,620,699 |
| Y/Y Growth | -7% | -4% | -10% | -4% | -16% | -15% | -10% | 5% | -6% | -9% | 11% | 15% |
| **Yahoo! Display Ad Affiliate (Gross)** | 12,500 | 16,000 | 20,000 | 24,000 | 35,000 | 41,300 | 47,908 | 54,136 | 72,500 | 178,344 | 231,847 | 301,401 |
| Y/Y Growth | 900% | 967% | 300% | 182% | 180% | 158% | 140% | 126% | 346% | 146% | 30% | 30% |
| Q/Q Growth | 47% | 28% | 25% | 20% | 46% | 18% | 16% | 13% | -- | -- | -- | -- |
| **Display Traffic Acquisition Cost (TAC)** | 8,207 | 10,649 | 13,584 | 15,782 | 23,605 | 28,910 | 33,536 | 37,895 | 48,222 | 123,946 | 162,293 | 210,981 |
| Y/Y Growth | 1230% | 1272% | 348% | 195% | 188% | 171% | 147% | 140% | 394% | 157% | 31% | 30% |
| Q/Q Growth | 54% | 30% | 28% | 16% | 50% | 22% | 16% | 13% | -- | -- | -- | -- |
| Display TAC as a % of Affiliate Display Rev | 66% | 67% | 68% | 66% | 67% | 70% | 70% | 70% | 67% | 69% | 70% | 70% |
| **Yahoo! Search Affiliate (Gross)** | 593,944 | 554,956 | 540,822 | 508,084 | 476,417 | 446,016 | 455,722 | 502,434 | 2,197,806 | 1,880,589 | 2,052,076 | 2,319,298 |
| Y/Y Growth | -8% | -6% | -12% | -7% | -20% | -20% | -16% | -1% | -9% | -14% | 9% | 13% |
| Q/Q Growth | 9% | -7% | -3% | -6% | -6% | -6% | 2% | 10% | -- | -- | -- | -- |
| % of Gross Search Revenue | 59% | 57% | 55% | 54% | 54% | 54% | 53% | 53% | 56% | 54% | 52% | 52% |
| **Search Traffic Acquisition Cost (TAC)** | 457,337 | 441,467 | 447,530 | 415,359 | 400,190 | 374,654 | 382,807 | 422,044 | 1,761,693 | 1,579,695 | 1,734,005 | 1,971,403 |
| Y/Y Growth | -6% | -3% | -7% | -2% | -12% | -15% | -14% | 2% | -5% | -10% | 10% | 14% |
| Q/Q Growth | 8% | -3% | 1% | -7% | -4% | -6% | 2% | 10% | -- | -- | -- | -- |
| TAC Rate Assumption | 77% | 80% | 83% | 82% | 84% | 84% | 84% | 84% | 80% | 84% | 85% | 85% |
| **Yahoo! Search Affiliate (Net)** | 136,607 | 113,489 | 93,292 | 92,725 | 76,227 | 71,363 | 72,916 | 80,389 | 436,113 | 300,894 | 318,072 | 347,895 |
| Y/Y Growth | -15% | -18% | -31% | -25% | -44% | -37% | -22% | -13% | -22% | -31% | 6% | 9% |
| Q/Q Growth | 11% | -17% | -18% | -1% | -18% | -6% | 2% | 10% | -- | -- | -- | -- |
| **Fees Revenue** | 245,148 | 211,129 | 223,704 | 212,300 | 196,861 | 185,049 | 198,003 | 193,053 | 892,281 | 772,966 | 753,642 | 791,324 |
| Y/Y | 21% | 0% | 0% | -12% | -20% | -12% | -11% | -9% | 1% | -13% | -3% | 5% |
| Q/Q | 1% | -14% | 6% | -5% | -7% | -6% | 7% | -2% | -- | -- | -- | -- |
| % of Total Revenue | 18% | 16% | 17% | 15% | 17% | 16% | 17% | 14% | 16% | 14% | 14% | 14% |
| **Total Branded/Display Advertising (Gross)** | 438,500 | 473,000 | 454,700 | 530,000 | 406,000 | 441,980 | 446,585 | 532,548 | 1,896,200 | 1,827,113 | 1,996,030 | 2,242,002 |
| Y/Y Growth | 19% | 14% | 7% | 1% | -7% | -7% | -2% | 0% | 9% | -4% | 9% | 12% |
| Q/Q Growth | -17% | 8% | 19% | -5% | -23% | 9% | 1% | 19% | -- | -- | -- | -- |
| **Total Search (Gross)** | 1,003,944 | 978,956 | 978,322 | 944,084 | 875,417 | 825,956 | 859,853 | 947,988 | 3,905,306 | 3,509,214 | 3,946,301 | 4,460,188 |
| Y/Y Growth | 1% | 3% | -1% | 1% | -13% | -16% | -12% | 0% | 1% | -10% | 12% | 13% |
| Q/Q Growth | 7% | -2% | 0% | -3% | -7% | -6% | 4% | 10% | -- | -- | -- | -- |

*Source: Company reports; Collins Stewart LLC estimates*

**Collins Stewart**
Independent thinking

06/15/09
**YHOO - Search Revenue Drivers & Assumptions**
($ Thousands)

| | 2008 | | | | 2009E | | | | Annual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/08 | 6/08 | 9/08 | 12/08 | 3/09A | 6/09E | 9/09E | 12/09E | 2008A | 2009E | 2010E | 2011E |
| **Search Queries** | 13,739,774 | 12,882,494 | 12,753,669 | 12,115,985 | 15,266,141 | 14,121,181 | 14,121,181 | 14,121,181 | 51,491,922 | 57,629,684 | 61,087,465 | 64,141,838 |
| Y/Y Growth | -10% | -7% | -11% | -7% | 11% | 10% | 11% | 17% | -9% | 12% | 6% | 6% |
| Q/Q Growth | 6% | -6% | -1% | -5% | 26% | -8% | 0% | 0% | -- | -- | -- | -- |
| **Click Thru Rate (CTR)** | 14.1% | 14.1% | 13.9% | 14.3% | 13.2% | 13.2% | 13.2% | 13.9% | 14.1% | 13.4% | 13.8% | 14.2% |
| Y/Y Growth | 12% | 6% | 5% | 2% | -6% | -6% | -5% | -3% | 7% | -5% | 3% | 3% |
| Q/Q Growth | 1% | 0% | -1% | 2% | -8% | 0% | 0% | 5% | -- | -- | -- | -- |
| **Sponsored Clicks** | 1,930,662 | 1,810,200 | 1,782,293 | 1,755,019 | 2,013,523 | 1,862,509 | 1,864,371 | 1,957,590 | 7,278,173 | 7,697,993 | 8,404,669 | 9,133,774 |
| Y/Y Growth | 1% | -1% | -7% | -3% | 4% | 3% | 5% | 12% | -2% | 6% | 9% | 9% |
| Q/Q Growth | 7% | -6% | -2% | -2% | 15% | -8% | 0% | 5% | -- | -- | -- | -- |
| **Cost Per Click (CPC)** | 0.52 | 0.54 | 0.55 | 0.54 | 0.43 | 0.44 | 0.46 | 0.48 | 0.54 | 0.46 | 0.47 | 0.49 |
| Y/Y Growth | 0% | 4% | 6% | 3% | -16% | -18% | -16% | -10% | 3% | -15% | 3% | 4% |
| Q/Q Growth | 0% | 4% | 1% | -2% | -19% | 2% | 4% | 5% | -- | -- | -- | -- |
| **Gross Search Revenue** | 1,003,944 | 978,956 | 978,322 | 944,084 | 875,417 | 825,956 | 859,853 | 947,988 | 3,905,306 | 3,509,214 | 3,946,301 | 4,460,188 |
| Y/Y Growth | 1% | 3% | -1% | 1% | -13% | -16% | -12% | 0% | 1% | -10% | 12% | 13% |
| Q/Q Growth | 7% | -2% | 0% | -3% | -7% | -6% | 4% | 10% | -- | -- | -- | -- |
| **RPS (Gross rev per 000s searches)** | $73 | $76 | $77 | $78 | $57 | $58 | $61 | $67 | $76 | $61 | $65 | $70 |
| Y/Y Growth | 12% | 10% | 11% | 8% | -22% | -23% | -21% | -14% | 10% | -20% | 6% | 8% |
| Q/Q Growth | 1% | 4% | 1% | 2% | -26% | 2% | 4% | 10% | -- | -- | -- | -- |

*Source: Company reports; Collins Stewart LLC estimates*

# Collins Stewart
## Independent thinking

06/15/09
**YHOO - Key Financial Metrics**
($ Thousands)

| | 2008 | | | | 2009E | | | | Annual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/08 | 6/08 | 9/08 | 12/08 | 3/09A | 6/09E | 9/09E | 12/09E | 2008A | 2009E | 2010E | 2011E |
| **Net Cash, Equivalents, Mkt Securities** | 2,847,762 | 3,219,324 | 3,299,228 | 3,521,973 | 3,691,095 | 3,943,705 | 4,235,586 | 4,574,280 | 3,521,973 | 4,574,280 | 6,060,942 | 7,716,470 |
| Seq. Change | 484,290 | 371,562 | 79,904 | 222,745 | 169,122 | 252,610 | 291,881 | 338,695 | 1,158,501 | 1,052,307 | 1,486,662 | 1,655,528 |
| Net Cash & Equivs. Per Share | $2.04 | $2.30 | $2.36 | $2.54 | $2.62 | $2.80 | $3.00 | $3.24 | $2.52 | $3.24 | $4.25 | $5.36 |
| Deferred Revenue | 495,999 | 478,352 | 446,565 | 413,224 | 405,616 | 405,625 | 418,819 | 462,306 | 413,224 | 462,306 | 802,471 | 1,187,538 |
| Q/Q Change | 127,529 | (17,647) | (31,787) | (33,341) | (7,608) | 9 | 13,193 | 43,487 | 44,754 | 49,082 | 340,166 | 385,066 |
| | | | | | | | | | | | | |
| **OCF** | 786,305 | 425,838 | 347,091 | 321,007 | 262,349 | 341,303 | 390,749 | 452,388 | 1,880,241 | 1,446,788 | 1,964,860 | 2,218,726 |
| Y/Y Growth | 81% | 5% | -24% | -51% | -67% | -20% | 13% | 41% | -4% | -23% | 36% | 13% |
| OCF (Excl. Stock Option Tax Benefit) | 661,300 | 271,537 | 193,426 | 228,655 | 138,334 | 225,675 | 253,453 | 314,014 | 1,354,918 | 931,476 | 1,414,304 | 1,668,170 |
| Y/Y Growth | 191% | 51% | -37% | -61% | -79% | -17% | 31% | 37% | 4% | -31% | 52% | 18% |
| OCF as % of Net Revenue | 58% | 32% | 26% | 23% | 23% | 30% | 33% | 34% | 35% | 30% | 37% | 38% |
| | | | | | | | | | | | | |
| **Capex** | 139,793 | 175,897 | 167,228 | 191,911 | 70,481 | 100,481 | 110,481 | 125,481 | 674,829 | 406,924 | 525,000 | 610,000 |
| % of net revenue | 10% | 13% | 13% | 14% | 6% | 9% | 9% | 10% | 13% | 8% | 10% | 11% |
| | | | | | | | | | | | | |
| **FCF = OCF - Capex** | 646,512 | 249,941 | 179,863 | 129,096 | 191,868 | 240,822 | 280,268 | 326,907 | 1,205,412 | 1,039,864 | 1,439,860 | 1,608,726 |
| Y/Y Growth | 104% | -4% | -42% | -72% | -70% | -4% | 56% | 153% | -11% | -14% | 38% | 12% |
| **FCF per Share** | $0.46 | $0.18 | $0.13 | $0.09 | $0.14 | $0.17 | $0.20 | $0.23 | $0.86 | $0.74 | $1.01 | $1.12 |
| Recurring GAAP EPS | $0.18 | $0.16 | $0.15 | $0.21 | $0.15 | $0.15 | $0.16 | $0.18 | $0.70 | $0.63 | $0.72 | $0.83 |
| | | | | | | | | | | | | |
| **EBITDA** | 438,562 | 427,046 | 410,378 | 542,273 | 408,978 | 433,510 | 447,056 | 497,499 | 1,811,490 | 1,791,844 | 1,934,886 | 2,222,025 |
| Y/Y Growth | -5% | -10% | -12% | 8% | -7% | 2% | 9% | -8% | -3% | -1% | 8% | 15% |
| **EBITDA per Share** | $0.31 | $0.31 | $0.29 | $0.39 | $0.29 | $0.31 | $0.32 | $0.35 | $1.30 | $1.27 | $1.36 | $1.54 |
| Y/Y Growth | -3% | -10% | -12% | 9% | -8% | 1% | 8% | -10% | -3% | -2% | 7% | 14% |
| | | | | | | | | | | | | |
| **OCF/EBITDA (TTM)** | 123% | 127% | 125% | 103% | 76% | 71% | 72% | 81% | 104% | 81% | 102% | 100% |
| **FCF/EBITDA (TTM)** | 89% | 91% | 87% | 66% | 42% | 41% | 46% | 58% | 67% | 58% | 74% | 72% |

*Source: Company reports; Collins Stewart LLC estimates*

**Collins Stewart**
*Independent thinking*

06/15/09
**YHOO - Balance Sheet**
($ Thousands)

| | 2008 | | | | 2009E | | | | Annual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/08 | 6/08 | 9/08 | 12/08 | 3/09A | 6/09E | 9/09E | 12/09E | 2008A | 2009E | 2010E | 2011E |
| Total Assets | 13,425,803 | 13,989,647 | 13,908,480 | 13,689,848 | 13,735,961 | 13,944,212 | 14,237,269 | 14,675,809 | 13,689,848 | 14,675,809 | 16,422,391 | 18,377,316 |
| Current Assets | 3,839,169 | 4,304,330 | 4,396,821 | 4,745,498 | 4,595,057 | 4,847,693 | 5,177,135 | 5,639,060 | 4,745,498 | 5,639,060 | 7,239,891 | 9,046,707 |
| Cash & Cash Equivalents | 2,341,205 | 2,051,370 | 2,143,750 | 2,292,296 | 2,318,509 | 2,571,119 | 2,863,175 | 3,201,869 | 2,292,296 | 3,201,869 | 4,688,881 | 6,344,759 |
| *Real Cash Usage (a)* | *646,512* | *249,941* | *179,863* | *129,096* | *191,868* | *240,822* | *280,268* | *326,907* | *129,096* | *326,907* | *326,907* | *326,907* |
| Marketable Securities - Debt | 267,129 | 1,019,641 | 1,070,350 | 1,159,691 | 1,127,141 | 1,127,141 | 1,127,141 | 1,127,141 | 1,159,691 | 1,127,141 | 1,127,141 | 1,127,141 |
| Marketable Securities - Equity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounts Receivable | 1,039,957 | 1,041,874 | 992,936 | 1,060,450 | 912,987 | 913,008 | 942,704 | 1,040,588 | 1,060,450 | 1,040,588 | 1,130,996 | 1,250,887 |
| Prepaid Expenses and Other Current Assets | 190,878 | 191,445 | 189,785 | 233,061 | 236,420 | 236,425 | 244,115 | 269,462 | 233,061 | 269,462 | 292,874 | 323,920 |
| Long Term Assets | 9,586,634 | 9,685,317 | 9,511,659 | 8,944,350 | 9,140,904 | 9,096,519 | 9,060,134 | 9,036,749 | 8,944,350 | 9,036,749 | 9,182,499 | 9,330,609 |
| Marketable Securities | 239,428 | 148,313 | 85,128 | 69,986 | 245,445 | 245,445 | 245,445 | 245,445 | 69,986 | 245,445 | 245,445 | 245,445 |
| Restricted Long-Term Investments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Property and Equipment | 1,363,475 | 1,415,801 | 1,490,655 | 1,536,181 | 1,469,721 | 1,425,336 | 1,388,951 | 1,365,566 | 1,536,181 | 1,365,566 | 1,161,316 | 959,426 |
| Goodwill, Intangibles, Other Assets | 7,983,731 | 8,121,203 | 7,935,876 | 7,338,183 | 7,425,738 | 7,425,738 | 7,425,738 | 7,425,738 | 7,338,183 | 7,425,738 | 7,775,738 | 8,125,738 |
| *Total Cash, Equivalents, Mkt Securities (Net)* | *2,847,762* | *3,219,324* | *3,299,228* | *3,521,973* | *3,691,095* | *3,943,705* | *4,235,761* | *4,574,455* | *3,521,973* | *4,574,455* | *6,061,467* | *7,717,345* |
| Liabilities & Shareholders' Equity | 13,425,803 | 13,989,647 | 13,908,480 | 13,689,848 | 13,735,961 | 13,944,212 | 14,237,269 | 14,675,810 | 13,689,848 | 14,675,810 | 16,422,390 | 18,377,316 |
| Total Liabilities | 2,925,835 | 2,322,948 | 2,306,655 | 2,447,438 | 2,163,859 | 2,264,688 | 2,436,373 | 2,719,436 | 2,447,438 | 2,719,436 | 3,818,916 | 4,992,277 |
| Current Liabilities | 1,683,403 | 1,678,024 | 1,674,546 | 1,705,015 | 1,479,847 | 1,471,840 | 1,517,184 | 1,673,322 | 1,705,015 | 1,673,322 | 2,116,863 | 2,638,031 |
| Accounts Payable | 134,133 | 136,754 | 150,990 | 151,897 | 115,763 | 107,724 | 108,700 | 118,592 | 151,897 | 118,592 | 127,055 | 137,293 |
| Accrued Expenses and Other Liabilities | 1,053,271 | 1,062,918 | 1,076,991 | 1,139,894 | 958,468 | 958,490 | 989,665 | 1,092,425 | 1,139,894 | 1,092,425 | 1,187,337 | 1,313,201 |
| Deferred Revenue | 495,999 | 478,352 | 446,565 | 413,224 | 405,616 | 405,625 | 418,819 | 462,306 | 413,224 | 462,306 | 802,471 | 1,187,538 |
| Long Term Liabilities | 1,242,432 | 644,924 | 632,109 | 742,423 | 684,012 | 792,848 | 919,189 | 1,046,114 | 742,423 | 1,046,114 | 1,702,053 | 2,354,246 |
| Other Liabilities | 1,230,253 | 631,531 | 616,824 | 724,404 | 664,856 | 773,692 | 899,858 | 1,026,783 | 724,404 | 1,026,783 | 1,682,372 | 2,334,215 |
| Long-Term Debt | 0 | 0 | 0 | 0 | 0 | 0 | 175 | 175 | 0 | 175 | 525 | 875 |
| Minority Interests in Consolidated Subs. | 12,179 | 13,393 | 15,285 | 18,019 | 19,156 | 19,156 | 19,156 | 19,156 | 18,019 | 19,156 | 19,156 | 19,156 |
| Shareholders' Equity | 10,499,968 | 11,666,699 | 11,601,825 | 11,242,410 | 11,572,102 | 11,679,523 | 11,800,896 | 11,956,373 | 11,242,410 | 11,956,373 | 12,603,474 | 13,385,039 |

*Source: Company reports; Collins Stewart LLC estimates*

Collins Stewart

Independent thinking

06/15/09
**YHOO - Cash Flow Statement**
($ Thousands)

| | 2008 | | | | 2009E | | | | Annual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/08 | 6/08 | 9/08 | 12/08 | 3/09A | 6/09E | 9/09E | 12/09E | 2008A | 2009E | 2010E | 2011E |
| Net Income (Loss) | 536,840 | 131,161 | 54,348 | (303,428) | 117,558 | 107,421 | 121,373 | 155,477 | 418,921 | 501,829 | 647,100 | 781,565 |
| plus Depreciation | 117,557 | 125,913 | 128,997 | 136,345 | 134,866 | 144,866 | 146,866 | 148,866 | 508,812 | 575,464 | 729,250 | 811,890 |
| plus Amort. of Intangibles | 69,954 | 77,444 | 78,608 | 55,215 | 46,707 | 50,707 | 50,707 | 50,707 | 281,221 | 198,828 | 39,668 | 39,668 |
| SBC+ SBC Tax Benefits | 125,005 | 154,301 | 153,665 | 92,352 | 124,015 | 115,627 | 137,296 | 138,374 | 525,323 | 515,313 | 550,556 | 550,556 |
| Excess Tax Benefits from SBC | 0 | 0 | (35,481) | (89,633) | (22,127) | (20,630) | (24,497) | (24,689) | (125,114) | (91,943) | (98,231) | (98,231) |
| plus Minority Interests in Ops. of Consol. Subs. | (75) | 1,214 | 1,892 | 2,734 | 1,137 | 837 | 537 | 237 | 5,765 | 2,748 | 2,748 | (1,000) |
| minus Gains From Sale/Exchange of Investments | 5,877 | (512) | 0 | (21,987) | (3,141) | 0 | 0 | 0 | (16,622) | (3,141) | 0 | 0 |
| plus Change in LT Deferred Revenue & Taxes | 0 | 0 | 4,973 | 2,734 | 5,826 | 0 | 0 | 0 | (72,851) | 5,826 | 0 | 0 |
| plus Earnings in equity interests | (454,782) | (54,927) | (27,762) | (59,508) | (48,934) | (48,934) | (48,934) | (48,934) | (596,979) | (195,736) | (235,952) | (235,952) |
| plus Other Non-Cash Charges | 29,636 | 26,833 | 6,275 | 495,462 | (558) | (558) | (558) | (558) | 558,206 | (2,232) | 0 | 0 |
| plus Changes in Working Capital | 356,293 | (35,589) | (18,424) | 91,279 | (93,000) | (8,034) | 7,958 | 32,908 | 393,559 | (60,168) | 329,722 | 370,231 |
| less Increase in Accounts Receivable | 27,180 | (3,544) | 22,786 | (108,504) | 136,535 | (21) | (29,696) | (97,884) | (62,082) | 8,934 | (90,408) | (119,891) |
| less Increase in Prepaids and Other Current Assets | (8,307) | 2,660 | (35,934) | 22,093 | 2,267 | (5) | (7,690) | (25,347) | (19,488) | (30,775) | (23,411) | (31,046) |
| plus increase in Accounts Payable | (44,343) | 4,891 | 3,856 | 11,756 | (29,689) | (8,039) | 976 | 9,891 | (23,840) | (26,860) | 8,463 | 10,238 |
| plus increase in Accrd. Expens. & Other | 46,235 | 8,381 | 46,546 | 223,868 | (170,480) | 22 | 31,175 | 102,760 | 325,030 | (36,523) | 94,912 | 125,864 |
| plus Increase in Deferred Revenue | 335,528 | (47,977) | (55,678) | (57,934) | (31,633) | 9 | 13,193 | 43,487 | 173,939 | 25,057 | 340,166 | 385,066 |
| **Net Cashflow from Operations** | **786,305** | **425,838** | **347,091** | **321,007** | **262,349** | **341,303** | **390,749** | **452,388** | **1,880,241** | **1,446,788** | **1,964,860** | **2,218,726** |
| | | | | | | | | | | | | |
| Acquisition of Property and Equipment | (139,793) | (175,897) | (167,228) | (191,911) | (70,481) | (100,481) | (110,481) | (125,481) | (674,829) | (406,924) | (525,000) | (610,000) |
| Purchases of Marketable Securities | (32,757) | (856,710) | (392,246) | (1,035,291) | (1,241,194) | 0 | 0 | 0 | (2,317,004) | (1,241,194) | 0 | 0 |
| Proceeds from Sales of Marketable Securities | 376,542 | 193,736 | 405,742 | 973,302 | 1,100,709 | 0 | 0 | 0 | 1,949,322 | 1,100,709 | 0 | 0 |
| Other Investments | (19,293) | (39,506) | (15,936) | 14,659 | (5,365) | 0 | 0 | 0 | (60,076) | (5,365) | 0 | 0 |
| Cash Acquired in Acquisition | (166,289) | (13,558) | (29,349) | 0 | 0 | 0 | 0 | 0 | (209,196) | 0 | 0 | 0 |
| **Net Cashflow from Investing** | **18,410** | **(891,935)** | **(199,017)** | **(239,241)** | **(216,331)** | **(100,481)** | **(110,481)** | **(125,481)** | **(1,311,783)** | **(552,774)** | **(525,000)** | **(610,000)** |
| | | | | | | | | | | | | |
| Capex as % of EBITDA | 32% | 41% | 41% | 35% | 17% | 23% | 25% | 25% | 37% | 23% | 27% | 27% |
| | | | | | | | | | | | | |
| Other | (131,729) | (4,193) | 27,025 | 77,949 | 11,788 | 11,788 | 11,788 | 11,788 | (30,948) | 47,152 | 47,152 | 47,152 |
| Proceeds from Issuance of Common Stock | 126,570 | 190,875 | 13,958 | 31,951 | 3,932 | 0 | 0 | 0 | 363,354 | 3,932 | 0 | 0 |
| **Net Cash Flow from Financing** | **(5,159)** | **186,682** | **40,983** | **109,900** | **15,720** | **11,788** | **11,788** | **11,788** | **332,406** | **51,084** | **47,152** | **47,152** |
| Effect of Exchange Rate Changes | 27,719 | (10,420) | (96,677) | (43,120) | (35,525) | 0 | 0 | 0 | (122,498) | (35,525) | 0 | 0 |
| | | | | | | | | | | | | |
| **Net Change in Cash & Equivalents** | **827,275** | **(289,835)** | **92,380** | **148,546** | **26,213** | **252,610** | **292,056** | **338,695** | **778,366** | **909,573** | **1,487,012** | **1,655,878** |
| **Cash & Equivalents (BOP)** | 1,513,930 | 2,341,205 | 2,051,370 | 2,143,750 | 2,292,296 | 2,318,509 | 2,571,119 | 2,863,175 | 1,513,930 | 2,292,296 | 3,201,869 | 4,688,881 |
| **Cash & Equivalents (EOP)** | 2,341,205 | 2,051,370 | 2,143,750 | 2,292,296 | 2,318,509 | 2,571,119 | 2,863,175 | 3,201,869 | 2,292,296 | 3,201,869 | 4,688,881 | 6,344,759 |

*Source: Company reports; Collins Stewart LLC estimates*


# Collins Stewart
Independent thinking

## Important Disclosure / Disclaimer Information

Other Public Companies Mentioned in this Report

| Company | Ticker | Price | Recommendation |
|---|---|---|---|
| Microsoft Corp. | MSFT | $22.44 | BUY |



| Ticker | Date | Action | Prior Rating | Current Rating | Price | Target Price |
|---|---|---|---|---|---|---|
| YHOO | 2009-04-22 | Raising Target Price | BUY | BUY | $14.48 | $20.00 |
| YHOO | 2008-11-04 | Raising Rating | HOLD | BUY | $13.35 | $18.00 |
| YHOO | 2008-05-15 | Raising Rating | SELL | HOLD | $27.75 | NA |
| YHOO | 2008-05-05 | Lowering Rating & TP | BUY | SELL | $24.37 | $23.00 |
| YHOO | 2008-04-16 | Initiation of Coverage | NA | BUY | $28.31 | $33.50 |



| Ticker | Date | Action | Prior Rating | Current Rating | Price | Target Price |
|---|---|---|---|---|---|---|
| MSFT | 2009-06-29 | Raising Target Price | BUY | BUY | $23.86 | $30.00 |
| MSFT | 2009-02-12 | Raising Target Price | BUY | BUY | $19.13 | $26.00 |
| MSFT | 2009-01-23 | Lowering Target Price | BUY | BUY | $17.08 | $23.00 |
| MSFT | 2008-11-24 | Lowering Target Price | BUY | BUY | $20.55 | $28.00 |
| MSFT | 2008-10-24 | Lowering Target Price | BUY | BUY | $21.66 | $30.00 |
| MSFT | 2008-10-03 | Lowering Target Price | BUY | BUY | $25.96 | $32.00 |
| MSFT | 2008-07-28 | Initiation of Coverage | NA | BUY | $25.06 | $33.00 |

<u>Collins Stewart LLC Ratings</u>

Collins Stewart LLC assigns research equity ratings of Buy, Hold or Sell. For Buys, we will publish a 12-month price target for any stock with an estimated appreciation potential of 20% or more. For Sells, we also publish a 12-month price target for any stock with an estimated underperformance potential of 20% or more.
Buy: 12 months, estimated 20% or more appreciation
Hold: 12 months, between 20% appreciation and 20% decline expected.



Sell: 12 months, estimated 20% or more decline.

US Disclaimers

This report is for informational purposes only, and the information herein is obtained from sources that we believe to be reliable, but its accuracy and completeness, and that of the opinions based thereon, are not guaranteed. The securities described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. Further, this report is not intended as an offer or solicitation to buy or sell any securities or related instruments. The investments discussed or recommended in this report may not be suitable for the specific investment objectives, financial situation or needs of the reader, and should not be relied upon without consultation with an investment professional. Opinions expressed in this report are subject to change without notice. Collins Stewart LLC accepts no liability whatsoever for any loss or damage of any kind arising out of the use of any part, or all, of this report. This report is for distribution only under such circumstances as may be permitted by applicable law, and may not be reproduced or distributed in any form without the specific consent of Collins Stewart LLC. Redistribution of this, via the Internet or otherwise, report without permission is specifically prohibited, and Collins Stewart LLC accepts no liability for the actions of third parties in this regard.

From time to time, Collins Stewart LLC or its employees may have a long or short position in the securities of company (ies) discussed herein and, at any time, may make purchases and/or sales as principal or agent.

| | % of CSTI Universe with this rating | % of rating tier for which CSTI provided IB services |
|---|---|---|
| Buy | 41% | 0% |
| Hold | 52% | 0% |
| Sell | 6% | 0% |

The research analyst who is primarily responsible for the research contained in this research report and whose name is listed first on this report: (1) attests that all of the views expressed in this research report accurately reflect that research analyst's personal views about any and all of the securities and issuers that are the subject of this research report; and (2) attests that no part of that research analyst's compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by the research analyst in this research report.

All Collins Stewart LLC ("CSTI") employees, including research associates, receive compensation that is based in part upon the overall performance of the firm, including revenues generated by CSTI's investment banking department.

**Footnotes for CSTI, a member of SIPC and NASD**

CSTI makes a market in YHOO and MSFT securities. CSTI, in its market making capacity, sells to or buys from customers the securities of these companies in the past 12 months on a principal basis.