UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :

UNITED STATES OF AMERICA

                                          :

         - v. -                          13 Cr. 539 (PGG)

                                            :

RICHARD LEE,

                                          :

           Defendant.

                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION TO WITHDRAW HIS GUILTY PLEA


                                                  JOON H. KIM
                                                  Acting United States Attorney for
                                                  the Southern District of New York

Brendan F. Quigley
Assistant United States Attorney
   - Of Counsel -

# TABLE OF CONTENTS

Page

**BACKGROUND** ................................................................................................ **2**

   I.   The Offense Conduct ................................................................................... 2

      A.   The Microsoft-Yahoo Trades ................................................................ 2

      B.   The 3COM Trades ............................................................................. 5

      C.   The Yahoo Earnings Trades ................................................................ 6

   II.   The Plea Agreement and the Defendant's Guilty Plea ...................................... 7

   III.   Events Following the Guilty Plea .................................................................. 10

      A.   Background ...................................................................................... 10

      B.   The Second Circuit Decides *Newman*, Following the Defendant's Guilty Plea ........ 11

      C.   The Demise of *Newman's* "Meaningfully Close Personal Relationship" Test .......... 12

      D.   The Defendant Moves to Withdraw His Guilty Plea .................................. 13

**DISCUSSION** .................................................................................................. **13**

   I.   Generally Applicable Law ........................................................................... 13

   II.   The Court Should Reject Lee's Attempt to Withdraw His Plea Based on "Newly-Discovered Evidence" ................................................................................. 15

   III.   "Legal Developments" Since the Plea Do Not Provide a Basis for Withdrawal ........... 19

   IV.   The Court Should Also Deny the Motion Because of the Passage of Time and the Prejudice to the Government ...................................................................... 22

**CONCLUSION** ............................................................................................... **24**

## Table of Authorities
### Cases

*Adames* v. *United States*, 171 F.3d 728 (2d Cir. 1999) ........................................................ 15, 23

*Blackledge* v. *Allison*, 431 U.S. 63 (1977) ................................................................................. 15

*Chiarella* v. *United States,* 445 U.S. 222 (1980) ........................................................................ 10

*Dirks* v. *SEC*, 463 U.S. 646 (1983) .................................................................................... passim

*Salman* v. *United States*,  137 S Ct. 420 (2016) ........................................................................ 13

*SEC* v. *Mayhew*, 121 F.3d 44 (2d Cir. 1997) ............................................................................ 17

*United States* v. *Adams*, 448 F.3d 492 (2d Cir. 2006) ................................................................ 23

*United States* v. *Conradt, et al*, No. 12 Cr. 887 (ALC) (S.D.N.Y. Jan. 22, 2015) ...................... 24

*United States* v. *Contorinis*, 692 F.3d 136 (2d Cir. 2012) ........................................................... 18

*United States* v. *Doe*, 537 F.3d 204 (2d Cir. 2008) .............................................................. 15, 23

*United States* v. *Goffer*, 721 F.3d 113 (2d Cir. 2013) ................................................................. 21

*United States* v. *Gonzalez*, 970 F.2d 1095 (2d Cir. 1992) ..................................................... 14, 24

*United States* v. *Hirsch*, 239 F.3d 221 (2d Cir. 2001) ........................................................... 15, 18

*United States* v. *Hyde*, 520 U.S. 670 (1997) ............................................................................. 14

*United States* v. *Maher*, 108 F.3d 1513 (2d Cir. 1997) ............................................................... 14

*United States v. Martoma*, 869 F.3d 58 (2d. Cir. 2017) ............................................................. 13

*United States* v. *Matos-Quinones*, 456 F.3d 14 (1st Cir. 2006) .................................................. 22

*United States* v. *Millan Colon*, 829 F. Supp. 620 (S.D.N.Y. 1993) ............................................ 19

*United States* v. *Newman*, 773 F.3d 438 (2d Cir. 2014) ................................................... 11, 12, 22

*United States* v. *O'Hagan*, 521 U.S. 642 (1997) ....................................................................... 10

*United States* v. *Quinones*, 906 F.2d 924 (2d Cir. 1990) ............................................................ 14

*United States* v. *Schmidt*, 373 F.3d 100 (2d Cir. 2004) .............................................................. 14

*United States* v. *Torres*, 129 F.3d 710 (2d Cir. 1997) ........................................................... 15, 24

**Rules**

Fed. R. Crim. P. 11 ...................................................................................................................... 21

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion filed by Richard Lee ("Lee" or "the defendant") seeking to withdraw his guilty plea. In the motion, Lee has for the first time proclaimed his innocence—eight years after the charged insider-trading conduct and four years after he admitted to his crimes and pled guilty pursuant to a cooperation agreement. Lee is not innocent. In fact, in proffers with the Government, Lee candidly admitted that he regularly traded on what he believed was inside information, to the extent he had difficulty distinguishing between cases where he knew at the time he was trading on inside information and situations where he became suspicious about the source of the information only after the fact.[1] Faced with the reality that he is about to be sentenced for his illegal acts, Lee in desperation has for the first time recalled his supposed innocence and asked the Court to let him withdraw his plea.

As set forth below, the Court should deny the defendant's motion. First, the "newly discovered evidence" Lee cites simply confirms that Lee traded in Yahoo stock while in possession of material, non-public information. Second, there was an adequate factual basis for Lee's guilty plea, and Lee's motion to withdraw is not, in fact, based on any intervening change in insider trading law. Finally, the length of time since Lee's plea—over four years—and the

---

[1] As he acknowledges in his motion, prior to his plea, Lee met with the Government and was extensively debriefed regarding his conduct. These debriefings were made pursuant to this Office's standard proffer agreement, which provides that the Government may use the defendant's proffer statements "to rebut any evidence or arguments offered by or on behalf of" the defendant "at any stage of the proceedings." Nevertheless, the summary of the offense conduct set forth below derives largely from other evidence the Government obtained during its investigation and not, unless otherwise noted, from the defendant's admissions to the Government.

related prejudice to Government from allowing Lee to withdraw his plea now, provide additional bases to deny the motion.

## BACKGROUND

### I.      The Offense Conduct

On July 23, 2013, Lee pled guilty to a two-count criminal information (the "Information").  The Information contained allegations regarding three sets of trades that Lee made while working as a portfolio manager for SAC Capital Management ("SAC Capital"): (i) Lee's July 2009 trades of Yahoo stock, ahead of the announcement that Yahoo and Microsoft were exploring a strategic partnership (the "Microsoft-Yahoo Trades"); (ii) the defendant's November 2009 trades in the stock of 3COM, ahead of Hewlett Packard's announcement it was buying 3COM (the "3COM Trades"); and (iii) the defendant's 2009 trades in Yahoo, ahead of a Yahoo earnings announcement (the "Yahoo Earnings Trades").  Below the Government provides an overview of that conduct.

####    A.  The Microsoft-Yahoo Trades

On July 9, 2009, Sandeep Aggarwal, who worked at Collins Stewart, a research firm, obtained material, non-public information about a potential partnership between Yahoo and Microsoft from a close friend who worked at Microsoft (the "Microsoft Insider").

The next day, July 10, 2009, after a Collins Stewart internal morning call in which Aggarwal participated, a Collins Stewart employee ("Collins Stewart Employee-1") sent an email to numerous clients, including SAC Capital, Lee's employer, regarding the potential Microsoft-Yahoo partnership.  The e-mail stated "we are hearing deal talks are starting again-- had stopped entirely a few weeks ago but contacts noting that YHOO back at the table."  Shortly after this email, at 9:08 a.m., Lee's desk line at SAC Capital received a phone call from Collins Stewart, which lasted three and a half minutes.  Almost immediately after the call, at 9:13 a.m.,

2

Lee sent an instant message to SAC Capital's founder, stating "re: YHOO. I mentioned the Collins Stewart call on YHOO this morning, they seem to think something may happen within 2 wks" and that "[w]e have no view regarding this but 1) Collins Stewart has been the only broker in line with our views regarding the initial 'coldness' of discussions and now they are the only broker to turn positive regarding the discussions."  Within two minutes after sending this instant message, Lee received another call from Collins Stewart.

A short time later, at approximately 9:38 a.m., Lee received an instant message from another SAC Capital colleague who placed trades for Lee (the "Trader").  The Trader forwarded an instant message from another Collins Stewart analyst, who stated "Sandeep," i.e., Aggarwal, "is making major call that the recently cooled off MSFT /YHOO talks have heated back up in a big way.  He believes it's possible something could happen in the next week or two based on his channel checks . . . ."  (Ex. A at 1).

At 9:50 a.m., Lee sent an instant message to the Trader asking him "[b]uy 100,000 YHOO . . . ."  (*Id.* at 1).  Lee then ordered another 600,000 shares of Yahoo between 9:58 a.m. and 10:48 a.m.  (*See id.* at 2).  Trading records show that the Trader continued to attempt to execute these orders for Lee over the next several hours.

At approximately 11:30 a.m., Lee spoke directly with Aggarwal in an attempt to get more information and determine how reliable the information about Microsoft and Yahoo was.  Collins Stewart Employee-1, also participated in the three-way call.  (*See* Ex. B).  Collins Stewart Employee-1 began the call by telling Aggarwal "I don't know who Richard Lee is but he wants to talk to you . . . ."  (*Id.* at 1).  Lee indicated that he had been trying to reach Aggarwal throughout the morning.  (*See, e.g.*, Ex. B at 2 ("Oh hi Sandeep! I left—I left a message on your mobile this morning.")).  Lee told Aggarwal that Aggarwal was "one of the first people who had

3

said . . . that the talks [between Microsoft and Yahoo] had chilled, and now you're saying that the talks are back on . . . .[,] and so we wanted to . . . get a . . . sense of why you feel that way." (*Id.* at 3). Aggarwal explained that he "used to work at Microsoft" and "many of my former colleagues friends are in the senior positions in internet business, definitely many of them have been, um, very accurate in terms of providing a good color in terms of what is the current framework with Microsoft and Yahoo." (*Id.* at 4). More specifically, Aggarwal added that "late last night" he had spoken with one specific "senior" contact at Microsoft, i.e., the Microsoft Insider. (*Id.*)

Aggarwal explained that the Microsoft Insider had told Aggarwal that "a senior team from Yahoo" had been meeting with Microsoft, that the "level of seriousness" had increased, and that "it is possible that they announce something . . . in [the] next two weeks." (*Id.* at 4-5). In response to questions from Lee, Aggarwal also provided information from the Microsoft Insider about "sticking point[s]" in the negotiations, *id.* at 6-7, and other considerations in a potential Microsoft-Yahoo partnership. (*See id.* at 7-11).

Lee then asked Aggarwal about his "confidence . . . here." (*Id.* at 11). In response, Aggarwal noted that the Microsoft Insider:

- Had been with Microsoft ten years, (*id.* at 11);

- Was Aggarwal's "buddy first," who Aggarwal knew "intimately well," (*id.* at 12); and

- Was his son's "favorite uncle," (*id.* at 15).

Later that afternoon, the Trader told Lee that he had bought 575,000 of the 700,000 Yahoo shares Lee had ordered before the Lee-Aggarwal call. (Ex. A at 4 (YHOO bot 575k . . . .")). Lee responded "[d]o another 100,000 Yahoo," *id.*, and the Trader began to execute that order, *see, e.g.*, *id.* ("YHOO bot 47k, working 53k"). Ultimately, Lee directed the Trader to

purchase a total of 3.9 million dollars of Yahoo on the day, and to "short" 150,000 shares of Microsoft.  (*Id.* at 4).  Approximately 20 minutes later, the Trader responded that he had bought 725,000 shares of Yahoo on the day, to get to a $3.9 million dollar position and shorted ("ss") 150,000 shares of Microsoft. (*Id.* at 5).

Also that afternoon—again, after the Lee-Aggarwal call—Lee purchased 25,000 shares of Yahoo for his personal trading account for approximately $372,000.  At the close of trading of July 10, 2009, Yahoo common stock traded at $14.93 a share.  (*See* Def.'s Mot. Ex. E).  On July 14, 2009, Lee bought over 59,000 additional shares of Yahoo stock for the account he managed on behalf of SAC Capital.

On the evening of July 16, 2009, a widely circulated financial press article (the "Microsoft-Yahoo Article") disclosed information regarding the timing of Microsoft-Yahoo deal, which was similar to the information that Aggarwal had provided to Lee six days earlier.  The article stated "unless there is some major glitch, there might finally be a search and online advertising deal struck between Yahoo and Microsoft" and that "[i]f all goes, well, the deal could be announced within the next week."  The next day, Yahoo's stock closed at $16.84 a share, resulting in a significant increase in the value of Lee's Yahoo holdings.

**B.  The 3COM Trades**

On November 11, 2009, Lee and a colleague received an email from another individual ("CC-1").  The email stated "[a]ccording to my recent interview of H3C, I had some news about [Hewlett Packard]/3Com[,] and it seems that HP wants to buy H3C and maybe we need to schedule a talk."  H3C was a Chinese-owned subsidiary of 3COM.

Lee's colleague responded to CC-1's email, asking CC-1 to "confirm" that the news about Hewlett Packard's potential acquisition of H3C resulted from CC-1's own analysis and not

based on anything anyone at the company had told him.  CC-1 wrote back that CC-1 was just making a personal "guess" based on CC-1's own analysis of potential "synergies."  Lee then sought SAC's Compliance Department's approval to trade on CC-1's information, and the Compliance Department approved.

Lee, however, later admitted to the Government that he understood that CC-1's initial email meant what it said—that CC-1 had received information directly from H3C and that his conclusion was not on a "guess" based on an analysis of potential "synergies."  Lee also acknowledged that he understood that the email exchange between CC-1 and his colleague was transparently just for appearances, i.e., to create a (false) record that CC-1's email was not based on material, non-public information.  Moreover, Lee also admitted that he knew CC-1 had a relationship with 3COM's CEO and that it was clear to him that CC-1 received the information directly from company insiders but that he had purposefully not disclosed either of these facts when seeking the Compliance Department's approval.  The defendant then bought over 700,000 shares of 3COM stock.  At the end of trading that day, Hewlett Packard announced it was, in fact, acquiring 3COM in its entirety.  Because of this announcement, the price of 3Com stock jumped 31 percent, and Lee made $1,340,411.85 in realized and unrealized profits for the portfolio he managed on behalf of SAC Capital.

### C.  The Yahoo Earnings Trades

In his plea allocution, Lee also admitted that, at his urging, in 2009, a friend of his gave him an advance copy of Yahoo's first quarter earnings report, which led Lee to put a short position on Yahoo.  Yahoo's stock price, however, actually rose in response to the earnings report, and the defendant lost money, even though the advance copy of the report was accurate.

## II.     The Plea Agreement and the Defendant's Guilty Plea

Lee pled guilty on July 23, 2013, the same day the Government filed the Information.
Count One of the Information charged that Lee and others had conspired to violate Title 15,
United States Code, Sections 78j(b) and 78ff, and Title 17 Code of Federal Regulations, Sections
240.10b-5 and 240.10b5-2, by engaging in a scheme to commit insider trading, in violation of 18
U.S.C § 371.  The description of the insider-trading scheme referenced as examples both the
Microsoft-Yahoo Trades and the Yahoo Earnings Trades, noting that, in 2009, "LEE obtained
inside information from multiple sources about Yahoo, Inc" and then traded, or caused others to
trade, on that information.  (Information ¶ 5).  The conspiracy count alleged four overt acts, two
of which related to the 3COM Trade and two of which related to the Yahoo Earnings Trade.  (*Id.*
¶ 9).  Count Two charged a substantive securities fraud count, in violation of Title 15 United
States Code, Sections 78j(b) and 78ff, and Title 17 Code of Federal Regulations, Sections
240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.  (*Id.* ¶¶ 10-11).  The
conduct charged in Count Two covered both the Yahoo Earnings Trades and the Microsoft-
Yahoo Trades.  (Information ¶ 11 (stating that "[i]n or about 2009 . . . LEE caused the SAC
Hedge Fund to execute securities transactions based in part on Inside Information LEE obtained
about Yahoo.").

Lee also executed a written cooperation agreement before pleading guilty, which was
signed by both him and his counsel.  In the cooperation agreement, Lee agreed, among other
things, that he was pleading guilty because he was "in fact guilty" of the counts charged in the
Information.

At the beginning of the plea proceeding that day, the Court placed the defendant under
oath and warned him that any false statements could be used against him in a prosecution for
perjury.  (Tr. 6).  After a colloquy, the Court found that the defendant had knowingly and

7

voluntarily waived indictment and that he was "fully competent to enter an informed plea." (Tr. 6-8, 10). The Court also noted that Lee had signed the Court's advice of rights form and the plea agreement between Lee and the Government. (Tr. 8). The Court explained the trial and other rights that the defendant would be giving up by pleading guilty, and Lee acknowledged that he understood he was giving up these rights. (Tr. 10-13). The Court then explained the elements of the charges in the Information. (Tr. 13-15). The Court said that, with respect to Count Two, "the government would have to prove that you obtained material nonpublic information in breach of a fiduciary or similar duty of trust and confidence, and that you traded while in possession of that information, or you disclosed the information to someone in exchange for a personal benefit, and that that person traded in possession of this information." (Tr. 15). The defendant acknowledged he understood these elements. (*Id.*). The Court also explained to the defendant the maximum penalties he faced (Tr. 16-17), the defendant's possible loss of certain civil rights as a result of his conviction (Tr. 17), and the method by which the Court would impose sentence and the impact of the Sentencing Guidelines (Tr. 17-18).

The Court then asked defense counsel whether he knew of "any valid defense that would prevail at trial, or any other reason why Mr. Lee should not be permitted to plead guilty." (Tr. 20). Defense counsel responded "No, your Honor." (*Id.*). Both defense counsel and counsel for the Government also stated there was an adequate factual basis for the defendant's guilty plea. (Tr. 20).

The Court then asked the defendant to "tell me what you did that makes you believe that you are guilty of the charges set forth in the information." (Tr. 20). The defendant stated he had "prepared an allocution" and requested to read from it, which the Court agreed to let him do. (*Id.*). Lee then stated "[o]n a number of occasions, I traded while in possession of material

8

nonpublic information that I had received from others under circumstances where I knew, or had

reason to believe, other persons had breached a fiduciary duty or a duty of confidentiality." (Tr.

21). Lee then referenced the Microsoft-Yahoo, 3COM, and Yahoo Earnings Trades described

above:

> For example, on one occasion in April 2009, at my urging,
> somebody I knew provided me with a copy of an earnings release
> for Yahoo Incorporated before that earnings release was made
> public. I thereafter traded in Yahoo before that release was made
> public. I knew at the time I should not have traded on that
> information, but I did anyway.
>
> On another occasion in July 2009, I obtained material nonpublic
> information by Yahoo from a sell-side analyst. I thereafter traded
> while in possession of that information. I knew at the time it was
> wrong for me to trade.
>
> On another occasion in November 2010 [sic], I obtained material
> nonpublic information from a company called 3COM corporation
> through a consultant. I thereafter traded while in possession of that
> information. I knew at the time it was wrong for me to trade.

(*Id.*).

The Court and the Government then engaged in a colloquy regarding the Government's

theory of venue and the identity and roles of the defendant's co-conspirators. (Tr. 21-22). In

response to a question from the Court about the individuals who provided him with material,

non-public information, the defendant stated "[i]n each of the instances that I cited, I believe

each of the individuals that had given me that information gave it with the understanding that

they knew I would trade on that information." (Tr. 23).

The Court then asked the defendant whether he was "pleading guilty because you are in

fact guilty" and whether he was "pleading guilty voluntarily and of your own free will." (*Id.*).

Lee responded "Yes, your Honor" to both questions. (*Id.*). Lee then formally pled guilty to both

counts of the Information and admitted the forfeiture allegation. (Tr. 23-24).

The Court accepted the defendant's guilty plea, finding the defendant had knowingly and voluntarily waived his trial rights and pled guilty and that the plea was "supported by [an] independent basis in fact containing each of the essential elements of the charged offenses . . . ." (Tr. 24).

The Court initially set a sentencing control date of December 9, 2013.  (Tr. 25).

## III.   Events Following the Guilty Plea

Sentencing was adjourned multiple times, initially because the defendant's cooperation remained on-going and subsequently because of decisions by the Second Circuit and the Supreme Court regarding insider trading.  A short recounting of the major decisions in insider trading law follows.

### A.  Background

By way of background, under the classical theory of insider trading liability, a corporate insider commits securities fraud when he "trades in the securities of his corporation on the basis of material, nonpublic information.  Trading on such information qualifies as a 'deceptive device' under § 10(b) [of the 1934 Exchange Act] . . .  because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.'"  *United States* v. *O'Hagan*, 521 U.S. 642, 651-52 (1997) (quoting *Chiarella* v. *United States,* 445 U.S. 222, 228 (1980)).

In *Dirks* v. *SEC*, 463 U.S. 646 (1983), the Supreme Court first addressed when an individual who receives material, non-public information from a corporate insider—a "tippee"— could be liable for insider trading.  The Court explained that "a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information," and thus becomes liable under Section 10(b), "only when the insider has breached his fiduciary duty to the

shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Dirks* v. *SEC*, 463 U.S. at 660.  The *Dirks* Court stated that a tipper breaches his fiduciary duty to the corporation's shareholders when he discloses the information for his personal benefit, rather than for a corporate purpose.  *See id.* at 662 ("Thus, the test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider, there is no derivative breach [by the tippee].").  As an example of when the required personal benefit could be found, the *Dirks* Court noted that "the elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend."  *Id.* at 664.

### B.  The Second Circuit Decides *Newman*, Following the Defendant's Guilty Plea

Over 20 years later, following the defendant's guilty plea in this case, the Second Circuit decided *United States* v. *Newman*, 773 F.3d 438 (2d Cir. 2014).  In *Newman*, the Court of Appeals reversed the convictions of two insider-trading tippees for two reasons.

First, the Court found the district court's jury instructions were in error, because they required only that "the defendants traded on material, nonpublic information they knew insiders had disclosed in breach of a duty of confidentiality."  *United States* v. *Newman*, 773 F.3d at 447 (quotation omitted).  Interpreting *Dirks* and subsequent cases, the *Newman* court held that the Government must also establish that the tippee knew of the insider-tipper's personal benefit for disclosing the information.  *Id.* at 450-51 ("[T]he district court was required to instruct the jury that the Government had to prove beyond a reasonable doubt that Newman and Chiasson knew that the tippers received a personal benefit for their disclosure.").  The *Newman* court reached this conclusion because (i) a tippee must know of the tipper's breach of fiduciary duty; (ii) a

tipper breaches his fiduciary duty only when "he receives a personal benefit in exchange for the disclosure" of confidential information; and (iii) "a tippee is liable only if he knows or should have known of the breach." *Id.* at 447.

*Second*, the *Newman* court found the evidence of personal benefit insufficient. In reaching this conclusion, the *Newman* court held that a personal benefit may not be inferred "from a personal relationship between the tipper and tippee" unless there is evidence that the relationship is "a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Id.* at 452.

The Second Circuit denied the Government's petition for rehearing in *Newman* in April 2015, and the Supreme Court denied *certiorari* in October 2015. Around that time, the defendant's current counsel contacted the Government and requested a meeting to discuss *Newman's* impact on Lee's plea. The parties agreed to delay making any determination regarding Lee's plea until the Supreme Court decided whether to accept *certiorari* in another insider-trading case, *Salman* v. *United States*, and then, after the Supreme Court granted *certiorari* in *Salman*, agreed to adjourn sentencing until after *Salman* was decided.

### C. The Demise of *Newman's* "Meaningfully Close Personal Relationship" Test

The Supreme Court in *Salman* rejected the second part of *Newman's* personal benefit holding, relating to pecuniary value. *See Salman* v. *United States*, 137 S Ct. 420, 428 (2016) ("To the extent the Second Circuit [in *Newman*] held that the tipper must also receive something of a pecuniary or similarly valuable nature in exchange for a gift to family or friends, we agree with the Ninth Circuit that this requirement is inconsistent with *Dirks*." (quotation and internal citation omitted)). And more recently, the Second Circuit then explicitly overruled the

12

"meaningfully close personal relationship" language from *Newman*, relying on *Salman*'s reaffirmation of the test and rationale of *Dirks*. *United States v. Martoma*, 869 F.3d 58, 70 (2d. Cir. 2017) (holding that "an insider or tipper personally benefits from a disclosure of inside information whenever the information was disclosed with the expectation that [the recipient] would trade on it, and the disclosure resemble[s] trading by the insider followed by a gift of the profits to the recipient, whether or not there was a meaningfully close personal relationship between the tipper and tippee." (internal citations and quotations omitted)).

### D.  The Defendant Moves to Withdraw His Guilty Plea

The defendant filed the instant motion to withdraw his guilty plea on September 15, 2017.

### DISCUSSION

### I.    Generally Applicable Law

"[S]ociety has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States* v. *Maher*, 108 F.3d 1513, 1529 (2d Cir. 1997) (internal quotation marks omitted); *see also United States* v. *Hyde*, 520 U.S. 670, 676-77 (1997) (observing that permitting "defendant[s] to withdraw [their] guilty plea[s] simply on a lark . . . would degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess.").  Accordingly, a defendant may not withdraw a guilty plea unless he shows "a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  While the "fair and just reason" standard "implies that the motions to withdraw prior to sentence should be liberally granted," a defendant who seeks to withdraw his plea "bears 'the burden of satisfying the trial judge that there are valid grounds for withdrawal, taking into account any prejudice to the government.'"  *United States* v.

*Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992) (quoting *United States* v. *Quinones*, 906 F.2d 924, 928 (2d Cir. 1990) (internal citation omitted)).  The standard is thus a "stringent" one.  *United States* v. *Schmidt*, 373 F.3d 100, 103 (2d Cir. 2004).

In determining whether the defendant has shown a "fair and just reason" to justify withdrawal, a district court "should consider, *inter alia*: (1) the amount of time that has elapsed between the plea and the motion; (2) whether the defendant has asserted a claim of legal innocence; and (3) whether the government would be prejudiced by a withdrawal of the plea." *United States* v. *Doe*, 537 F.3d 204, 210 (2d Cir. 2008) ) (internal citation omitted).  The absence of prejudice to the government is immaterial where the defendant has failed to demonstrate sufficient grounds for a plea to be withdrawn. *See, e.g., United States* v. *Torres*, 129 F.3d 710, 715 (2d Cir. 1997).

"A claim of innocence can be a basis for withdrawing a guilty plea, but the claim must be supported by evidence."  *United States* v. *Hirsch*, 239 F.3d 221, 225 (2d Cir. 2001).  "A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." *Id.* (quotation and internal citation omitted); *see also Blackledge* v. *Allison*, 431 U.S. 63, 73-74 (1977) ("[T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity."); *Adames* v. *United States*, 171 F.3d 728, 732 (2d Cir. 1999) ("A criminal defendant's self-inculpatory statements made under oath at his plea allocution carry a strong presumption of verity, and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." (citations and internal quotation marks omitted)).

14

II.     **The Court Should Reject Lee's Attempt to Withdraw His Plea Based on "Newly-Discovered Evidence"**

Lee first argues that the Court should allow him to withdraw his guilty plea because instant messages produced by the Government (the "Instant Messages") show that he placed most of the Microsoft-Yahoo Trades before the July 10, 2009 call with Sandeep Aggarwal, referenced above.  The Court should reject this argument.  As set forth below, the Instant Messages and other documents attached to Lee's motion demonstrate that Lee remains guilty of trading based on material non-public information.

*First*, there is no serious question that after his call with Aggarwal, the defendant was aware that the Microsoft Insider had provided Aggarwal with confidential information in exchange for a personal benefit.  Aggarwal told Lee that the Microsoft Insider was his "buddy first," who Aggarwal knew "intimately well," Ex. B at 12, and was his son's "favorite uncle," *id*. at 15.  Under *Dirks* itself, and in light of *Salman* and *Martoma's* rejection of *Newman's* "meaningfully close relationship" test, this information is clearly sufficient to show the defendant's knowledge of personal benefit.  *See, e.g.*, *Dirks*, 463 U.S. at 664 ("The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.").

*Second*, there is also no serious question defendant continued to place orders for Yahoo stock after the call with Aggarwal.  On the afternoon of July 10, Lee told the Trader to "do another 100,000 Yahoo," Ex. A. at 4, and, as noted in a footnote in his motion to withdraw, also purchased 25,000 Yahoo shares for his personal trading account, Def.'s Mem. of Law at 10 n.16.  Further, Lee bought over 59,000 shares of additional Yahoo stock on July 14.

*Third*, at the time of the Aggarwal call, information concerning the Microsoft-Yahoo partnership and the timing of an announcement was still material, non-public information.

Aggarwal's disclosure of some of that information to his colleagues at Collins Stewart several hours before the call with Lee and their disclosure of that information to their clients did not render the information public.

"Information becomes public when disclosed to achieve a broad dissemination to the investing public generally and without favoring any special person or group, or when, although known only by a few persons, their trading on it has caused the information to be fully impounded into the price of the particular stock." *SEC* v. *Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (quotations and internal citations omitted).

Here, even if Collins Stewart, prior to 11:30 a.m. on July 10, disclosed to its clients the information Aggarwal had provided earlier that morning, that does not equate to "a broad dissemination to the investing public generally . . . without favoring any special person or group." *Mayhew*, 121 F.3d at 50. Moreover, the information regarding the timing of the potential deal was not "fully impounded" into the price of Yahoo stock at the time of the Lee-Aggarwal call. *Id.* On July 10, 2009, the day of the call, Yahoo opened at $14.78 a share and closed at $14.93 a share, reaching a high of $15.18 a share. (*See* Def.'s Ex. E). However, on July 17, 2009, the morning after the publication of the Microsoft-Yahoo Article, which disclosed details about the potential timing of the deal, Yahoo opened at $16.75 a share, almost two dollars a share higher than it closed on July 10. (*See id.*).

Further, "nonpublic information is information that either is not publicly available or is sufficiently more detailed and/or reliable than publicly available information to be deemed significant, in and of itself, by reasonable investors." *United States* v. *Contorinis*, 692 F.3d 136, 144 (2d Cir. 2012). Here, the information that Aggarwal provided to Lee on the call was "sufficiently more detailed and reliable" than the information Lee had before the call, which

16

purportedly was based on legitimate "channel checks."  (*See* Ex. A at 1).  Not only did Aggarwal

tell Lee that he thought a deal may take place in the next two weeks, but he provided additional

details regarding the source of his information, a "senior" contact at Microsoft, Ex. B. at 4,

information from the Microsoft Insider about "sticking point[s]" in the negotiations, *id.* at 6-7,

and other considerations in a potential Microsoft-Yahoo partnership, *id.* at 7-11.  Indeed, the fact

that Lee apparently repeatedly sought a call with Aggarwal prior to 11:30 a.m. provides further

evidence that he sought "more detailed and/or reliable" information than he had received via

Collins Stewart salespeople.

 *Fourth*, any argument or suggestion that the Government withheld exculpatory

information from the defendant is meritless.  Notably, while Lee claims in his brief that FBI

agents told him he had purchased all 725,000 Yahoo shares after the Aggarwal call, Def.'s Mem.

of Law at 4, that assertion appears nowhere in Lee's sworn declaration.  *Cf. United States* v.

*Hirsch,* 239 F.3d at 225 ("A claim of innocence can be a basis for withdrawing a guilty plea, but

the claim must be supported by evidence.").[2]  Further, based on a review of the Government's

file, it appears the Government did not receive the Instant Messages between Lee and the Trader

until August 15, 2013, i.e., almost a month after Lee's guilty plea, and in any event, the Instant

Messages do not establish Lee's factual innocence (indeed, they are completely consistent with

his guilt).[3]  As such, the Court should reject the defendant's argument that the Government

"fail[ed] to understand, discover, or disclose" exculpatory evidence before Lee's guilty plea.

---

[2] Notably, defense counsel's premise for requesting the Instant Messages in the first place was to
determine how much of Lee's trades occurred before the Aggarwal call and how much occurred
after the call, for the purposes of calculating an appropriate "gain" figure under U.S.S.G. §2B1.1.
(*See* Morvillo Decl. ¶ 8).  This request would make little sense if, prior to receipt of the Instant
Messages, Lee actually believed he purchased all 725,000 shares after the call with Aggarwal.

[3] The Government may have received the Instant Message between Lee and SAC's founder prior
to Lee's guilty plea, although particularly in light of multiple calls between Lee's phone and

*Finally*, even if the Court disagreed with the Government regarding the import of the Instant Messages on the Microsoft-Yahoo Trades, it would at, most, support vacatur of the defendant's plea on Count Two alone.  Lee's motion does not meaningfully address either the 3COM Trades, which are part of the conspiracy charged in Count One, or the Yahoo Earnings Trades, which apply to both Counts.  Particularly with respect to the 3COM Trades, the record evidence strongly undercuts any claim that the defendant is actually innocent of insider trading with respect to those trades.  As noted above, the defendant was aware of his tipper's relationship with high-level 3COM executives and took steps to conceal the nature of that relationship from SAC Compliance personnel before making trades in 3COM stock.  While Lee's brief claims that Government stated in 2015 "that it was unaware of any personal benefit or knowledge of personal benefit related to the 3COM Trade," Def.'s Mem. of Law at 6, that assertion (again) does not appear in a sworn affidavit, and the primary Assistant U.S. Attorney responsible for the case at that time has no recollection of making such an assertion.

***

---

Collins Stewart around the time of that message, that message is also not inconsistent with Lee having access to material, non-public information.  This case is therefore distinguishable from *United States* v. *Millan Colon*, 829 F. Supp. 620 (S.D.N.Y. 1993), relied on by the defendant.  In that case, the district court allow two defendants to withdraw their pleas because the Government failed to disclose before the guilty pleas that its key law enforcement witnesses were themselves subjects of a federal narcotics investigation (and were ultimately charged in that investigation), information that was clearly *Giglio* material.  829 F. Supp. at 635-36.  In addition, in his plea agreement, Lee waived his right to receipt of *Brady* and *Giglio* material "other than information establishing the factual innocence of the defendant."  As set forth above, none of Instant Messages establish Lee's factual innocence.  At most they constitute "sentencing *Brady*," provided so that the defendant could properly argue which trades occurred before the illicit conversation with Aggarwal and which occurred after for purposes of calculating the Guidelines.

Accordingly, the record evidence still establishes that Lee traded in Yahoo stock while in possession of material non-public information regarding the Microsoft-Yahoo partnership, and Lee's motion provides no basis to vacate his plea with respect to the 3COM Trade or Yahoo Earnings Trade.  Accordingly, his purported innocence does not provide a basis to withdraw his plea on either count of the Information.

## III.     "Legal Developments" Since the Plea Do Not Provide a Basis for Withdrawal

Lee also argues "legal developments" in insider trading law since his plea also provide a basis for withdrawal.  The Court should reject this argument as well.

*First*, while the defendant purports to rely on a "change in law" between the time of his guilty plea and the present,[4] the defendant's only real legal argument is that "his plea is insufficient under *Dirks* v. *SEC*"[5]—a case decided 20 years before he pled.  Thus, case law allowing a defendant to withdraw a guilty plea based on a change in law provides no support for Lee here.

*Second*, and in any event, the challenged portion of the defendant's plea largely tracks language from *Dirks* itself.  In *Dirks*, the Supreme Court explained that "a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Dirks*, 463 U.S. at 660.  Here, the defendant admitted under oath that he had "traded while in possession of material nonpublic information that I had received from others under circumstances where I knew, or had reason to believe, other persons had breached a fiduciary

---

[4] (Def.'s Mem. of Law at 19).

[5] (Def.'s Mem. of Law at 21).

duty or a duty of confidentiality." (Tr. 21).[6]  Thus, the defendant admitted that he traded while

in possession of material, non-public information in circumstances where he knew he received

that information from an insider's breach of duty, i.e., the circumstances *Dirks* outlined for

imposing liability on tippees.

*Third*, there is an adequate factual basis in the plea to find that Lee possessed the

requisite knowledge of personal benefit.   The defendant admitted that he "knew, or had reason

to believe" that the people who provided him with material non-public information had breached

"a fiduciary duty." (Tr. 21).  The insider's breach of "fiduciary duty" consists of the exchange of

confidential information in return for a personal benefit. *Dirks*, 463 U.S. at 662 ("Absent some

personal gain, there has been no breach of duty to stockholders.").  As such, the defendant's

knowledge of a breach of fiduciary duty is sufficient to encompass his knowledge of personal

benefit.

The Court should reject the defendant's argument that his addition of the phrase "or a

duty of confidentiality" provides a basis to withdraw his plea.  To be sure, the first part of

*Newman's* holding, which has not been overruled, states "the insider's disclosure of confidential

---

[6] To the extent the defendant complains that the "had reason to believe" language is not the same as knowledge, it properly describes the necessary factual predicate for conscious avoidance. *See, e.g.*, *United States* v. *Goffer*, 721 F.3d 113, 126-27 (2d Cir. 2013) (explaining, in affirming giving of conscious-avoidance instruction in insider-trading case, that the necessary factual predicate existed when tippee was "aware of a high probability that the 3Com tip came from an insider and chose to avoid confirming that fact . . . ."). Here, having been put on ample notice that the information was being provided in breach of a duty, Lee did not attempt to learn the truth or even do nothing.  Instead, he actively engaged in efforts to ensure others would not realize that Lee had illicit sources with access to inside information.  For example, as discussed above, Lee admitted to the Government that, when seeking the SAC Compliance Department's approval to trade in 3COM stock, he failed to disclose that the source of his information had high-level relationships at 3COM and that the email exchange between tipper and his colleague was transparently just for appearances, i.e., to create a (false) record that tipper's statements regarding a potential merger with Hewlett Packard were not based on material, non-public information.

information, standing alone, is not a breach" of fiduciary duty, without personal benefit. 773 F.3d at 448. However, the question here is whether there was "a factual basis for the plea," Fed. R Crim. P. 11(b)(3), not whether a defendant's plea can be finely parsed four years later to suggest he is not actually guilty of the charged offenses. *See United States* v. *Matos-Quinones*, 456 F.3d 14, 21 (1st Cir. 2006) (explaining that "Rule 11 does not require a test of guilt versus innocence, much less proof beyond a reasonable doubt that the defendant is in fact guilty. The idea is for the district court to ensure that there is, on the record as it stands at the time of the plea, a reasoned basis to believe that the defendant actually committed the crime to which he is admitting guilt." (citations and quotations omitted)).

Here, the defendant's under-oath statements, which "carry a strong presumption of verity, and are generally treated as conclusive in the face of the defendant's later attempt to contradict them," *Adames* v. *United States*, 171 F.3d at 732 (quotation and internal citation omitted), covered all the elements of insider trading, including his knowledge of a "breach of fiduciary duty." Indeed, the prepared allocution closely tracked language from *Dirks*. And after allocuting, the defendant acknowledged he was pleading guilty because he was in fact guilty. (Tr. 23).[7] Accordingly, the Court should reject the defendant's argument that "developments in insider trading cases," provide a basis to withdraw his plea and his argument that his plea was insufficient under the law at the time.

---

[7] Although the court must consider the sufficiency of the allocution of the time of the defendant's guilty plea, *see United States* v. *Adams*, 448 F.3d 492, 500 (2d Cir. 2006), the July 10 Aggarwal Call, discussed above makes clear that the defendant is not, in fact, actually innocent of the charges. As discussed above, after that call, the defendant traded while in possession of material, non-public information that he unquestionably knew had been provided by the Microsoft Insider in return for a personal benefit.

**IV.    The Court Should Also Deny the Motion Because of the Passage of Time and the Prejudice to the Government**

In addition, the Court should deny the motion because of the passage of time since Lee's plea and, relatedly, because of prejudice to the Government.

*First*, the amount of time since the defendant's guilty plea weighs against withdrawal. The Second Circuit has repeatedly found that delays of even five to seven months support upholding the original plea. *See United States* v. *Doe*, 537 F.3d at 213 (finding that the defendant's five-month delay in filing his motion "strongly supports the district court's finding that his plea was entered voluntarily"); *United States* v. *Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992) ("Gonzalez's assertion of his innocence is undercut by its timing, coming nearly seven months after the plea."); *Torres*, 129 F.3d at 715) (seven-month delay counseled against entertaining defendant's motion).

Here, more than four years have passed since the defendant's plea.  While defense counsel asserts that, after the parties agreed to "to wait to make any determinations about Mr. Lee's case until the Supreme Court issued its decision in *Salman*" and "[i]n deciding to wait, the government agreed not to argue undue delay . . . .," Morvillo Decl. ¶ 6, the defendant's motion in no way relies on *Salman*.

The delay is particularly lengthy given that the defendant is contending his allocution was insufficient under *Dirks*, decided two decades before the defendant's guilty plea, and, also, to the extent he contends his allocution was insufficient under *Newman*.  Notably, the case the defendant cites for the proposition that defendants have been allowed to withdraw their pleas based on *Newman*—*United States* v. *Conradt, et al*, No. 12 Cr. 887 (ALC) (S.D.N.Y. Jan. 22, 2015)—was decided almost three years ago.  In short, the *Dirks* and *Newman*-based arguments the defendant now asserts could have been asserted at the 2013 plea allocution or, at the latest,

22

after the Second Circuit decided *Newman* in 2014.  The defendant's delay in raising these arguments further supports denial of his motion.

*Second*, and relatedly, while the Government need not show prejudice to defeat a motion to withdraw, *United States* v. *Gonzalez*, 970 F.2d at 1100, there would be prejudice to the Government here.  While Lee contends the Government does not "have to deal with . . . reconstruction of its case[] or much additional investigation," Def.'s Mem. of Law at 24, that is simply not accurate.  Had Lee not swore under oath that he was in fact guilty of the charged offenses and executed a plea agreement, in which he also confirmed his guilt, the Government would have likely continued pursuing additional evidence of insider trading by Lee.  Notably, when Lee met with the Government, he admitted regularly receiving information from certain industry contacts, in addition to those discussed above, although he had difficulty distinguishing between trades that he understood were based on material, non-public information and trades where he became suspicious about the source of the information only after the fact.  While evidence of these other trades would likely be admissible at any trial as direct proof of the charged conspiracy, the Government now faces significant challenges in further investigating those trades, many of which occurred in 2009 and 2010.

Accordingly, the Court should also deny Lee's motion to withdraw because of the passage of time since Lee's guilty plea and the prejudice to the Government from allowing Lee to proceed to trial at this late date.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendant's motion to withdraw his plea should be denied.

Dated:  New York, New York
        September 29, 2017

                                      Respectfully submitted,

                                      JOON H. KIM
                                      United States Attorney
                                      for the Southern District of New York

By:                                   
                                      Brendan F. Quigley
                                      Assistant United States Attorney
                                      Tel.:  (212) 637-2190