UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

RICHARD LEE,

Defendant.

**ORDER**

13 Cr. 539 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On July 23, 2013, Defendant Richard Lee pled guilty to conspiracy to commit securities fraud and securities fraud. (Dkt. No. 2) Pending before the Court is Lee's motion to withdraw his guilty plea. (Dkt. No. 42) Lee argues that information provided by the Government in May 2017 demonstrates that he is innocent. In the alternative, Lee contends that had he known this information, he would not have pled guilty. Finally, Lee contends that his guilty plea is insufficient based on developments in insider trading law concerning the "personal benefit" requirement.

The Court concludes that the evidence cited by Lee does not demonstrate that he is innocent, nor has Lee demonstrated that he would not have pled guilty had he known the information he knows now. However, the Court finds that – given developments in insider trading law since Lee's plea was taken in 2013 – his guilty plea is insufficient. Accordingly, Lee's guilty plea will be vacated on grounds of insufficiency.

## BACKGROUND

### I.   LEE'S GUILTY PLEA

On July 23, 2013, Lee pled guilty to an information charging him with conspiracy to commit securities fraud and securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff; and 17

C.F.R. Parts 240.10b-5 and 240.10b5-2. (Information (Dkt. No. 2) ¶¶ 6, 11)  According to the

Information, Lee was a portfolio manager at SAC Capital Advisors LP, an investment advisor

headquartered in Stamford, Connecticut that managed the assets of a group of affiliated funds.

(Id. ¶ 1)  Lee worked at SAC Capital's Manhattan office from approximately April 2009 to June

2011, and at SAC Capital's Chicago office from approximately September 2012 through March

2013.  (Id.)  During that time, Lee managed or co-managed a portfolio that focused on "special

situations," such as "mergers, acquisitions, private equity buy-outs, and corporate structurings in

publicly traded companies across various industry sectors."  (Id. ¶ 2)

   The Information alleges that Lee "conspired to engage in insider trading"; that he

"obtained Inside Information directly and indirectly from individuals who worked at public

companies and investment firms"; that this information "was disclosed or misappropriated in

violation of duties of trust and confidence"; and that

> [o]n the basis of the Inside Information, [Lee] . . . and others known and
> unknown, executed trades and caused others to execute trades in the securities of
> numerous public companies across multiple sectors of the economy, earning
> millions of dollars in illegal profits.  For example, on various occasions in 2009,
> [Lee] obtained Inside Information from multiple sources about Yahoo, Inc. . . .
> Specifically, [Lee] received, among other things, information about Yahoo's
> earnings and a planned corporate partnership, and then executed trades and caused
> others to execute trades in whole or in part on the basis of this Inside Information.

(Id. ¶¶ 3, 5)

   During his guilty plea proceeding, Lee provided the following factual allocution:

> Your Honor, from April 2009 through May of 2011 I was employed as a portfolio
> manager at SAC Capital Advisors LP in New York.  As a portfolio manager, my
> job was to buy and sell securities on behalf of investment funds managed by SAC.
>
> . . .
> .
> On a number of occasions, I traded while in possession of material nonpublic
> information that I had received from others under circumstances where I knew, or

had reason to believe, other persons had breached a fiduciary duty or a duty of confidentiality.

For example, on one occasion in April 2009, at my urging, somebody I knew provided me with a copy of an earnings release for Yahoo Incorporated before that earnings release was made public, I thereafter traded in Yahoo before that release was made public. I knew at the time I should not have traded on that information, but I did anyway.

On another occasion in July 2009, I obtained material nonpublic information by Yahoo from a sell-side analyst. I thereafter traded while in possession of that information. I knew at the time it was wrong for me to trade.

On another occasion in November 2010, I obtained material nonpublic information about a company called 3Com Corporation through a consultant. I thereafter traded while in possession of that information. I knew at the time it was wrong for me to trade.

. . .

In each of the instances that I cited, I believe each of the individuals that had given me that information gave it with the understanding that they knew I would trade on that information.

(July 23, 2013 Plea Tr. (Dkt. No. 44-1) at 114, 115, 117)[1]

## II.   **EVIDENCE CONCERNING LEE'S JULY 2009 YAHOO TRADES**

In connection with the instant motion, the parties have submitted evidence relating to the July 2009 Yahoo trades Lee referenced during his allocution. This evidence shows that – at some point before 9:13 a.m. on July 10, 2009 – Lee learned that Collins Stewart – an investment research firm (see Lee Aff. (Dkt. No. 45) ¶ 12)[2] – was advising its clients that a Microsoft-Yahoo partnership transaction was likely to take place within two weeks. (Id.) At 9:13 a.m., Lee sent the following instant message to the head of SAC Capital, Steven A. Cohen:

---

[1]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

[2]  According to Collins Stewart's 2010 Annual Report, it is a "leading independent international financial advisory group" providing services in the areas of wealth management, securities, corporate broking, and corporate advisory. (Annual Rpt. (Dkt. No. 44-1) at 13)

Hi Steve, just tried reaching you on your cell Re [Yahoo]. I mentioned the Collins Stewart call on [Yahoo] this morning, they seem to think something might happen within 2 wks. We have no view regarding this but 1) Collins Stewart has been the only broker in line with our views regarding the initial "coldness" of discussions and now they are the only broker to turn positive regarding the discussions. We're trying to be price sensitive as we think upside might be $17.50-$19 on a deal, depending on the split of economics between [Yahoo] and [Microsoft] (many possible permutations...)

(Morvillo Decl., Ex. B (Lee-Cohen IM) (Dkt. No. 44-1) at 4)

At 9:38 a.m., an SAC Capital trader forwarded to Lee an excerpt of an instant message from a Collins Stewart employee. The Collins Stewart employee states: "Sandeep, my [Microsoft-Yahoo] analyst is making a major call that the recently cooled off [Microsoft-Yahoo] talks have heated back up in a big way. He believes it's possible something could happen in the next week or two based on his channel checks as [Yahoo] has come back to the table since Bing has debuted to strong [market] share gains." (Trader Chat (Dkt. No. 44-1) at 6)

At 9:50 a.m., Lee told his SAC Capital trader to buy 100,000 shares of Yahoo (id.); at 9:58 a.m., Lee told his trader to buy another 100,000 shares of Yahoo (id. at 7); and at 10:48 a.m., Lee told his trader to purchase another 500,000 shares of Yahoo. (Id.) At 11:16 a.m., Lee told the trader that "[t]hese Collins Stewart people are frustrating. Can you ask them to have their Analyst on [Yahoo] give us a call?" (Trader Chat II (Dkt. No. 46-1) at 4) At 11:39 a.m., the trader told Lee that he had purchased 450,000 shares of Yahoo. Lee responds that he is "[t]alking to guy [Collins Stewart analyst Aggarwal] now." (Id.; see also Def. Br. (Dkt. No. 43) at 13)

During Aggarwal's telephone call with Lee (the "Aggarwal Call"), Aggarwal tells Lee:

[L]ate last night I spoke with one of – another guy, he's a senior guy at Microsoft . . . . [H]e has been very, very accurate in the past, uh, in terms of, you know, telling me what's going on. . . . [H]e told me last three days there is a senior team

4

from Yahoo of this thing Redmond Microsoft headquarter, and these are like a
CEO director post type of people who are meeting Yusuf Mehdi and Qi Lu, who
are the two senior most people in Microsoft internet business. . . . [A]nd basically
they are re-engaged in talks, and the level of seriousness is much higher than the
second half of the previous negotiation which ended third week of June.

(Aggarwal Transcript (Dkt. No. 46-2) at 5-6)

Aggarwal goes on to say that his Microsoft source

did not give me exact timing, uh, in terms of exact dates, etc. And our – but he
said that it is possible that they announce something from now in next two weeks.
But they share more details subsequently, so there may be announcement that
Yahoo and Microsoft have agreed to do a commercial agreement for such and
display, and then maybe they share more details when Microsoft has analysts' day
early in July.

(Id. at 6-7)

Lee and Aggarwal then discuss sticking points in the Microsoft-Yahoo

negotiations (id. at 7-12); how Aggarwal knows the information he is providing; and how

confident Aggarwal is in his source. (Id. at 12-16) Aggarwal states that his source is "my buddy

first. . . . I don't call him my channel check or industry contact, he's my buddy first. . . . I've

known him intimately well. . . . I've known him before even he joined Microsoft." (Id. at 13)

Aggarwal also says, "when I lived in Seattle for my son he was his favorite uncle. . . . He's not

going to tell me something which . . . can be more damaging for me rather than benefitting me."

(Id. at 16) Lee responds, "got it. Understood." (Id.) Aggarwal also says that his Microsoft

source "reached out to me because I had a little agreement with him that if anything changes,

he's going to probably, you know, reach out to me." (Id.)

Lee responds, "we appreciate more than anything when we . . . speak to our

counter parties, just . . . being able to get the facts and the data. . . . I think often times

counterparties feel like, you know, we want to . . . just throw a bunch of ideas at you, and then

5

the ones that . . . work, we can say 'oh look, you know, we helped you make money,' . . . [s]o

we . . . pay you for . . . that." (Id. at 17)

At 2:24 p.m., Lee's trader reports that he has purchased 575,000 shares of Yahoo

(of the 700,000 shares Lee had requested), taking the total position to $3.75 million. (Trader

Chat (Dkt. No. 44-1) at 9) Lee instructs the trader to purchase another 100,000 shares of Yahoo.

(Id.) Lee then instructs the trader to take the Yahoo position to a total of $3.9 million. (Id.) In

total, Lee purchased 725,000 shares of Yahoo stock for his SAC Capital portfolio. (Id. at 10)

The Government asserts – and Lee does not dispute – that Lee also bought 25,000 Yahoo shares

for his personal account after the call with Aggarwal. (Gov't Opp. (Dkt. No. 46) at 9; Lee Reply

(Dkt. No. 47) at 7)

## III.   THE GOVERNMENT'S DISCLOSURE OF LEE'S
##        9:13 A.M. INSTANT MESSAGE TO COHEN,
##        AND LEE'S MOTION TO WITHDRAW HIS PLEA

In preparation for sentencing, Lee asked the Government to provide certain

documents necessary to calculate the gain resulting from Lee's alleged insider trading in Yahoo

stock. (Def. Br. (Dkt. No. 43) at 10) In May 2017, the Government produced to the defense

Lee's July 10, 2009, 9:13 a.m. instant message to Cohen – set forth above – in which Lee tells

Cohen that Collins Stewart has told its clients that morning that a Microsoft-Yahoo transaction

may occur (the "Lee-Cohen IM"). (Id. at 10-11)

Lee states that production of the Lee-Cohen IM was the "catalyst for [Lee's]

motion to withdraw [his plea]." (Id.) Lee argues that this IM shows that

> well in advance of the Aggarwal Call, Mr. Lee learned – from a source other than Mr.
> Aggarwal himself – the same information that the government deemed to be material and
> nonpublic. The critical import of the Cohen IM is clear: more than two hours before the
> Aggarwal Call, Mr. Lee learned that Collins Stewart disclosed to its clients that one of its
> analysts expected the long-rumored Yahoo/Microsoft search partnership to happen within

6

about two weeks; that Mr. Lee relayed the information to Mr. Cohen; and that Mr. Lee indicated his intent to trade.

(Id. at 11-12) (footnote omitted)

> In moving to withdraw his plea, Lee contends that
>
> 1. "newly discovered evidence" – the Lee-Cohen IM – demonstrates that he is innocent;
>
> 2. had he been aware of the Lee-Cohen IM, he would not have pled guilty; and
>
> 3. in any event, his plea is now insufficient, given "developments in [insider trading] law since the time of his plea."

(Def. Br. (Dkt. No. 43) at 14-22)

## DISCUSSION

## I.   NEWLY DISCOVERED EVIDENCE

Fed. R. Crim. Proc. 11(d)(2)(B) provides that "[a] defendant may withdraw a plea of guilty . . . if the defendant can show a fair and just reason for requesting the withdrawal." "In general, to determine whether the defendant has shown a 'fair and just reason' to justify withdrawal, a district court considers ... (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion . . . ; and (3) whether the government would be prejudiced by a withdrawal of the plea." United States v. Rivernider, 828 F.3d 91, 104 (2d Cir. 2016) (quoting United States v. Schmidt, 373 F.3d 100, 102-03 (2d Cir. 2004)). While the "fair and just" standard implies that "motions to withdraw prior to sentence should be liberally granted," United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992), "a defendant who seeks to withdraw his plea 'bears "the burden of satisfying the trial judge that there are valid grounds for withdrawal."'" Id. (quoting United States v. Quinones, 906 F.2d 924, 928 (2d Cir. 1990)).

## A.  **Innocence and Voluntariness**

"A claim of innocence can be a basis for withdrawing a guilty plea, but the claim must be supported by evidence. 'A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.'" United States v. Hirsch, 239 F.3d 221, 225 (2d Cir. 2001) (quoting United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997)).  Similarly, "[a] criminal defendant's self-inculpatory statements made under oath at his plea allocution 'carry a strong presumption of verity,' and are generally treated as conclusive in the face of the defendant's later attempt to contradict them." Adames v. United States, 171 F.3d 728, 732 (2d Cir. 1999) (quoting United States v. Maher, 108 F.3d 1513, 1530 (2d Cir. 1997)).

Lee argues that the Lee-Cohen IM demonstrates that he is innocent, because it shows that most of the Yahoo trades he made on July 10, 2009 were made before his 11:39 a.m. call with Aggarwal.  (See Def. Br. (Dkt. No. 43) at 4-5)  According to Lee, he became aware – two hours before his call with Aggarwal – that Collins Stewart had told its clients that the Microsoft-Yahoo transaction would likely proceed in two weeks' time.  Collins Stewart's position concerning the likelihood of a Microsoft-Yahoo deal was public information, because it had been widely distributed to Collins Stewart's clients.  (See id. at 17-21)  According to Lee, he did not know at the time of his guilty plea that – of the 725,000 Yahoo shares he purchased on July 10, 2009 for SAC Capital's account – 700,000 shares were purchased before his call with Aggarwal.  Lee further states that had he known of this sequence of events, he would have not pled guilty, because almost all his trades were made on the basis of publicly available information.  (Lee Aff. (Dkt. No. 48) ¶ 6)

8

Lee maintains that – at the time of his guilty plea – he understood that the

sequence of events was as follows:

- At approximately 11:30 a.m., Lee spoke with Aggarwal;

- Aggarwal disclosed material nonpublic information to Lee (that Yahoo and Microsoft were likely to enter into a partnership deal within approximately two weeks); and

- In the aftermath of that call, Lee purchased 725,000 shares of Yahoo stock in his SAC portfolio.

(Def. Br. (Dkt. No. 43) at 5)  According to Lee, FBI agents told him – prior to his guilty plea –

that he had "purchased approximately 700,000 shares of Yahoo stock" after his call with

Aggarwal.  (Lee Aff. (Dkt. No. 48) ¶ 3)

Based on documents the Government provided after Lee's guilty plea and in

connection with sentencing, however, Lee understands the sequence of events to be as follows:

- Before 9:13 am, Lee learned that Collins Stewart had informed its clients that Yahoo and Microsoft were likely to enter into an internet search partnership deal within approximately two weeks;

- At 9:13 am, Lee sent an instant message to his then-boss, Steven Cohen, sharing this information and indicating that Lee intended to purchase Yahoo shares to add to his already substantial position at SAC;

- At 9:38 am, a trader at SAC informed Lee via instant message that sales representatives from Collins Stewart were disseminating the Yahoo/Microsoft information via instant message and, in fact, sent part of it to Lee;

- Between 9:50 am and 11:00 am, Lee instructed his trader at SAC to purchase 700,000 shares of Yahoo;

- At 11:30 am (30 minutes after his last order to purchase shares) Lee spoke with Aggarwal and received the same information he received over two hours prior from at least two separate sources;

- After the call with Aggarwal, Lee ordered another 100,000 shares of Yahoo stock, and subsequently cancelled 75,000 of those shares.

(Def. Br. (Dkt. No. 43) at 5-6)

9

In response, the Government argues that "there is no serious question that after [Lee's] call with Aggarwal, the defendant was aware that the Microsoft Insider had provided Aggarwal with confidential information in exchange for a personal benefit" (Gov't Opp. (Dkt. No. 46) at 19), and that "there is also no serious question defendant continued to place orders for Yahoo stock after the call with Aggarwal." (Id.) The Government further contends that although Aggarwal had disclosed some information regarding the Microsoft-Yahoo deal to his Collins Stewart colleagues prior to his 11:39 call with Lee, certain of the information Aggarwal shared with Lee during the 11:39 call remained material, non-public information. (Id. at 19-21)

As to voluntariness, the Government argues that it did not withhold exculpatory information from Lee. (Id. at 21) The Government states that it "did not receive the Instant Messages between Lee and [his] [t]rader until August 15, 2013, [i.e.], almost a month after Lee's guilty plea. The Government further contends that neither these IMs nor the Lee-Cohen IM "establish Lee's factual innocence." According to the Government, these communications are "completely consistent with his guilt." (Id.)

Finally, the Government argues that Lee does not address the 3Com trades or the July 2009 Yahoo earnings-related trades that are charged in the Information, and which are also the subject of Lee's plea allocution. (Id. at 22)

### 1. Whether Lee Has Demonstrated That He Did Not Trade On Material Non-Public Information

#### a. Whether the Information Lee Obtained Prior to the Aggarwal Call Was Public Information, and Whether Lee Obtained Material Non-Public Information During the Aggarwal Call

During his plea allocution, Lee admitted that he traded on material non-public information. (July 23, 2013 Tr. (Dkt. No. 44-1) at 115 ("On a number of occasions, I traded while in possession of material non[-]public information.")) As to Lee's purchase of Yahoo

10

shares after he learned of a potential Microsoft-Yahoo transaction, Lee stated: "I obtained

material nonpublic information by Yahoo from a sell-side analyst. I thereafter traded while in

possession of that information. I knew at the time it was wrong for me to trade." (Id.) As

discussed above, this Court is required to give weight to Lee's statements that he traded while in

possession of material non-public information with respect to a potential Microsoft-Yahoo

transaction in July 2009.

Moreover, Lee has not demonstrated that the information he obtained before the

Aggarwal Call was public. Lee argues that "[t]here is empirical data to suggest that a large

number of investors knew the Yahoo/Microsoft information from Collins Stewart and traded on

it. The price of Yahoo stock rose during pre-market activity and continued to rise throughout the

early morning while Mr. Lee was trading." (Def. Br. (Dkt. No. 43) at 20) Lee further contends

that "the fact that the Yahoo stock price increased in the wake of Collins Stewart disclosing the

Aggarwal information suggests that a number of institutional investors knew and traded on the

information, and thus [the information] was 'fully impounded' into the stock price." (Def. Br.

(Dkt. No. 43) at 21) Information is not "fully impounded" into the price of a stock if the price is

rising as one is trading, however. At best, the information is in the process of being

"impounded" into the share price by virtue of the trades that are contemporaneously occurring.

Lee cites United States v. Contorinis, 692 F.3d 136 (2d Cir. 2012) for the

proposition that "information is . . . deemed public if it is known only by a few securities

analysts or professional investors. This is so because their trading will set a share price

incorporating such information." Id. at 143; see Def. Br. (Dkt. No. 43) at 20. It is not enough

that multiple institutional investors had received Collins Stewart's tip that a Microsoft-Yahoo

transaction was imminent, however, even where some of these investors had traded on this

11

information. As stated in SEC v. Mayhew, 121 F.3d 44 (2d Cir. 1997), "[i]nformation becomes public when disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,' or when, although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular stock.'" Id. at 50 (quoting Dirks v. SEC, 463 U.S. 646 653 n.12 (1983); United States v. Libera, 989 F.2d 596, 601 (2d Cir. 1993)).

Lee contends that during Collins Stewart's July 10, 2009 "morning call," the firm disclosed that a Microsoft-Yahoo partnership would likely be consummated in the next two weeks. Lee further asserts that, "[f]ollowing that call, but before the market opened, Collins Stewart sales representatives began disseminating Mr. Aggarwal's information to its clients." (Def. Br. (Dkt. No. 43) at 11 n.4) Lee also notes that – according to Collins Stewart's 2010 annual report – the firm employs 800 people and has 400 institutional clients. (Id.)

This evidence does not demonstrate that the information Lee obtained prior to the Aggarwal Call was public at the time he received it. There is, for example, no evidence as to how many or which Collins Stewart clients received this information, or when they received it. Accordingly, there is no basis for this Court to find that the information Lee obtained had been widely disseminated. Moreover, any disclosure that was made by Collins Stewart was made to a "special group" – Collins Stewart's clients. And, as noted above, Yahoo's share price continued to rise while Lee was trading, demonstrating that the information he had obtained was not "fully impounded" into the share price.

Finally, even if the trades Lee engaged in before the Aggarwal Call were made on the basis of public information, Lee continued to trade in Yahoo stock after the 11:39 Aggarwal Call. During the afternoon of July 10, Lee purchased another net 25,000 shares of Yahoo for

12

SAC Capital and another 25,000 shares for his personal account. (Def. Br. (Dkt. No. 43) at 19 &
n.10)) Although Lee states that "he did not learn any new information on [the Aggarwal] Call
that induced him to purchase additional shares" (id. at 19), the transcript of that call refutes that
assertion.

Prior to the Aggarwal Call, Lee sent a 9:13 a.m. IM to Steven Cohen reporting
that – in an earlier Collins Stewart call that morning about a potential Microsoft-Yahoo
transaction – the firm had expressed that "something might happen within 2 [weeks.]" (Lee-
Cohen IM (Dkt. No. 44-1) at 4). Lee's trader then sent Lee an excerpt of a message from a
Collins Stewart sales rep: "Sandeep, my [Microsoft-Yahoo] analyst is making a major call that
the recently cooled off [Microsoft-Yahoo] talks have heated back up in a big way. He believes
it's possible something could happen in the next week or two based on his channel checks as
[Yahoo] has come back to the table since Bing has debuted to strong [market] share gains."
(Trader Chat (Dkt. No. 44-1) at 6)

During the Aggarwal Call, however, Aggarwal provides Lee with significantly
more detailed information concerning his basis for predicting a Microsoft-Yahoo transaction:

> [L]ate last night I spoke with one of – another guy, he's a senior guy at Microsoft.
> . . . [H]e has been very, very accurate in the past, uh, in terms of, you know,
> telling me what's going on. . . . [H]e told me last three days there is a senior team
> from Yahoo of this thing Redmond Microsoft headquarter, and these are like a
> CEO director post type of people who are meeting Yusuf Mehdi and Qi Lu, who
> are the two senior most people in Microsoft internet business. . . . [A]nd basically
> they are re-engaged in talks, and the level of seriousness is much higher than the
> second half of the previous negotiation which ended third week of June.

(Aggarwal Transcript (Dkt. No. 46-2) at 5-6)

Aggarwal goes on to say that his highly-placed source at Microsoft

> did not give me exact timing, uh, in terms of exact dates, etc. And our – but he
> said that it is possible that they announce something from now in next two weeks.
> But they share more details subsequently, so there may be announcement that

13

Yahoo and Microsoft have agreed to do a commercial agreement for such and display, and then maybe they share more details when Microsoft has analysts' day early in July.

(Id. at 6-7)

Aggarwal thus provides Lee with specific information regarding his well-placed Microsoft source, as well as details regarding the high-level talks then taking place between the two companies. Accordingly, even assuming arguendo that the information Lee received before the Aggarwal Call was public, after the Aggarwal Call Lee possessed material non-public information, and he nonetheless ordered a net 25,000 Yahoo shares for SAC Capital's account and 25,000 Yahoo shares for his personal account.

### b.   Lee's 3Com Trades and Yahoo Earnings-Related Trading

Count One of the Information – which charges conspiracy to commit securities fraud – is predicated on Lee's alleged unlawful trading in connection with a possible Microsoft-Yahoo transaction; Yahoo earnings; and 3Com. (Information, ¶¶ 5, 9)  Count Two of the Information – which charges substantive securities fraud – is premised on Lee's alleged unlawful trading related to a possible Microsoft-Yahoo transaction and Yahoo earnings. (Id.)[3]  Lee's

---

[3]  The parties disagree as to whether Count Two encompasses Lee's earnings-related trading in Yahoo stock. (Compare Def. Br. (Dkt. No. 43) at 8 ("Count [Two] . . . relates to [Lee's] purchase of Yahoo stock following the Aggarwal Call in July 2009. . . .") with Gov't Opp. (Dkt. No. 46) at 11 ("The conduct charged in Count Two covered both the Yahoo Earnings Trades and the Microsoft-Yahoo Trades.")  The Information alleges that "LEE caused the SAC Hedge Fund to execute securities transactions based in part on Inside Information LEE obtained about Yahoo." (Information (Dkt. No. 2) ¶ 11)  The Information also states that "on various occasions in 2009 LEE obtained Inside Information from multiple sources about Yahoo, Inc. ('Yahoo'), which trades on the NASDAQ stock exchange. Specifically, LEE received, among other things, information about Yahoo's earnings and a planned corporate partnership." (Id. ¶ 5)  These allegations from Count One of the Information are incorporated by reference in Count Two. See id. ¶ 10. Accordingly, the conspiracy and substantive securities fraud counts charge Lee with unlawful trading both in connection with the potential Microsoft-Yahoo transaction and in connection with Yahoo's earnings.

current motion is premised on alleged new information concerning Lee's trading related to a potential Microsoft-Yahoo transaction; Lee does not address the additional factual bases for his guilty plea to Counts One and Two.

Instead of offering evidence that he is innocent of unlawful trading in 3Com stock and in connection with Yahoo's earnings, Lee argues that "but for his plea to the July [2009] [Microsoft-Yahoo] Trade charged in Count [Two], Mr. Lee would not have entered a guilty plea with respect to the conspiracy alleged in Count [One]." (Def. Br. (Dkt. No. 43) at 22) According to Lee, "it is the July Yahoo Trade based on the Aggarwal Call that is the catalyst for the government's investigation into Mr. Lee, and, in turn, it was the July Yahoo Trade that propelled Mr. Lee toward a guilty plea. Had Mr. Lee understood the true facts underlying the July Yahoo Trade, he would have taken a very different view of his case holistically." (Id.)

This is an argument not of innocence but of regret, and regret is not an appropriate basis for withdrawal of a guilty plea. See Gonzalez, 970 F.2d at 1100 ("The fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea."); see also United States v. Doe, 537 F.3d 204, 212 (2d Cir. 2008) (same).

In contending that he would not have pled guilty had he known all the evidence he is aware of today (see Def. Br. (Dkt. No. 43) at 15-16, 21-22), Lee cites United States v. Millan-Colon, 829 F. Supp. 620 (S.D.N.Y. 1993). In that case, the court stated that "'even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.'" Id. at 635 (quoting

15

Miller v. Angliker, 848 F.2d 1312, 1320 (2d Cir. 1988)).[4] Evidence is material if "there is a reasonable probability that 'but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial.'" Id. (quoting Tate v. Wood, 963 F.2d 20, 24 (2d Cir. 1992)).

In Millan-Colon, two defendants moved to withdraw their guilty pleas after the Government disclosed that a police officer involved in the underlying investigation had been charged with drug trafficking. Id. The court found that the evidence withheld by the Government was material because there was a "reasonable probability" that had the defendants been aware of the police misconduct, they "would not have entered their guilty pleas, but instead, would have gone to trial." Id. at 635-36.

Here, Lee argues that there is "far more than a 'reasonable probability'" that he would have not pled guilty had he known of the information regarding the timing of his trades and the extent to which the alleged material non-public information had been disseminated. Indeed, Lee contends that it is a "certainty" that he "would not have pled guilty to the instant charges." (Def. Br. (Dkt. No. 43) at 21)[5]

---

[4] To the extent Lee makes a Brady claim, any such claim is barred by his plea agreement. In the plea agreement, Lee "waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, Jencks Act material, exculpatory material pursuant to Brady v. Maryland, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to Giglio v. United States, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement." (July 22, 2013 Plea Agreement at 3)

[5] Lee does not argue that the Government deliberately withheld material exculpatory information from him before his guilty plea (Def. Reply (Dkt. No. 47) at 4 n.2), nor does he contend that the Government intentionally misled him about the timing of his trades. (Def. Br. (Dkt. No. 43) at 16 n.7)) He does maintain, however, that FBI agents represented to him that "subsequent to the call with Mr. Aggarwal and on that very day, [he] purchased approximately 700,000 shares of Yahoo stock" (Lee Aff. (Dkt. No. 48) ¶ 3), and that this "is not true." (Def. Br. (Dkt. No. 43) at 16)

Lee mischaracterizes the test for materiality, however. An objective standard applies here, and not the subjective test posed by Lee. Accordingly, the issue is not whether Lee currently believes that he would have pled guilty had he been aware of the information that was not provided until after his plea. Instead, "[t]he inquiry is an objective one that is resolved largely on the basis of the persuasiveness of the withheld evidence." Tate, 963 F.2d at 24; see also Millan-Colon, 829 F. Supp. at 635 ("[i]n assessing the likelihood that the defendant would not have entered a plea, the court must objectively examine the persuasiveness of the withheld information").

As discussed above, the evidence Lee cites does not demonstrate that he did not possess material non-public information before the Aggarwal Call, nor does it undermine Lee's guilt as to the Yahoo trades that were made after the Aggarwal Call. Moreover, the evidence Lee cites does not address the Yahoo earnings trades and the 3Com trades. Accordingly, Lee has not demonstrated that he would not have pled guilty had he been aware of the alleged "newly discovered evidence" at the time of his plea.

## B.      The Amount of Time Between Lee's Guilty Plea and Withdrawal Motion

Lee pleaded guilty on July 23, 2013, and did not seek to withdraw his plea until August 30, 2017 – more than four years later. (Dkt. No. 38) Much of the delay resulted from Lee's cooperation with the Government, however, and from the parties' agreement to delay sentencing in light of Salman v. United States, 137 S. Ct. 420 (2016). While the Government argues that Lee's "motion in no way relies on Salman" (Gov't. Opp. (Dkt. No. 46) at 26), until the Salman opinion was issued, there was great uncertainty about the effect a decision in that case would have on insider trading law. Moreover, while Lee did not seek to withdraw his plea until August 2017, his motion is predicated on information he received in May 2017.

17

Acknowledging that more than four years passed between Lee's guilty plea and his withdrawal motion, the Court concludes that -- under the unusual circumstances of this case -- this delay does not require that his motion be denied.

**C.    Prejudice to the Government**

"The Government is not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal; however, the presence or absence of such prejudice may be considered by the district court in exercising its discretion." Gonzalez, 970 F.2d at 1100; see also United States v. Gonzalez, 647 F.3d 41, 56 (2d Cir. 2011) ("There is no burden on the government to show that it would be prejudiced by the withdrawal of the guilty plea unless the defendant has shown sufficient grounds to justify withdrawal.").

Here, as discussed above, Lee has not demonstrated his innocence, nor has he shown that the Government withheld material information before his guilty plea. The Court nonetheless considers, pursuant to Gonzalez, whether the Government would suffer prejudice if Lee were permitted to withdraw his plea.

"'Prejudice' in the context of plea withdrawal typically refers to depriving the Government of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it, as well as the potential difficulty to the Government in securing evidence against the defendant that would have been easier to secure at an earlier moment in time." United States v. Lopez, 385 F.3d 245, 254 (2d Cir. 2004).

Here, the trades at issue are now more than eight years old (July 23, 2013 Plea Tr. (Dkt. No. 44-1) at 115 (discussing trades in April 2009, July 2009, and November 2010)), and Lee's employer – SAC Capital – is no longer an operating entity. These circumstances suggest

18

that the Government may well encounter difficulty in securing evidence that would have been more accessible years ago.

Millan-Colon, cited by Lee, is not on point. In that case, the two defendants seeking to withdraw their guilty pleas could be added to an upcoming trial of their co-defendants. As the court noted, "the addition of two defendants – defendants who were in fact expected to go to trial in the first instance – will not force the Government to reconstruct its case or engage in additional trial preparation." Millan-Colon, 829 F. Supp. at 636. Here, the Government never planned on going to trial against Lee, and no co-defendants are awaiting trial.

The Court concludes that granting Lee's motion would cause significant unfair prejudice to the Government.

\*　　\*　　\*　　\*

Lee has not demonstrated that he is innocent of the charges he pled guilty to, nor has he demonstrated that he would not have pled guilty had he known the information he knows now. This Court must nonetheless consider whether Lee's guilty plea is sufficient in light of developments in insider trading law since Lee's plea was taken in 2013.

## II.　FACTUAL SUFFICIENCY OF LEE'S GUILTY PLEA

Lee argues that his plea allocution is factually insufficient as to both the conspiracy and substantive securities fraud charges because it does not "address personal benefit ..., and the developments in insider trading cases make clear that this element must be addressed during a plea." (Def. Br. (Dkt. No. 43) at 22)

### A.　Legal Standards and Recent
### Developments in Insider Trading Law

Under Fed. R. Crim. Proc. 11(b)(3), "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." FRCP 11(b)(3). "[A] district

court judge has an obligation up through the entry of judgment to vacate a previously-accepted guilty plea and enter a plea of not guilty on behalf of a defendant if it becomes clear that there no longer is a sufficient factual basis for the plea." United States v. Conradt, No. 12 CR. 887 (ALC), 2015 WL 480419, at *1 (S.D.N.Y. Jan. 22, 2015) (citing United States v. Culbertson, 670 F.3d 183, 191 n. 4 (2d Cir. 2012)).

"The court is not required 'to weigh evidence to assess whether it is . . . more likely than not that the defendant is guilty.'" United States v. Robinson, 799 F.3d 196, 199 (2d Cir. 2015) (quoting United States v. Maher, 108 F.3d 1513, 1524 (2d Cir. 1997)). Instead, "the district court must simply satisfy itself that 'the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty.'" Id. (quoting Maher, 108 F.3d at 1524). In making a sufficiency determination, a court must "'match[] the facts to the legal elements of the charged crime.'" United States v. Calderon, 243 F.3d 587, 590 (2d Cir. 2001) (quoting United States v. Smith, 160 F.3d 117, 121 (2d Cir. 1998)). Where there is not a sufficient factual basis for each element of a charged offense, a defendant's guilty plea must be vacated. Culbertson, 670 F.3d at 191 n. 4 (citing Smith, 160 F.3d at 121).

In Dirks v. SEC, 463 U.S. 646 (1983) the Supreme Court held that a tippee is liable "only when the insider has breached his fiduciary duty . . . and the tippee knows or should know that there has been a breach." Id. at 660. Dirks further provides that, "[a]bsent some personal gain, there has been no breach of duty." Id. at 662.

In United States v. Newman, 773 F.3d 438, 448 (2d Cir. 2014), partially abrogated by Salman, 137 S. Ct. 420, the Second Circuit drew a connection between these two aspects of Dirks. The Second Circuit ruled that, absent proof "that the tippee knows of the personal benefit received by the insider in exchange for the disclosure, the Government cannot

meet its burden of showing that the tippee knew of a breach." Id. at 448. The Newman court summarized the elements of insider trading as follows: "to sustain an insider trading conviction against a tippee, the Government must prove each of the following elements beyond a reasonable doubt: that (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit." Id. at 450. The Newman court thus viewed confidentiality and personal benefit as components of the required breach of fiduciary duty.

> Newman says the following about the "personal benefit" requirement:

> We have observed that "[p]ersonal benefit is broadly defined to include not only pecuniary gain, but also, inter alia, any reputational benefit that will translate into future earnings and the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." [United States v. Jiau, 734 F.3d 147, 153 (2d Cir. 2013)] (internal citations, alterations, and quotation marks deleted). This standard, although permissive, does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature. If that were true, and the Government was allowed to meet its burden by proving that two individuals were alumni of the same school or attended the same church, the personal benefit requirement would be a nullity. To the extent Dirks suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades "resemble trading by the insider himself followed by a gift of the profits to the recipient," see 463 U.S. at 664, 103 S.Ct. 3255, we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature. In other words, as Judge Walker noted in Jiau, this requires evidence of "a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the [latter]." Jiau, 734 F.3d at 153.

Id. at 452.

Salman abrogates Newman's analysis of the personal benefit requirement.

Salman instructs that, "[t]o the extent the Second Circuit held that the tipper must also receive

something of a 'pecuniary or similarly valuable nature' in exchange for a gift to family or

friends, . . . this requirement is inconsistent with Dirks." Salman, 137 S. Ct. at 428 (citing

Newman, 773 F.3d, at 452).

In United States v. Martoma, 894 F.3d 64 (2d Cir. 2017), cert. denied, No. 18-

972, 2019 WL 342208 (U.S. June 3, 2019), the Second Circuit clarified the "meaningfully close

personal relationship" test articulated in Newman:

> The term "meaningfully close personal relationship" is new to our insider trading
> jurisprudence, and, viewed in isolation, it might admit multiple interpretations. But
> Newman provided substantial guidance. Immediately after introducing the
> "meaningfully close personal relationship" concept, Newman held that it "requires
> evidence of 'a relationship between the insider and the recipient that suggests a quid pro
> quo from the latter, or an intention to benefit the [latter].'" Newman, 773 F.3d at 452
> (quoting Jiau, 734 F.3d at 153 (quoting Dirks, 463 U.S. at 664)). . . . [E]ach of these is an
> independently sufficient basis to infer a personal benefit under Dirks and its progeny. . . .
> In other words, Newman cabined the gift theory using two other freestanding personal
> benefits that have long been recognized by our case law.

Id. at 77 (emphasis in original). The Martoma court went on to state that "a jury can often infer

that a corporate insider receives a personal benefit (i.e., breaches his fiduciary duty) from

deliberately disclosing valuable, confidential information without a corporate purpose and with

the expectation that the tippee will trade on it." Id. at 79 (citing Dirks, 463 U.S. at 659).

**B.     Analysis**

As discussed above, "in determining whether . . . a factual basis exists [for a

guilty plea], judges should 'match[ ] the facts in the record with the legal elements of the

crime.'" Conradt, 2015 WL 480419, at *1 (S.D.N.Y. Jan. 22, 2015) (quoting Calderon, 243 F.3d

at 589-90). Newman makes clear that tippee liability exists only where, inter alia, (1) the tipper

breached a fiduciary duty by "(a) disclosing confidential information to a tippee (b) in exchange

for a personal benefit"; and (2) the tippee "knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit." Newman, 773 F.3d at 450. Accordingly, the factual sufficiency of Lee's guilty plea depends on whether the record of the Rule 11 proceeding demonstrates Lee's knowledge of these components of tippee liability. See Conradt, 2015 WL 480419, at *1 (vacating insider trading guilty pleas as insufficient "in light of Newman's clarification of the personal benefit and tippee knowledge requirements of tipping liability for insider trading").

"[A] sufficient factual basis must be determined at the time the plea is accepted." United States v. Adams, 448 F.3d 492, 500 (2d Cir. 2006). "Facts considered to be in the record can include not only the defendant's allocution, but also any representations made by counsel for the defense and the government on the record and the allegations in the indictment." Conradt, 2015 WL 480419, at *1 (citing Smith, 160 F.3d at 121).

Lee's Rule 11 proceeding does not address his knowledge of any "personal benefit" Yahoo and 3COM corporate insiders received as a result of divulging confidential information. (See generally July 23, 2013 Plea Tr. (Dkt. No. 44-1); see also Information (Dkt. No. 2)) Indeed, neither the Rule 11 proceeding nor the Information addresses (1) who the corporate insiders were; (2) whether Lee knew who they were; (3) to whom the corporate insiders disclosed material non-public information, or (4) the nature of the relationship between the tippers and those to whom they disclosed material non-public information. For example, the evidence regarding Aggarwal and the Aggarwal Call discussed above was not presented to the Court in any fashion at the time of Lee's guilty plea. Accordingly, the Court cannot consider this evidence in making its sufficiency determination.

Because there is nothing in the record of the Rule 11 proceeding that speaks directly or indirectly to Lee's knowledge of any personal benefit the corporate insiders received as a result of divulging confidential information, Lee's guilty plea to Counts One and Two is factually insufficient.

The Government argues that Newman merely reiterates the personal benefit requirement first articulated in Dirks. (Govt. Br. (Dkt. No. 46) at 23) According to the Government, the personal benefit requirement was a known element of tippee liability at the time of Lee's 2013 guilty plea, and there has been no change in the law since that time. (Id.)

As an initial matter, this argument is immaterial to this Court's obligation under Fed. R. Crim. P. 11(b)(3) to ensure that there is an adequate factual basis for Lee's guilty plea: Even if there had been no change in law between 2013 and today, there would still be an insufficient factual basis for Lee's guilty plea, and this Court would be obligated to vacate the plea. More importantly, the Government's argument glosses over the significance of Newman: Prior to Newman, the personal benefit requirement for tippee liability was not clear. Indeed, in Newman the Government itself argued that

> it was not required to prove that [the tippees] knew that the insiders . . . received a personal benefit in order to be found guilty of insider trading. Instead, the Government [argued that] it merely needed to prove that the "defendants traded on material, nonpublic information they knew insiders had disclosed in breach of a duty of confidentiality. . . ."

Newman, 773 F.3d at 447 (quoting the Government's brief in Newman at 58).

The Government also argues that Lee's allocution fortuitously addressed Lee's knowledge of the personal benefits received by the tippers, despite the lack of clarity in the law prior to Newman: "The defendant admitted that he 'knew, or had reason to believe' that the people who provided him with material non-public information had breached 'a fiduciary duty.'"

24

(Govt. Br. (Dkt. No. 46) at 24 (quoting July 23, 2013 Plea Tr. (Dkt. No. 44-1) at 21) Under
Newman and Salman, a corporate insider breaches a fiduciary duty when the insider exchanges
confidential information in exchange for personal gain. Newman, 773 F.3d at 446; Salman, 137
S.Ct. at 427. The Government argues that, accordingly, "the defendant's knowledge of a breach
of fiduciary duty is sufficient to encompass his knowledge of personal benefit." (Govt. Br. (Dkt.
No. 46) at 24)

        The Government again improperly minimizes the significance of Newman. Prior
to Newman, it was not clear that a breach of fiduciary duty by definition includes a personal
benefit to the tipper. Newman clarifies this point, which the Supreme Court later confirmed in
Salman. See Marshall v. United States, No. 17-CV-2951 (AJN), 2018 WL 3059652, at *2
(S.D.N.Y. June 20, 2018) (discussing the significance of Newman and Salman). There is no
reason to believe that Lee – in using the phrase "breach of fiduciary duty" during his 2013
allocution – understood that phrase to include the liability components later explicated in
Newman and Salman.

        Because the record of the Rule 11 proceeding does not contain a sufficient factual
basis to support Lee's guilty plea to Counts One and Two, his guilty plea must be vacated.

## CONCLUSION

For the reasons stated above, Lee's guilty plea is vacated. The Clerk of Court is

respectfully directed to terminate Lee's motion. (Dkt. No. 42)

There shall be a conference in this matter on **Wednesday, July 10, 2019 at 10:15**

**a.m.** in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square,

New York, New York.

Dated: New York, New York
June 21, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge

26